**Nos. 25-1079, 25-1081, 25-1083, 25-1509, 25-1132**
(Consolidated with Nos. 25-1080, 25-1082, 25-1084, 25-1118, 25-1133, 25-1144, 25-1509)

# In the United States Court of Appeals for the Third Circuit

AMERICAN CHEMISTRY COUNCIL; GEORGIA CHEMISTRY COUNCIL; MICROPOROUS, LLC; OHIO CHEMISTRY TECHNOLOGY COUNCIL; ENVIRONMENTAL DEFENSE FUND; ALLIANCE FOR A STRONG U.S. BATTERY SECTOR; TEXAS CHEMISTRY COUNCIL; TRENT CAPITAL PARTNERS, LLC; PPG INDUSTRIES, INC.; OLIN CORPORATION; MISSOURI ALLIANCE FOR A STRONG US BATTERY SECTOR; CENTER FOR ENVIRONMENTAL HEALTH; and VINYL INSTITUTE,

Petitioners,

v.

UNITED STATES ENVIRONMENTAL PROTECTION AGENCY, ET AL.,

Respondents.

*On Petitions for Review of Final Agency Action of the United States Environmental Protection Agency*

**OPENING BRIEF OF AMERICAN CHEMISTRY COUNCIL, GEORGIA CHEMISTRY COUNCIL, OHIO CHEMISTRY TECHNOLOGY COUNCIL, TEXAS CHEMISTRY COUNCIL, OLIN CORPORATION, AND VINYL INSTITUTE**

Eric P. Gotting
Gregory A. Clark
Keller and Heckman LLC
1001 G Street, N.W.
Suite 500 West
Washington, D.C. 20001
(202) 434-4100
gotting@khlaw.com
clarkg@khlaw.com

*Counsel for Vinyl Institute, Inc.*
*(No. 25-1509)*

Keith Bradley
Kayla Marie Mendez
Squire Patton Boggs (US) LLP
717 17th Street, Suite 1825
Denver, CO 80202
Tel: (303) 830-1776
keith.bradley@squirepb.com
kayla.mendez@squirepb.com

Samuel B. Ballingrud
Squire Patton Boggs (US) LLP
2550 M Street, NW
Washington, DC 20037
samuel.ballingrud@squirepb.com

W. Caffey Norman
2550 M Street NW
Washington, DC 20037
(202) 460-9495
caffeynorman@outlook.com
Norman Law & Policy PLLC

*Counsel for Olin Corporation (No.*
*25-1132)*

David Y. Chung
Crowell & Moring LLP
1001 Pennsylvania Ave., N.W.
Washington, DC 20004
(202) 624-2500
(202) 628-5116 (fax)
dchung@crowell.com

*Counsel for the American Chemistry*
*Council, Georgia Chemistry Council,*
*and Texas Chemistry Council*
*(No. 25-1079)*

David A. Terry
Hunton Andrews Kurth
600 Travis Street
Suite 4200
Houston, TX 77002
(713) 220-4285
dterry@huntonak.com

*Counsel for Texas Chemistry Council*
*(No. 25-1083)*

Robert J. Karl, Esq.
Eric B. Gallon
Porter, Wright, Morris & Arthur
L.L.P.
41 S. High Street, Suite 3000
Columbus, OH 43215
(614) 227-1925
rkarl@porterwright.com
egallon@porterwright.com

*Counsel for the Ohio Chemistry*
*Technology Council (No. 25-1081)*

# CORPORATE DISCLOSURE STATEMENT

Pursuant to Federal Rule of Appellate Procedure 26.1, the undersigned Petitioners respectfully submit the following Corporate Disclosure Statement:

American Chemistry Council ("ACC") is a non-profit trade association that has no parent corporation, and no publicly held company has ten percent or greater ownership in ACC.

Georgia Chemistry Council ("GCC") is a non-profit trade association that has no parent corporation, and no publicly held company has ten percent or greater ownership in GCC.

Ohio Chemistry Technology Council ("OCTC") is a non-profit trade association that has no parent corporation, and no publicly held company has ten percent or greater ownership in OCTC.

Texas Chemistry Council ("TCC") is a non-profit trade association that has no parent corporation, and no publicly held company has ten percent or greater ownership in TCC.

Vinyl Institute ("VI") is a non-profit trade association that has no parent corporation, and no publicly held company has ten percent or greater ownership in VI.

Olin Corporation is a leading manufacturer of chlorinated derivatives. Olin is a publicly traded company incorporated in Virginia with headquarters and principal

place of business in Clayton, Missouri. BlackRock, Inc. and The Vanguard Group, Inc. each own 10% or more of the stock of Olin Corporation.

Dated: May 13, 2026

/s/ *David Y. Chung*
David Y. Chung

*Counsel for the American Chemistry Council, Georgia Chemistry Council, and Texas Chemistry Council*

**TABLE OF CONTENTS**

CORPORATE DISCLOSURE STATEMENT ..................................................... i

JURISDICTIONAL STATEMENT ................................................................ 1

STATEMENT OF ISSUES ............................................................................ 3

STATEMENT OF RELATED CASES ........................................................... 5

INTRODUCTION ......................................................................................... 5

STATEMENT OF THE CASE ....................................................................... 9

I.    Chemical Companies Produce TCE as an Unintended
      Byproduct During the Manufacture of Other Chemicals and
      Reuse That Byproduct Under Tightly Controlled Conditions to
      Prevent Waste. ...................................................................................... 9

II.   The Reuse, Transportation, and Disposal of Byproduct TCE are
      Subject to Various Regulatory Requirements and Operational
      Controls.................................................................................................. 12

III.  Congress Established TSCA's Risk-Evaluation and Risk-
      Management Program as Gap-Filling Authority to Mitigate
      Unreasonable Risk to Health or the Environment. ................................ 15

      A.   Risk evaluation considers the real-world applications of
           the chemical..................................................................................... 16

      B.   Risk management considers a host of factors and permits
           regulation only "to the extent necessary" to eliminate the
           unreasonable risk. ........................................................................... 17

IV.   EPA's Risk Evaluation for TCE................................................................ 19

V.    EPA's Risk Management Proceedings...................................................... 24

      A.   EPA proposed to ban reuse of byproduct TCE and
           disposal of wastewater containing even de minimis levels
           of TCE, but on different timelines................................................... 24

      B.   EPA's Final Rule partially bans reuse of byproduct TCE
           and broadly bans most disposals of TCE in wastewater. ................. 26

      C.   Affected entities petition for relief. ................................................. 29

SUMMARY OF ARGUMENT ....................................................................... 31

STANDARD OF REVIEW ................................................................ 33

ARGUMENT ................................................................................... 35

I.    EPA's Partial Ban on Reuse of Byproduct TCE Is Unlawful. ................... 35

    A.    EPA exceeded its statutory authority by imposing risk management requirements that are not necessary to eliminate unreasonable risk. .......................................... 35

    B.    EPA arbitrarily banned offsite reuse of byproduct TCE while simultaneously excluding identical activities from regulation. .................................................................. 42

II.    EPA's Prohibition on Permitted Discharges of Wastewater Containing Even De Minimis Concentrations of Byproduct TCE Is Unlawful. .......................................................................... 45

III.    The Court Should Vacate the Final Rule's Prohibitions on Reuse and Wastewater Disposal of TCE Present in De Minimis Levels. ................................................................................... 51

CONCLUSION ............................................................................... 54

CERTIFICATE OF COMPLIANCE

CERTIFICATE OF SERVICE

ADDENDUM

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*350 Montana v. Haaland,*
  50 F.4th 1254 (9th Cir. 2022) ..................................................................52

*Allied-Signal, Inc. v. U.S. Nuclear Regul. Comm'n,*
  988 F.2d 146 (D.C. Cir. 1993) ................................................................53

*Am. Pub. Gas Assoc. v. DOE,*
  22 F.4th 1018 (D.C. Cir. 2022) ..............................................................54

*Babb v. Wilkie,*
  589 U.S. 399 (2020) ................................................................................35

*Belmont Mun. Light Dep't v. FERC,*
  38 F.4th 173 (D.C. Cir. 2022) ................................................................52

*Bridgeport Hosp. v. Becerra,*
  108 F.4th 882 (D.C. Cir. 2024) ..............................................................53

*Bus. Roundtable v. SEC,*
  647 F.3d 1144 (D.C. Cir. 2011) ..............................................................49

*Chem. Mfrs. Ass'n v. EPA,*
  859 F.2d 977 (D.C. Cir. 1988) ................................................................34

*Chem. Mfrs. Ass'n v. EPA,*
  899 F.2d 344 (5th Cir. 1990) ..................................................................34

*Corrosion Proof Fittings v. EPA,*
  947 F.2d 1201 (5th Cir. 1991) ..............................................34, 41, 45, 47

*Council Tree Commc'ns, Inc. v. FCC,*
  619 F.3d 235 (3d Cir. 2010) ...................................................................52

*Ctr. for Biological Diversity v. EPA,*
  141 F.4th 153 (D.C. Cir. 2025) ..............................................................52

*Engine Mfrs. Ass'n v. EPA,*
  20 F.3d 1177 (D.C. Cir. 1994) ................................................................45

*Env't Def. Fund, Inc. v. EPA,*
    636 F.2d 1267 (D.C. Cir. 1980)..................................................................34

*Env't Health Tr. v. FCC,*
    9 F.4th 893 (D.C. Cir. 2021)......................................................................50

*Facebook, Inc. v. Duguid,*
    592 U.S. 395 (2021)...................................................................................35

*FCC v. Prometheus Radio Project,*
    592 U.S. 414 (2021)...................................................................................50

*High Sierra Hikers Ass'n v. Blackwell,*
    390 F.3d 630 (9th Cir. 2004) .....................................................................36

*HollyFrontier Cheyenne Refin., LLC v. Renewable Fuels Ass'n,*
    594 U.S. 382 (2021)...................................................................................35

*Horne v. Flores,*
    557 U.S. 433 (2009).....................................................................................2

*Hunt v. Wash. State Apple Advert. Comm'n,*
    432 U.S. 333 (1977).....................................................................................2

*In re Energy Future Holdings Corp,*
    949 F.3d 806 (3d Cir. 2020) ........................................................................2

*Little Sisters of the Poor Saints Peter & Paul Home v. Pennsylvania,*
    591 U.S. 657 (2020)...................................................................................35

*Loper Bright Enters. v. Raimondo,*
    603 U.S. 369 (2024)...................................................................................35

*Lujan v. Defs. of Wildlife,*
    504 U.S. 555 (1992)..................................................................................1, 3

*Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins.*
    *Co.,*
    463 U.S. 29 (1983)................................................................................34, 51

*Nat. Res. Def. Council v. EPA,*
    489 F.3d 1250 (D.C. Cir. 2007) .................................................................54

*Nat. Res. Def. Council v. U.S. Nuclear Reg. Comm'n,*
  879 F.3d 1202 (D.C. Cir. 2018)...............................................................45

*PJM Power Providers Group v. FERC,*
  88 F.4th 250 (3d Cir. 2023) ....................................................................52

*Shell Chem. Co. v. EPA,*
  826 F.2d 295 (5th Cir. 1987) ..................................................................35

*Tex. Corn Producers v. EPA,*
  141 F.4th 687 (5th Cir. 2024) .................................................................51

*United Food & Com. Workers Union Loc. 751 v. Brown Grp., Inc.,*
  517 U.S. 544 (1996)...................................................................................3

*Vinyl Institute v. EPA,*
  106 F.4th 1118 (D.C. Cir. 2024)..............................................................34

*World Shipping Council v. Fed. Mar. Comm'n,*
  152 F.4th 215 (D.C. Cir. 2025).........................................................42, 45

**Statutes**

5 U.S.C. § 706(2) .........................................................................................51

5 U.S.C. § 706(2)(E) ....................................................................................33

15 U.S.C. § 2601(b)(2)..................................................................................15

15 U.S.C. § 2602(4) ......................................................................................17

15 U.S.C. § 2602(4) ......................................................................................40

15 U.S.C. § 2602(12) ....................................................................................17

15 U.S.C. § 2605 ...........................................................................................16

15 U.S.C. § 2605(a)
  ..................................... 5, 6, 18, 19, 22, 31, 32, 33, 35, 36, 37, 38, 39, 41, 45, 47

15 U.S.C. § 2605(b)(4)(A).................................................................16, 36, 40

15 U.S.C. § 2605(b)(4)(D).....................................................................16, 37

15 U.S.C. § 2605(b)(4)(F)............................................................................17

15 U.S.C. § 2605(c)(2)................................................................................18

15 U.S.C. § 2605(c)(2)(A)...........................................................................37

15 U.S.C. § 2605(c)(2)(A)(iv)......................................................................19

15 U.S.C. § 2605(d)(1)................................................................................19

15 U.S.C. § 2605(d)(2)................................................................................19

15 U.S.C. § 2605(i).....................................................................................17

15 U.S.C. § 2605(i)(2)...................................................................................1

15 U.S.C. § 2618.........................................................................................29

15 U.S.C. § 2618(a).......................................................................................1

15 U.S.C. § 2618(a)(1)(A).............................................................................1

15 U.S.C. § 2618(c).....................................................................................33

15 U.S.C. § 2618(c)(1)(B)(i)(I)...............................................................33, 34

15 U.S.C. § 2620.........................................................................................29

28 U.S.C. § 2112.........................................................................................29

28 U.S.C. § 2112(a).......................................................................................1

33 U.S.C. § 1311(a).....................................................................................13

33 U.S.C. § 1362(12)...................................................................................13

Pub. L. No. 114-182, 130 Stat. 448 (2016)...................................................37

**Regulations**

40 C.F.R. § 23.5(a)........................................................................................1

40 C.F.R. § 173.202.....................................................................................13

40 C.F.R. § 173.242.....................................................................................13

40 C.F.R. § 751.305(b)(4)..................................................................................48

40 C.F.R. § 751.305(b)(9)....................................................................................1

49 CFR ............................................................................................................13

**Other Authorities**

88 Fed. Reg. 74712 (Oct. 31, 2023).....................................................12, 24, 25, 46

89 Fed. Reg. 102568 (Dec. 17, 2024)
...1, 2, 3, 4, 5, 6, 7, 8, 9, 17, 26, 27, 28, 29, 30, 31, 38, 39, 40, 41, 43, 44, 45, 47, 48, 49, 52, 53

90 Fed. Reg. 44772 (Sep. 17, 2025) .............................................................29, 30

S. Rep. No. 114-67 (2015) .........................................................................37, 38

## JURISDICTIONAL STATEMENT

These consolidated petitions seek review of a final rule of the Environmental Protection Agency ("EPA") titled Trichloroethylene (TCE); Regulation Under the Toxic Substances Control Act (TSCA), 89 Fed. Reg. 102568 (Dec. 17, 2024) ("Final Rule"), JA__-__. Under TSCA section 6(i)(2), the Final Rule is a final agency action, including the underlying risk evaluation and its "associated determination" of unreasonable risk; and section 19(a) confers exclusive jurisdiction for such review upon the circuit courts. 15 U.S.C. §§ 2605(i)(2), 2618(a). This Court has jurisdiction under 15 U.S.C. § 2618(a)(1)(A), 28 U.S.C. § 2112(a), and the January 14, 2025, Consolidation Order of the United States Judicial Panel on Multidistrict Litigation (ECF No. 4). Each of the petitions was timely filed within 60 days of the date that the Final Rule was promulgated for purposes of judicial review, December 31, 2024. 15 U.S.C. §§ 2605(i)(2), 2618(a); 40 C.F.R. § 23.5(a).

Petitioner Olin Corporation has standing to challenge the Final Rule and raises the questions herein presented because it is directly regulated and affected by the Final Rule's prohibitions on the reuse and disposal of TCE. *See Lujan v. Defs. of Wildlife*, 504 U.S. 555, 561-62 (1992) ("[T]here is ordinarily little question" that a directly regulated entity has standing to "challeng[e] the legality of government action or inaction[.]"). The compliance deadline (December 18, 2026) for those prohibitions is rapidly approaching. *See* 40 C.F.R. § 751.305(b)(9). Olin participated

1

extensively in regulatory proceedings leading to promulgation of the Final Rule. *E.g.*, Summary of July 15, 2021 Meeting, at 2, EPA-HQ-OPPT-2020-0642-0030 (undated), JA__; Summary of Mar. 3, 2021 Meeting, EPA-HQ-OPPT-2020-0642-0012 (undated), JA__.

Because "only one [petitioner] must have standing for a case to be justiciable," the Court need not consider whether the Industry Association Petitioners[1] also have standing. *See In re Energy Future Holdings Corp*, 949 F.3d 806, 815 n.4 (3d Cir. 2020) (citing *Horne v. Flores*, 557 U.S. 433, 446 (2009)). But if it does, the Industry Associations have associational standing because: (i) their members would have standing to sue in their own right; (ii) the interests they seek to protect are germane to their purposes; and (iii) "neither the claim asserted nor the relief requested requires the participation of individual members in the lawsuit." *Hunt v. Wash. State Apple Advert. Comm'n*, 432 U.S. 333, 343 (1977).

The Industry Associations' member companies, such as Olin Corporation[2], will suffer economic and property-based injuries because the Final Rule restricts their ability to reuse TCE in the manufacture of other chemicals and to discharge

---

[1] "Industry Association Petitioners" include American Chemistry Council, Georgia Chemistry Council, Ohio Chemistry Technology Council, Texas Chemistry Council, and the Vinyl Institute.

[2] *See* ACC, *Manufacturer Members*, https://www.americanchemistry.com/about-acc/membership/manufacturer-members (last visited May 5, 2026).

wastewater containing any concentration of TCE. Those injuries are directly traceable to the prohibitions in the Final Rule, and this Court can redress the injuries by vacating those prohibitions. *See Lujan*, 504 U.S. at 560-61. Seeking the reasonable regulation of chemical substances is germane to the Industry Association Petitioners' interests in advocating for and furthering the interests of the chemical industry, as evidenced by their extensive participation during the relevant regulatory proceedings. *See infra* at 20-21, 25, 29-30. Finally, individual member company participation is not required. The undersigned petitioners seek equitable relief (namely, vacating aspects of the Final Rule), not money damages. *See United Food & Com. Workers Union Loc. 751 v. Brown Grp., Inc.*, 517 U.S. 544, 553-54 (1996).

**STATEMENT OF ISSUES**

1. Whether the Final Rule's prohibition on offsite reuse of trichloroethylene that is unintentionally produced as a byproduct in small amounts during the manufacture of other chemicals (*i.e.*, reuse at a facility that is different than the one at which the byproduct was produced) exceeds EPA's authority under section 6 of the Toxic Substances Control Act because it imposes measures beyond "the extent necessary."

> Raised: ACC TCE Panel RM Comments, EPA-HQ-OPPT-2020-0642-0310, at
>
> 13-17, JA__-__; Vinyl Inst. RM Comments, EPA-HQ-OPPT-2020-0642-

0318, at 2-17, JA__-__; HSIA RM Comments, EPA-HQ-OPPT-2020-0642-0296, at 74-83, JA__-__.

Objected to: Not applicable.

Ruled upon: Final Rule, 89 Fed. Reg. 102568-102635, JA__-__.

2.     Whether the Final Rule's prohibition on offsite reuse of byproduct trichloroethylene is arbitrary and capricious.

Raised: ACC TCE Panel RM Comments, EPA-HQ-OPPT-2020-0642-0310, at 13-17, JA__-__; Vinyl Inst. RM Comments, EPA-HQ-OPPT-2020-0642-0318, at 2-17, JA__-__; HSIA RM Comments, EPA-HQ-OPPT-2020-0642-0296, at 74-83, JA__-__.

Objected to: Not applicable.

Ruled upon: Final Rule, 89 Fed. Reg. 102568-102635, JA__-__.

3.     Whether EPA's ban on the disposal of wastewater containing any concentration of TCE is arbitrary and capricious.

Raised: ACC TCE RM Comments, EPA-HQ-OPPT-2020-0642-0310, at 9-11, JA__-__; Vinyl Inst. RM Comments, EPA-HQ-OPPT-2020-0642-0318, at 15-17, JA__-__; Keller & Heckman RM Comments, EPA-HQ-OPPT-2020-0642-0308, at 3-5, JA__; ACC RM Comments, EPA-HQ-OPPT-2020-0642-0320, at 3-4, JA__-__;.

Objected to: Not applicable.

Ruled upon: Final Rule, 89 Fed. Reg. 102568-102635, JA__-__.

**STATEMENT OF RELATED CASES**

This case has not been before this Court previously. Pursuant to Third Circuit Local Appellate Rule 28.1(a)(2), the Industry Associations state that between March 24, 2025, and May 29, 2025, EPA received three separate petitions under TSCA section 21 requesting that EPA amend certain provisions of the Final Rule. *See* PPG Industries Sec. 21 Petition, JA__-__; Alliance for a Strong U.S. Battery Sector and Microporous, LLC Sec. 21, Petition, JA__-__; ACC Sec. 21 Petition, JA__-__. All three petitions were withdrawn prior to any EPA ruling.

**INTRODUCTION**

TSCA, as originally enacted and as amended, carefully constrains EPA's ability to regulate. The statute was and remains a gap-filling law, expressly designed and intended to permit regulation of *unreasonable* risks that would otherwise escape control. TSCA section 6(a), 15 U.S.C. § 2605(a), is a powerful tool; EPA can restrict or even outright prohibit uses of a particular chemical. Before wielding that authority, EPA must first determine whether each of the various uses of a chemical present unreasonable risk. EPA must make that determination about specific real-world uses of a chemical. EPA cannot regulate uses merely because a chemical presents a hazard under unrealistic circumstances. Nor can it regulate every use of a chemical merely because it finds that a specific use presents unreasonable risk. By

EPA's own admission, if the Agency does not determine unreasonable risk, it cannot take risk management action under TSCA section 6(a).

The rule at issue runs over the guardrails that Congress placed on TSCA risk management regulations. EPA has banned most activities using TCE. The undersigned Petitioners, however, do not seek to topple the entire Final Rule. Rather, they challenge two discrete aspects of the rule: (i) a partial ban on the ability to reuse TCE that is unintentionally and unavoidably formed as a byproduct at low concentrations during complex chemical processing streams (hereinafter, "byproduct TCE"); and (ii) a ban on disposal of wastewater containing *any* trace of TCE, which has the potential to altogether eliminate, and at a minimum will significantly curtail, the ability to manufacture and process widely used, critically important chlorinated solvents.

Although byproduct TCE forms unintentionally, in low concentrations, during production of certain other chemicals, feedstock streams containing byproduct TCE are extremely valuable and can be reused as a reactant to make other chlorinated solvents that are in turn used to manufacture next-generation, climate-friendly refrigerants, medical grade polyvinyl chloride, materials used in drinking water and wastewater infrastructure, among other products. By reusing feedstock streams that contain byproduct TCE, manufacturers save energy and avoid the significant costs of producing or acquiring raw material such as virgin chlorine or ethylene. As EPA

has recognized, a prohibition on the reuse of byproduct TCE could severely restrict the manufacturing of other chlorinated solvents and wreak havoc on supply chains. Despite this recognition, the Final Rule only allows such reuse if byproduct TCE remains on site. Starting on December 18, 2026, chemical manufacturers can no longer reuse byproduct TCE if they send it offsite to a different manufacturing facility.

The Final Rule's prohibition on offsite reuse of byproduct TCE violates TSCA and is arbitrary and capricious. EPA effectively failed to assess whether reuse of byproduct TCE presents unreasonable risk. Because EPA lacked data on reuse of process streams where byproduct TCE is present only in low concentrations (0.01 to 7%), it assumed that worker exposures and risk related to such reuse is the same as when workers are manufacturing or processing pure TCE in liquid form at concentrations of 99-100%. On that basis, EPA proposed to ban all uses of TCE as a reactant, regardless of concentration. When stakeholders pointed out the impropriety of banning the reuse of byproduct TCE where EPA effectively did not assess risk, EPA seemingly recognized its error and tried to correct the course. EPA exempted onsite reuse of byproduct TCE but maintained the ban on offsite reuse.

Under the Final Rule, companies can continue reusing byproduct TCE *if* the byproduct remains onsite within closed systems. Companies can also remove byproduct TCE from closed systems, transport the byproduct offsite for incineration,

and incinerate the byproduct. The Final Rule exempts those activities, because they do not present unreasonable risk. *However*, the Final Rule prohibits a company from removing the byproduct from a closed system, transporting byproduct material offsite, and reusing it in a *different* closed system facility, even though nothing in the record, much less substantial evidence, supports a finding that the change in destination introduces unreasonable risk. Even if the record had supported a conclusion that offsite reuse presents unreasonable risk, EPA still regulated beyond what was necessary to eliminate the unreasonable risk.

EPA similarly erred by prohibiting virtually all disposal of wastewater containing any concentration of TCE. EPA lacked data to assess whether treatment or disposal of wastewater containing only low concentrations of TCE—*e.g.*, whatever residual concentration might remain after reuse of byproduct TCE— presents unreasonable risk. Thus, EPA repurposed exposure and risk estimates for facilities recycling process solvents, which assumes that workers are handling essentially pure TCE in liquid form (99-100% concentration). EPA never explains why or how such estimates align with real world conditions in which workers are disposing of and treating wastewater with *de minimis* concentrations of TCE. Because EPA effectively failed to assess unreasonable risk from disposal of wastewater containing only traces of byproduct TCE at low concentrations, the Final Rule's broad prohibition on wastewater disposals violates TSCA.

EPA's ban on the disposal of wastewater is also arbitrary. EPA acknowledged that the formation of byproduct TCE cannot be prevented and that the byproduct is essentially an impurity that is infeasible to remove, if even possible. Consequently, EPA created a *de minimis* threshold in the Final Rule to allow TCE to be present at very low levels (0.1%), which was necessary to avoid impacts on supply chains, particularly chlorinated organic products. EPA, however, arbitrarily declined to apply that exemption to wastewater and summarily sidestepped comments warning that the *de minimis* exemption may be meaningless without a corresponding exemption for trace concentrations of TCE in wastewater.

The Court should grant these Petitions and vacate the challenged prohibitions.

## STATEMENT OF THE CASE

**I.  Chemical Companies Produce TCE as an Unintended Byproduct During the Manufacture of Other Chemicals and Reuse That Byproduct Under Tightly Controlled Conditions to Prevent Waste.**

Chemical manufacturers generate low concentrations of TCE[3] as an unintended byproduct during the manufacture of chlorinated organics, including carbon tetrachloride, perchloroethylene, and ethylene dichloride. ACC TCE Panel

---

[3] The ethylene dichloride manufacturing process generates TCE byproduct at levels ranging from 0.13% to 0.2% on average. *See* ACC TCE Panel Comments at 14-15, EPA-HQ-OPPT-2020-0642-0310 (Dec. 15, 2023), JA__-__. The carbon tetrachloride and perchloroethylene manufacturing processes typically generate TCE byproduct at levels averaging 0.9% but sometimes can contain up to 7% of byproduct TCE. *See id.* at 15-16.

RM Comments at 13, EPA-HQ-OPPT-2020-0642-0310, JA __. Those chlorinated organics are in turn used to produce a wide range of critically important products, ranging from next-generation refrigerants and foam blowing agents with low global-warming and zero ozone-depletion potential to polyvinyl chloride used in medical equipment, drinking water and wastewater infrastructure, and various construction materials. *See* HSIA RM Comments at 79-80, EPA-HQ-OPPT-2020-0642-0296 (Dec. 15, 2023), JA__. There is no way to prevent the unintentional generation of byproduct TCE without ceasing manufacture of chlorinated organics altogether. *See* ACC RM Comments at 4, EPA-HQ-OPPT-2020-0642-0320 (Dec. 15, 2023), JA__; *accord* HSIA RM Comments at 76, EPA-HQ-OPPT-2020-0642-0296, JA_ (explaining how the ethylene dichloride manufacturing process "cannot be altered to prevent the unintentional TCE byproduct formation").

Consistent with EPA's longstanding Waste Management Hierarchy, companies reuse byproduct TCE as a feedstock—*e.g.*, to produce hydrochloric acid or muriatic acid—which is then used to manufacture additional chlorinated organics. *See* ACC TCE Panel Comments at 16, EPA-HQ-OPPT-2020-0642-0310, JA__. This reuse allows companies to obtain and realize the full value of every chlorine molecule processed at various manufacturing facilities, rather than having to dispose of or incinerate the byproduct TCE that is unintentionally produced. *See* HSIA RM Comments at 74, EPA-HQ-OPPT-2020-0642-0296, JA__. Throughout this reuse

process, impurity quantities of byproduct TCE are essentially eliminated. *See* HSIA

RE Comments at 30, EPA-HQ-OPPT-2019-0500-0094 (Apr. 27, 2020), JA__.

Some companies reuse feedstock streams containing byproduct TCE in the

same facility as the one in which the manufacturing process that generated byproduct

TCE takes place. *See* Vinyl Institute RM Comments at 2, EPA-HQ-OPPT-2020-

0642-0318 (Dec. 15, 2023), JA__ (illustrating how byproduct TCE is hard piped to

feed tanks for further chemical production within a hydrochloric acid production

furnace or a Catoxid reactor). Other companies transport byproduct TCE offsite so

that further chemical production can take place at a different facility with process-

specific reactors. *See id.*, JA__; *see also* Summary of July 23, 2025 ACC Meeting,

EPA-HQ-OPPT-2020-0642-0738 (Aug. 1, 2025), JA__ (ACC member companies

"emphasized the vast majority of chemical feedstock reprocessing that contains

byproduct TCE occurs at different physical locations[.]").

If companies were prohibited from reusing byproduct TCE in further chemical

production, they would need to load and transport that byproduct to an incinerator

for destruction. *See* HSIA RM Comments at 81, EPA-HQ-OPPT-2020-0642-0296,

JA__. Transportation costs would likely be in the tens of millions of dollars, and

incineration costs would likely be in the several hundreds of millions of dollars. *See*

*id.* Notably, those cost estimates do not include the cost required to build additional

loading infrastructure or increased personnel, training, and industrial hygiene costs

associated with controls and safety procedures implemented for increased loading activities. *See id.* Equally important, existing hazardous waste incinerators are struggling to keep up with increasing demand for incineration services. *Id.* Finally, if companies cannot reuse byproduct TCE in further production processes, they would have to use virgin feedstocks, *e.g.*, raw chlorine or ethylene, and bear the associated capital, transportation, and energy costs. *See id.* at 80, JA__.

## II. The Reuse, Transportation, and Disposal of Byproduct TCE are Subject to Various Regulatory Requirements and Operational Controls.

Companies generating, transporting, reusing, and, when necessary, disposing of byproduct TCE comply with numerous regulations designed to protect health and safety. For instance, the Occupational Safety and Health Administration ("OSHA") regulates worker exposure. "OSHA has numerous standards that apply to employers who operate chemical manufacturing and processing facilities, as well as to downstream employers whose employees may be occupationally exposed to hazardous chemicals." 88 Fed. Reg. 74712, 74719 (Oct. 31, 2023), JA___ (proposed TCE risk management rule). OSHA has imposed a "legally enforceable limit[] on the airborne concentration[]" of TCE to which workers may be exposed (a permissible exposure limit or "PEL"). *Id.* The PEL for TCE is currently set at 100 ppm (29 C.F.R. § 1910.1000 Table Z-2), but OSHA could revise the PEL to eliminate any "significant risk" from TCE to the extent such a change "is technologically and economically feasible." 88 Fed. Reg. at 74719.

The Department of Transportation (DOT) regulates loading, unloading, and movement of byproduct TCE between facilities. DOT "has designated TCE as a hazardous material, and there are special requirements for marking, labeling and transporting it (49 CFR Part 171, 49 CFR § 172, 40 CFR § 173.202 and 40 CFR § 173.242)." Risk Evaluation at 496 (Nov. 2020), JA__. Emissions are minimal during transportation, and the potential for exposure is limited. *See id.* at 421, JA__; *see also* AFPM RM Comments at 4, EPA-HQ-OPPT-2020-0642-0319, JA__ (detailing relevant OSHA hazard communication standards and DOT material handling requirements).

Releases or emissions of byproduct TCE are subject to myriad EPA-administered environmental laws, such as the Clean Water Act, Clean Air Act, Safe Drinking Water Act, Resource Conservation and Recovery Act, and the Comprehensive Environmental Response, Compensation, and Liability Act. *See* Risk Evaluation at 490-95, JA__-__. For instance, wastewater disposal of TCE is regulated under the Clean Water Act, which forbids "any addition of any pollutant to navigable waters from any point source" unless authorized by a discharge permit. 33 U.S.C. §§ 1311(a), 1362(12). The affected facilities hold such discharge permits, which contain limits on what substances and in what quantities a facility can discharge and impose monitoring and reporting requirements. Many of the processes at subject facilities result in wastewater that still contains minute concentrations of

13

byproduct TCE in water, within permit limits, despite best practices. *See* EPA Response to RM Comments at 45-46, EPA-HQ-OPPT-2020-0642-0726 (summarizing stakeholder comments on CWA requirements), JA__-_; *see also* Summary of July 23, 2025 ACC Meeting, EPA-HQ-OPPT-2020-0642-0738, JA__.

To comply with regulatory requirements and protect workers from exposure to various chemicals, including byproduct TCE, chemical companies use a combination of engineering, administrative, and personal protection controls. *See* HSIA RM Comments at 78-79, EPA-HQ-OPPT-2020-0642-0296, JA__; *see generally* HSIA Meeting Summary and Submissions at 1 & 7-12, 21-27, 29-36, EPA-HQ-OPPT-2020-0642-0034, JA__, __-__, __-__, __-__ (detailing controls applicable to use of byproduct TCE); HSIA Revised Risk Determination Comments, App. 1, EPA-HQ-OPPT-2016-0737-0138 (Aug. 8, 2022), JA__-__ (standard operating procedures for personal protection, rail tank car loading, tank truck loading, process sampling, waste packaging, and minor maintenance and line openings).

During chemical manufacturing, feedstocks and process reactants, including byproduct TCE, "are all maintained within piping and vessels with tight control of emissions." HSIA RE Comments, App. 4 at 2-1, EPA-HQ-OPPT-2019-0500-0094, JA__. "[F]or the limited time where there is potential for exposure in tasks such as loading/unloading, sampling or line opening, administrative, engineering and

[personal protective equipment] controls are required for each task based upon the potential for exposure." HSIA RM Comments at 78, EPA-HQ-OPPT-2020-0642-0296, JA__; *see also* HSIA Meeting Summary and Submissions at 10-12, 21-27, EPA-HQ-OPPT-2020-0642-0034, JA__ (detailing required engineering controls such as hard piping, double valves, and closed loop sampling; providing standard operating procedure flow charts illustrating line and equipment opening and railcar loading activities). Workers receive hundreds of hours of training, including refresher and requalification training and testing, to confirm knowledge of and ensure compliance with administrative controls. *See* HSIA Meeting Summary and Submissions at 29-30, EPA-HQ-OPPT-2020-0642-0034, JA__-__.

## III. Congress Established TSCA's Risk-Evaluation and Risk-Management Program as Gap-Filling Authority to Mitigate Unreasonable Risk to Health or the Environment.

Enacted in 1976 and amended most recently in 2016, TSCA provides EPA limited authority "to regulate chemical substances and mixtures which present an unreasonable risk of injury to health or the environment[.]" 15 U.S.C. § 2601(b)(2). The statute is not an unrestricted license to regulate all perceived chemical hazards anywhere. Instead, as evidenced by TSCA's text and legislative history, Congress gave EPA gap-filling authority to address only unreasonable risks to health and the environment from a particular condition of use that might otherwise go unregulated because such risks fall within the interstices of other regulatory authority.

TSCA section 6, as last amended in 2016, directs EPA through a two-step process to regulate conditions of using a chemical substance that present an unreasonable risk of injury. 15 U.S.C. § 2605. The first step is risk evaluation, and the second is risk management.

## A. Risk evaluation considers the real-world applications of the chemical.

The first step requires EPA to evaluate whether a use of a chemical substance presents an unreasonable risk of injury to health or the environment without consideration of costs or non-risk factors. 15 U.S.C. § 2605(b)(4)(A). Congress did not define *unreasonable* risk in the statute, nor has EPA defined the term by regulation. The statute requires EPA to evaluate risk not in the abstract but under the circumstances the substance is actually used—*i.e.*, "conditions of use." The Administrator is directed to "conduct risk evaluations . . . to determine whether a chemical substance presents an unreasonable risk of injury to health or the environment, without consideration of costs or other nonrisk factors . . . under the conditions of use." *Id.* Likewise, in "publish[ing] the scope of the risk evaluation," EPA must identify "the hazards, exposures, conditions of use, and the potentially exposed or susceptible subpopulations [EPA] expects to consider[.]" *Id.* § 2605(b)(4)(D).[4]

---

[4] A "potentially exposed or susceptible subpopulation" is "a group of individuals within the general population identified by [EPA] who, due to either greater

The term "conditions of use" means "the circumstances . . . under which a chemical substance is intended, known, or reasonably foreseen to be manufactured, processed, distributed in commerce, used, or disposed of." *Id.* § 2602(4). Thus, in conducting a risk evaluation, EPA must consider available information on hazards and exposures for the conditions of use, including information relevant to specific risks of injury to health or the environment and potentially exposed or susceptible subpopulations. *Id.* § 2605(b)(4)(F). EPA must also take into account "the likely duration, intensity, frequency, and number of exposures under the conditions of use of the chemical substance" and "describe the weight of the scientific evidence for the identified hazard and exposure." *Id.*

EPA's determination that a chemical presents an unreasonable risk in a condition use is challenged when a risk management rule—like the Final Rule here—is promulgated. *Id.* § 2605(i).

**B.    Risk management considers a host of factors and permits regulation only "to the extent necessary" to eliminate the unreasonable risk.**

If EPA finds that conditions of using a chemical substance present an unreasonable risk of injury to health or the environment, it moves on to risk

---

susceptibility or greater exposure, may be at greater risk than the general population of adverse health effects from exposure to a chemical substance or mixture, such as infants, children, pregnant women, workers, or the elderly." 15 U.S.C. § 2602(12).

management. 15 U.S.C. § 2605(a). For this second step, Congress placed even more constraints on EPA beyond those applicable to the risk-evaluation process.

To begin, risk management requires EPA to consider costs, among other factors. *Id.* § 2605(c)(2). EPA must consider the magnitude of the exposure of humans and the environment to the chemical substance and the benefits of the chemical substance for various uses. *Id.* In addition, EPA must consider the economic consequences and cost effectiveness of any proposed risk management rule, including the likely effect on the national economy, small businesses, technological innovation, the environment, and public health. *Id.*

As for the actual regulatory measure, Congress limited the actions EPA can take. Congress did not grant EPA general discretion, but rather provided EPA with a specific and exclusive set of regulatory approaches. *Id.* § 2605(a). The available measures are: (1) prohibiting or otherwise restricting the manufacture, processing, or distribution of the substance or limiting the amount of the substance that can be manufactured, processed, or distributed; (2) prohibiting or otherwise restricting the manufacture, processing, or distribution of the substance for a particular use or use in excess of a certain concentration; (3) requiring clear warnings or instructions on the substance; (4) imposing record or testing requirements; (5) prohibiting or regulating a manner of use of the substance; (6) prohibiting or regulating the disposal of the substance; and (7) requiring notice of the determination to the public or

affected persons. *Id.* Critically, EPA may only apply such measures "*to the extent necessary* so that the chemical substance or mixture no longer presents such [unreasonable] risk." *Id.* (emphasis added).

Congress also required EPA to consider options other than the action EPA proposes to take. *Id.* § 2605(c)(2)(A)(iv). These are termed "primary alternative regulatory actions[.]" *Id.* EPA must evaluate the costs, benefits, and cost effectiveness of at least one alternative to the approach it ultimately proposes in rulemaking. *Id.*

The risk-management measures EPA selects must take effect "as soon as practicable, but not later than 5 years after the date of promulgation of the rule" except with respect to a ban or phase-out, which must begin (though need not be completed) "as soon as practicable, but not later than 5 years after the date of promulgation[.]" *Id.* § 2605(d)(1). The effective date must also "provide for a reasonable transition period." *Id.* The statute provides that the effective date of EPA's regulatory requirements "may vary for different affected persons." *Id.* § 2605(d)(2).

## IV.   EPA's Risk Evaluation for TCE.

In November 2020, EPA published its Risk Evaluation for Trichloroethylene. JA__-__. The Risk Evaluation concluded that "there is no unreasonable risk to the environment from all conditions of use of TCE," that the distribution in commerce and consumer use in pepper spray do not present an unreasonable risk to human

health, and that most other uses present unreasonable risks to human health. Risk Evaluation at 38 & 41-43, 460-62, JA__, __-__, __-__.

The Risk Evaluation does not discuss reuse of byproduct TCE that is unintentionally formed during the manufacture of other chemicals. Although EPA evaluated the processing of TCE as a "reactant/intermediate in industrial gas manufacturing (*e.g.,* manufacture of fluorinated gases used as refrigerants, foam blowing agents and solvents)," *see id.* at 411, JA__, it did not have any real-world data on exposures from such processing. Rather, EPA used "monitoring data from the manufacture of TCE as surrogate data for the processing condition of use." *Id.* at 417, JA__. Elsewhere the Risk Evaluation explains that EPA assumed that TCE is processed as a reactant in "liquid form at 99-100% concentration." *Id.* at 136, JA__. Not surprisingly, this resulted in risk estimates that are identical for the domestic manufacture of pure TCE and *any* processing of TCE as a reactant/intermediate in chemical manufacturing. *See id.* at 389-90, JA__-__. Nowhere in the Risk Evaluation did EPA consider that processing of *byproduct* TCE as a reactant occurs at much lower concentrations ranging from 0.01% to 7% and thus, does not present the same risk profile as the manufacture or use of pure TCE. *See supra* n.3.

Industry stakeholders commented on EPA's unwarranted assumptions and urged EPA to "recognize that operations and data from facilities intentionally manufacturing TCE are foundationally different than operation and occupational

exposures during EDC manufacturing where TCE is unintentionally produced" and is "found at a concentration of approximately 0.0036 percent[.]" Vinyl Inst. RE Comments at 4, EPA-HQ-OPPT-2019-0500-0101 (Apr. 27, 2020), JA__; HSIA RE Comments at 30, EPA-HQ-OPPT-2019-0500-0094, JA__ ("[T]here is a central flaw in EPA's exposure assessments for TCE use as feedstock or reactant or release as byproduct in intermediate operations" because "these are not at all comparable to the manufacture of TCE itself."). Industry stakeholders also emphasized that personal exposure to byproduct TCE "is limited to maintenance activities, where PPE controls essentially eliminate exposure" and thus, "EPA's dermal exposure modeling of one exposure event per day to TCE in liquid form at 99-100% concentration is a massive overestimate of dermal exposure to TCE during EDC manufacturing." Vinyl Inst. RE Comments at 4, EPA-HQ-OPPT-2019-0500-0101, JA__; *see also* HSIA RE Comments at 30-31, EPA-HQ-OPPT-2019-0500-0094, JA__-__ (explaining why EPA overestimated risk for use of byproduct TCE in processing as a reactant/intermediate).

In response, EPA clarified that it "will address on a case-by-case basis circumstances where the chemical substance subject to risk evaluation is unintentionally present as an impurity, or as a byproduct, resulting from a process for another chemical substance undergoing risk evaluation." Summary of External Peer Review and Public Comments on RE at 124 (Nov. 2020), JA__. EPA further

explained that it "included additional language in the final scope document for 1,2-dichloroethane . . . to indicate that byproduct TCE . . . formed during the manufacture of 1,2-dichloroethane will be addressed in the 1,2-dichloroethane risk evaluation" and that "the regulatory tools under TSCA section 6(a) are better suited to address any unreasonable risks that might arise from these activities through regulation of the activities that generate 1,2-dichloroethane than they are to addressing them through direct regulation of TCE." *Id.* Nonetheless, EPA maintained that "TCE concentrations" for use of TCE as a reactant "would be similar to manufacturing, and TCE exposures during unloading would be comparable in magnitude to TCE loading following manufacture," thereby sidestepping comments about how reuse of *byproduct* TCE involves low concentrations and is readily distinguishable from either the manufacture of TCE or use of liquid TCE in 99-100% concentration to manufacture other substances. *See id.*

EPA's risk evaluation also addressed the disposal of wastewater that contains TCE. EPA excluded other disposal pathways, such as landfilling or incineration, from risk evaluation, while noting that such disposal pathways are heavily regulated under various statutes. *See* Risk Evaluation at 68-69, JA__-__. After EPA "assessed environmental exposures derived from predicted and measured concentrations of TCE in surface water in the U.S.," it concluded "there is no unreasonable risk to the environment from all conditions of use of TCE," including disposal of wastewater

containing TCE. *See id.* at 38, JA__. Through intra-agency coordination, EPA concluded that "exposures to the general population via surface water, drinking water, ambient air and sediment pathways are covered under the jurisdiction of other environmental statutes" and thus, it did not assess risk to the general population from disposal of TCE-containing wastewater, such as by discharges pursuant to Clean Water Act permits. *Id.* at 39, JA__.

EPA did, however, find that disposal of TCE-containing wastewater presents unreasonable risk to health of workers exposed to TCE while performing industrial wastewater pre-treatment and treatment activities. *See id.* at 39-40, 43, JA__-__, __. Much like the gaps in EPA's data on the "processing as a reactant/intermediate" use, EPA lacked data to evaluate worker exposures or estimate risk from the disposal of wastewater containing only trace concentrations of byproduct TCE. EPA's evaluation of wastewater disposal is instead based on risk estimates for the "process solvent recycling and worker handling of wastes" uses. *See id.* at 401 & 790, JA__, __. Here, again, EPA assumed that workers would be handling TCE "in liquid form at 99-100% concentration." *Id.* at 136, JA__. To state the obvious, that is not what is happening at facilities where workers are disposing of wastewater containing only minimal concentrations of byproduct TCE.

## V.   EPA's Risk Management Proceedings.

### A.   EPA proposed to ban reuse of byproduct TCE and disposal of wastewater containing even *de minimis* levels of TCE, but on different timelines.

In 2023, EPA moved to the second step and proposed risk-management regulations. *See* 88 Fed. Reg. 74712 (Oct. 31, 2023), JA___. EPA proposed to "prohibit all manufacture (including import), processing, and distribution in commerce of TCE and industrial and commercial use of TCE for all uses" and "prohibit the disposal of TCE to industrial pre-treatment, industrial treatment, or publicly owned treatment works[.]" *Id.* Notably, the proposed rule clarified that the generation of TCE "as a byproduct, including during the manufacture of 1,2-dichloroethane," does not constitute the "domestic manufacture" of TCE and thus, the proposed rule's prohibition on manufacturing TCE does not impact chemical companies' ability to manufacture other chemicals that might include unintended low concentrations of TCE. *See id.* at 74726.

EPA did, however, restrict companies' ability to reuse byproduct TCE, because EPA included "reuse of byproduct or residual TCE as a reactant" within the broader "processing as a reactant/intermediate" condition of use. *See id.* EPA proposed to prohibit *all* processing of TCE as a reactant/intermediate, including the reuse of byproduct TCE as a reactant, within two years. *See id.* at 74787. EPA also proposed to prohibit disposal of wastewater that contains *any* concentration of TCE

within nine months. *See id.* As such, the ability to continue processing (*i.e.*, reusing) byproduct TCE as a reactant for two years was effectively shortened to nine months, because companies could no longer discharge wastewater containing whatever trace concentration of TCE remains after reuse even though they are authorized to do so under their Clean Water Act permits. Finally, EPA requested comment on whether to establish a *de minimis* level to exempt impurities or trace amounts of TCE in products from regulation. *See id.* at 74776.

Numerous industry stakeholders commented extensively in opposition to EPA's proposal to prohibit reuse of byproduct TCE as a reactant in further chemical manufacturing, and they warned about the lack of capacity to incinerate or destroy byproduct TCE and the cascading consequences for chemical production. *See, e.g.*, ACC TCE Panel RM Comments at 13-17, EPA-HQ-OPPT-2020-0642-0310, JA__-__; Vinyl Inst. RM Comments at 2-10, EPA-HQ-OPPT-2020-0642-0318, JA__-__; HSIA RM Comments at 74-83, EPA-HQ-OPPT-2020-0642-0296, JA__-__. At least one commenter reiterated prior concerns about how EPA's risk evaluation failed to distinguish between uses involving high concentrations of TCE (*e.g.*, manufacturing TCE) and the reuse of byproduct TCE in minimal concentrations and thus, wrongly estimates that both uses would present unreasonable risk. *See* Vinyl Inst. RM Comments at 9-10, EPA-HQ-OPPT-2020-0642-0318, JA__-__. Finally, commenters urged EPA to exempt feedstock streams or wastewater streams containing *de minimis*

concentrations of TCE from the many proposed prohibitions. *See* ACC TCE Panel RM Comments at 21-22, EPA-HQ-OPPT-2020-0642-0310, JA__-__; Vinyl Inst. RM Comments at 15-17, EPA-HQ-OPPT-2020-0642-0318, JA__-__.

> **B.      EPA's Final Rule partially bans reuse of byproduct TCE and broadly bans most disposals of TCE in wastewater.**

EPA issued the Final Rule on December 17, 2024, with an effective date of January 16, 2025. 89 Fed. Reg. 102568, JA___. EPA finalized most of the proposed restrictions on the manufacturing, processing, distribution in commerce, and disposal of TCE, subject to varying compliance deadlines, but EPA made some noteworthy changes and clarifications.

*First*, EPA established a *de minimis* regulatory threshold, which generally exempts "products containing TCE at thresholds less than 0.1 percent by weight" from the prohibitions and restrictions in the Final Rule. *See id.* at 102623. EPA, however, declined to apply that exemption to wastewater containing *de minimis* levels of TCE. *See id.*

*Second*, EPA exempted reuse of byproduct TCE from the prohibitions and restrictions in the Final Rule, but only if: (i) the "byproduct TCE is processed within a site-limited, physically enclosed system that is part of the same overall manufacturing process from which the byproduct TCE was generated"; and (ii) "any product that results from [reuse of byproduct TCE within] such site-limited,

physically enclosed systems" contains TCE at thresholds less than 0.1 percent by weight. *See id.*

*Third*, EPA confirmed that "disposal activities not involving TCE in wastewater" are exempt from regulation, because EPA's "evaluation of the disposal condition of use in the 2020 Risk Evaluation for TCE [ ] was limited to the disposal of TCE-containing wastewater and did not address disposal activities not involving TCE in wastewater." *Id.* at 102599-600. Thus, the transport of byproduct TCE offsite to an incinerator is exempt from regulation. Also relevant, EPA previously "determined there is no unreasonable risk of injury to health (workers and ONUs) from the distribution in commerce of TCE" because "[e]xposures and emissions are not expected" from "distribution in commerce of TCE" and because "transportation of TCE is in compliance with existing regulations for the transportation of hazardous materials." Risk Evaluation at 421-22 & 392, JA__-__, __. Thus, "a facility that generates TCE as a byproduct, isolates the TCE from the process for the sole purpose of disposal, and sends it off-site for disposal to a hazardous waste incinerator permitted under RCRA is not covered by this final rule." 89 Fed. Reg. at 102600. Elsewhere, the Final Rule reiterates that "TCE that exits the site-limited, physically enclosed systems in which it was manufactured by removal from the system" is not regulated by the Final Rule if it is removed "for the purposes of disposal[.]" *Id.* at 102593.

Significantly, in exempting "site-limited" reuse of byproduct TCE within closed systems from the Final Rule, EPA acknowledged that prohibiting reuse of byproduct TCE "would severely impact the availability of many chlorinated solvents and could also increase worker exposures to TCE because they would have to remove waste TCE from a closed system." EPA Resp. to RM Comments at 37, EPA-HQ-OPPT-2020-0642-0726, JA__. EPA further emphasized that "for the manufacturing of two chemicals, perchloroethylene (PCE) or carbon tetrachloride (CTC), which may produce TCE as a byproduct within site-limited, physically enclosed systems, EPA is requiring [workplace controls], which would provide a level of protection from TCE for potentially exposed persons while addressing the unreasonable risk from" those chemicals. *Id.* at 27, JA__. Curiously, although EPA acknowledged that byproduct TCE is not always reused at the same facility in which it was generated during further manufacturing processes, *see id.*, EPA declined to exempt *offsite* reuse of byproduct TCE (*i.e.*, when a company removes the byproduct from a closed system, ships the TCE in a closed vessel in accordance with regulations governing the transportation of hazardous materials, and loads the byproduct into a closed system at a *different* manufacturing facility for further processing).

As initially promulgated, the Final Rule broadly proclaims that "all persons manufacturing (including importing), processing, and using TCE are prohibited

from disposal of TCE" in wastewater after September 15, 2025, subject to a few narrow exceptions not at issue in these Petitions. *See* 89 Fed. Reg. at 102624. Again, the Final Rule does not apply the *de minimis* exemption to TCE in wastewater. *See id.* at 102623. Thus, even though the Final Rule allows companies to send byproduct TCE to a different facility for further reuse and processing until December 2026 and generally exempts companies from reusing byproduct within site-limited, closed systems, the inability to dispose of wastewater containing even the slightest trace of TCE after September 15, 2025, would have significantly curtailed companies' ability to reuse byproduct either onsite or offsite.

### C. Affected entities petition for relief.

In January 2025, Petitioners filed petitions for review of the Final Rule in various circuit courts around the country under 15 U.S.C. § 2618. Those petitions were transferred to this Court by the Judicial Panel on Multidistrict Litigation under 28 U.S.C. § 2112 and consolidated.

Several industry stakeholders, including Petitioner American Chemistry Council, also petitioned EPA pursuant to 15 U.S.C. § 2620, to reconsider and amend or repeal aspects of the Final Rule. *See* ACC Sec. 21 Petition, EPA-HQ-OPPT-2020-0642-0741 (May 27, 2025), JA__-__. Several months later, EPA issued an interim final rule revising certain compliance deadlines in the Final Rule. *See* 90 Fed. Reg. 44772 (Sep. 17, 2025). Relevant here, EPA extended the compliance deadline, to

29

December 18, 2026, for the disposal of TCE to wastewater by processors of TCE, including companies that reuse byproduct TCE as a reactant. *See id.* at 44774. EPA noted that, without that extension, facilities "would not be able to dispose of their wastewater and would effectively be forced to cease their operations," even though the Final Rule allows reuse of byproduct TCE until December 18, 2026. *See id.*

ACC commented in favor of the interim final rule. *See* ACC IFR Comments, EPA-HQ-OPPT-2020-0642-0772 (Oct. 17, 2025), JA__-__. ACC emphasized that "[a]llowing treatment and disposal of byproduct TCE in wastewater (under regulated conditions) is vital for continued operations of our members' processes." *Id.* at 2, JA__. ACC also highlighted how member company facilities that handle TCE are subject to stringent water discharge permits—for example, one facility's permit "specifies a maximum allowable TCE discharge of 0.40 pounds per day (daily max) and an average of 0.15 pounds per day (calculated monthly) in its effluent, which equates to weight percent in water of 0.000001, well below the regulatory threshold prescribed in the [Final Rule]." *Id.* at 2-3, JA__-__. Equally important, one ACC member company's facility collected 747 daily wastewater samples in 2024, and "industrial hygiene exposure monitoring samples for employees conducting wastewater treatment tasks were less than the non-detect level of TCE of 0.000073 [parts per million]." *Id.* at 3, JA__.

## SUMMARY OF ARGUMENT

The undersigned Petitioners challenge two aspects of EPA's Final Rule: the prohibition on offsite reuse of byproduct TCE and the prohibition on disposal of wastewater containing *any* TCE—even *de minimis* levels. Both prohibitions are unlawful for multiple reasons and must be vacated.

*First*, EPA exceeded its statutory authority under TSCA section 6(a) by regulating beyond the extent necessary to eliminate unreasonable risk. EPA improperly prohibited offsite reuse of byproduct TCE even though it lacked substantial evidence to support a determination that offsite reuse presents unreasonable risk. EPA's risk evaluation focused on estimating the risks of processing pure TCE (liquid form at 99–100% concentration) as a reactant and failed to assess whether the processing of byproduct TCE (in concentrations ranging from only 0.01% to 7% of process streams) presents any risk. Because the Final Rule's prohibition on offsite reuse of byproduct TCE is not necessary to eliminate unreasonable risk, it violates section 6(a).

EPA also acted arbitrarily and capriciously by simultaneously exempting onsite reuse of byproduct TCE from regulation and prohibiting offsite reuse within the same sorts of closed systems, without identifying any record evidence that the latter results in greater worker exposure or otherwise presents more risk. Compounding that error, EPA separately exempted from regulation the removal of

byproduct TCE from closed systems, transport of TCE to hazardous waste incinerators, and all attendant loading and unloading activities, while prohibiting the very same activities if the destination is a chemical manufacturing facility rather than an incinerator. EPA offered no rational explanation for its differential treatment of activities that are identical in all material respects.

*Second*, EPA's prohibition on disposal of wastewater containing *any* concentration of TCE violates TSCA and is arbitrary and capricious. EPA found that wastewater disposal presents unreasonable risk to workers based on estimates derived from process solvent recycling occupational exposure scenarios involving neat TCE at 99–100% concentration. In so doing, EPA never actually assessed risk to workers disposing of facility wastewater, which would invariably contain far less TCE on a weight percentage basis and perhaps at no more than *de minimis* concentrations. EPA cannot rely on an inapposite exposure scenario to find unreasonable risk to *all* workers disposing of wastewater containing TCE in *any* concentration and thus, EPA exceeded its section 6(a) authority by prohibiting virtually all wastewater disposal and regulating beyond the extent necessary to eliminate unreasonable risk.

EPA also arbitrarily refused to apply the Final Rule's *de minimis* exemption (also known as the 0.1% regulatory threshold) to wastewater. In creating that exemption, EPA acknowledged it was necessary: (i) because byproduct TCE cannot

be prevented in the production process or feasibly removed; and (ii) to avoid serious disruptions to the chlorinated solvent supply chain. EPA even noted that concentrations at or below 0.1% are well below the concentration used for any products that contributed to the unreasonable risk. That same reasoning applies with equal force to wastewater containing only trace concentrations of TCE. Water use and wastewater disposal are integral to chemical manufacturing and processing, and a prohibition on the ability to dispose of wastewater containing even trace amounts of TCE would be crippling. EPA's cursory deflection of commenters' significant concerns that prohibiting wastewater disposal of trace TCE would, as a practical matter, nullify the benefit of the regulatory threshold, was insufficiently explained and arbitrary and capricious.

## STANDARD OF REVIEW

This Court can "grant appropriate relief . . . as provided in" the Administrative Procedure Act ("APA"), and generally "review[s] [a] rule . . . in accordance with" the APA. 15 U.S.C. § 2618(c). TSCA excludes one particular APA standard, with respect to a section 6(a) rule (and the "associated determination" of unreasonable risk), namely 5 U.S.C. § 706(2)(E), and replaces it with a TSCA-specific requirement of "substantial evidence in the rulemaking record taken as a whole." 15 U.S.C. § 2618(c)(1)(B)(i)(I).

The TSCA "substantial evidence" standard "requires (1) that the agency's decision be based upon the entire record, taking into account whatever in the record detracts from the weight of the agency's decision; and (2) that the agency's decision be what 'a reasonable mind might accept as adequate to support [its] conclusion.'" *Corrosion Proof Fittings v. EPA*, 947 F.2d 1201, 1213 (5th Cir. 1991) (citation omitted); *see* 15 U.S.C. § 2618(c)(1)(B)(i)(I) ("the court shall hold unlawful and set aside such rule if the court finds that the rule is not supported by substantial evidence in the rulemaking record taken as a whole"). EPA must "'cogently explain why it has exercised its discretion in a given manner' and 'must offer a rational connection between the facts found and the choice made.'" *Chem. Mfrs. Ass'n v. EPA*, 899 F.2d 344, 359 (5th Cir. 1990) (quoting *Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 48, 52 (1983)).

This standard, which was unchanged by the 2016 amendments, is "more searching" than the APA's arbitrary and capricious standard and "particularly 'demanding'" for the agency to meet. *Vinyl Institute v. EPA*, 106 F.4th 1118, 1125 (D.C. Cir. 2024) (quoting *Chem. Mfrs. Ass'n v. EPA*, 859 F.2d 977, 992 (D.C. Cir. 1988)); *Env't Def. Fund, Inc. v. EPA*, 636 F.2d 1267, 1277 (D.C. Cir. 1980) (substantial-evidence standard "more rigorous than the arbitrary and capricious standard"). Put another way, the substantial-evidence standard is "less deferential"

to the agency than the arbitrary and capricious standard. *Shell Chem. Co. v. EPA*, 826 F.2d 295, 297 (5th Cir. 1987).

## ARGUMENT

### I.  EPA's Partial Ban on Reuse of Byproduct TCE Is Unlawful.

#### A.  EPA exceeded its statutory authority by imposing risk management requirements that are not necessary to eliminate unreasonable risk.

EPA can only regulate "*to the extent necessary* so that the chemical substance or mixture no longer presents such risk." 15 U.S.C. § 2605(a) (emphasis added). The "ordinary or natural meaning" of those words controls. *HollyFrontier Cheyenne Refin., LLC v. Renewable Fuels Ass'n*, 594 U.S. 382, 388 (2021) (citation omitted). To determine that meaning, courts consult dictionaries, *see, e.g.*, *Little Sisters of the Poor Saints Peter & Paul Home v. Pennsylvania*, 591 U.S. 657, 676 (2020); *Babb v. Wilkie*, 589 U.S. 399, 405 (2020), and "conventional rules of grammar," *Facebook, Inc. v. Duguid*, 592 U.S. 395, 402 (2021). Further, this Court "must exercise independent judgment" in determining the "single, best meaning" of the statute. *Loper Bright Enters. v. Raimondo*, 603 U.S. 369, 394, 400 (2024).

The single, best reading of section 6(a) is that EPA must carefully tailor risk management requirements by choosing only those requirements needed to eliminate the identified unreasonable risk, but no more. At the time of TSCA's enactment, "extent" was defined as "the point or degree to which something extends," and

"necessary" was defined as "whatever is essential for some purpose." Webster's Third New International Dictionary 1510 (1986); *High Sierra Hikers Ass'n v. Blackwell*, 390 F.3d 630, 646-47 (9th Cir. 2004) (Forest Service could regulate "no more than was necessary to achieve" statutory goals where statute limited authority to act "to the extent necessary."). "Such risk" clearly means the "unreasonable risk of injury to health or the environment" in the first part of the sentence. Together, the plain text shows that EPA is not free to eliminate *all* risk, but only *unreasonable* risk, and then only to the extent necessary to render the risk no longer unreasonable.

Congress's prescription of a specific and exclusive list of risk management requirements in section 6(a) reinforces that EPA must align such requirements to the activities—namely, "manufacture, processing, distribution in commerce, use, or disposal . . . or [] any combination of such activities"—that actually "present[] an unreasonable risk[.]" 15 U.S.C. § 2605(a). Thus, if a particular activity does not present unreasonable risk, EPA cannot impose risk management requirements under section 6(a), as such requirements would not be necessary to eliminate unreasonable risk.

The context of TSCA supports this reading. EPA must base its initial risk-evaluation determination on unreasonable risk and not just any risk. 15 U.S.C. § 2605(b)(4)(A). And at the outset of a risk evaluation, EPA is required to "publish the scope of the risk evaluation to be conducted, including the . . . conditions of use

. . . [EPA] expects to consider[.]" 15 U.S.C. § 2605(b)(4)(D). Thus, EPA cannot perform a risk evaluation without identifying the particular conditions of use at issue. That requirement would be meaningless if EPA could exercise its section 6(a) risk management authority without regard to what particular activities or uses actually present unreasonable risk. Finally, EPA must consider the costs and benefits and economic consequences of its risk-management rules. *Id.* § 2605(c)(2)(A).

Legislative history points in the same direction. As noted, Congress removed a "least burdensome" requirement from section 6(a) in 2016. It did so because of the "evidentiary and analytic burdens associated with justifying that each proposed regulatory action was the least burdensome requirement needed to ensure a chemical did not pose an unreasonable risk." S. Rep. No. 114-67, at 18–19 (2015). But Congress not only *retained* the requirement that EPA regulate only "to the extent necessary" to eliminate unreasonable risk, it also *reinforced* that requirement by granting EPA more regulatory options. Pub. L. No. 114-182, 130 Stat. 448, 460 (2016). Specifically, Congress amended sections 6(a)(1) and 6(a)(2) to make clear EPA had authority not only to "prohibit[]" but also to "otherwise restrict[]" manufacturing of a substance. *Id.* In other words, Congress encouraged more nuance—beyond an across-the-board ban on a substance—to carry out its statutory charge to regulate only "to the extent necessary." Together, this history confirms that Congress intended to limit regulation to just what is necessary, while "ensur[ing]

that the competitive advantage of the U.S. chemical industry is not eroded by regulatory mandates[.]" S. Rep. No. 114-67, at 2.

Consistent with this single, best reading of section 6(a), EPA's Final Rule does not impose risk management requirements for certain activities because EPA either did not evaluate whether they present unreasonable risk or EPA specifically determined they do not present such risk. For example, the Final Rule excludes all disposal activities that do not involve disposing of TCE in wastewater (*e.g.*, incineration), because EPA did not evaluate those other methods of disposal during risk evaluation. *See* 89 Fed. Reg. at 102599-600.[5] Similarly, because EPA's Risk Evaluation resulted in a determination that the transportation of TCE does not present unreasonable risk to human health, the Final Rule does not prohibit companies from removing byproduct TCE and transporting it offsite for incineration. *See id.*

The Final Rule also does not prohibit the processing of byproduct TCE as a reactant "when that byproduct TCE is processed within a site-limited, physically enclosed system that is part of the same overall manufacturing process from which the byproduct TCE was generated." *Id.* at 102623. In agreeing that byproduct TCE

---

[5] *Accord* RTC at 24, JA__ ("EPA did not assess risk associated with vapor intrusion and is thus unable to take risk management action on vapor intrusion under TSCA section 6(a).").

"should logically be able to be processed, including recycled, during or concurrent with the processing of the intended manufactured chemical substance(s) so long as the TCE is processed in a site-limited, physically enclosed system within the same reaction process," EPA acknowledged there are "controls in place at chlorinated organic facilities to mitigate risk associated with TCE byproduct creation and [reuse]." *Id.* at 102592. In other words, EPA agreed that such reuse does not present unreasonable risk.

EPA's exclusion of transportation of TCE, onsite reuse of byproduct TCE, and disposal activities that do not involve wastewater from risk management regulation under the Final Rule not only flows logically from the lack of record evidence that any of those activities present unreasonable risk; it is the only permissible outcome under the statute because EPA cannot invoke its powerful section 6(a) authority when doing so is unnecessary to eliminate unreasonable risk. *See supra* at 35-37. And EPA's exclusion of onsite reuse of byproduct TCE just underscores that the Final Rule's ban on *offsite* reuse likewise is not based on an assessment of unreasonable risk, much less one that is supported by substantial evidence.

In evaluating whether the processing of TCE as a reactant or intermediate presents unreasonable risk, EPA assumed that companies would be using pure TCE ("in liquid form at 99-100% concentration"). *See* Risk Evaluation at 136, 411, JA__, __. EPA failed to consider whether the reuse of byproduct TCE as a reactant, where

TCE is present only in very low concentrations, sometimes well under 0.1%, would present a similar degree of risk. *See* Vinyl Inst. RE Comments at 4, EPA-HQ-OPPT-2019-0500-0101, JA__, and HSIA RE Comments at 30, EPA-HQ-OPPT-2019-0500-0094, JA__. EPA thus flouted the statutory requirement to evaluate real world "conditions of use." *See* 15 U.S.C. § 2605(b)(4)(A); *see also id.* § 2602(4) (defining "conditions of use" to mean "the circumstances . . . under which a chemical substance is intended, known, or reasonably foreseen to be . . . processed"). Because facilities do not reuse byproduct TCE at concentrations remotely close to 99-100%, EPA's risk evaluation effectively did not even assess risk associated with reuse of byproduct TCE.

EPA received voluminous comments on how it: (i) vastly overestimated risk by equating the reuse of byproduct TCE in low concentrations with the processing of pure TCE as a reactant; and (ii) overlooked the plethora of engineering and administrative controls that mitigate or eliminate occupational risk from reuse of byproduct TCE. *See supra* at 20-21, 25-26. Although EPA appropriately exempted onsite reuse (in recognition that reuse of byproduct TCE occurs within physically enclosed systems), it nevertheless banned offsite reuse. *See* RTC at 27, JA__. EPA "emphasize[d] that [it] is not excluding from this final rule TCE that is manufactured as a byproduct . . . if it is removed from the site-limited, enclosed systems in which it was manufactured." *Id.* at 37, JA__. EPA further noted that, "[o]nce removed or

relocated, any TCE manufactured as a byproduct would be subject to the restrictions and prohibitions of this final rule." *Id.*

EPA did not analyze or explain why offsite reuse of byproduct TCE that is present in low concentrations, and that occurs within the same type of closed-loop equipment as on-site reuse, presents the same risk as either the intentional manufacture of TCE or the use of pure TCE as a reactant or intermediate. EPA's minimalist "[m]usings and conjecture are not the stuff of which substantial evidence is made." *Corrosion Proof Fittings*, 947 F.2d at 1227 (internal quotation marks and citation omitted). Because EPA effectively failed to find that offsite reuse of byproduct TCE presents unreasonable risk, it exceeded its authority under TSCA section 6(a) by regulating beyond the extent necessary to eliminate unreasonable risk.

Even assuming offsite reuse of byproduct TCE under tightly controlled conditions presents unreasonable risk that onsite reuse or offsite disposal does not, the Final Rule still violates TSCA section 6(a) by regulating beyond the extent necessary to eliminate such risk. EPA failed to analyze whether any requirement short of a ban on offsite reuse of byproduct TCE would have sufficed. EPA could have imposed a workplace chemical protection program similar to that which EPA has required for perchloroethylene or carbon tetrachloride, which "would provide a level of protection from TCE for potentially exposed persons[.]" *See* RTC at 27,

41

JA__. Or EPA could have evaluated whether the existing chemical exposure limit (ECEL) "that [it determined] would fully address the unreasonable risk," *i.e.*, 0.0011 ppm, "could be reliably/effectively implemented" rather than simply assume it "is not feasible to measure or comply with [that level] over the long term." *Id.* at 6, JA__. For example, an industry association submitted comments illustrating how a perchloroethylene "manufacturing or processing facility with an exposure concentration of 0.140 ppm that meets the [perchloroethylene] ECEL, . . . [a] [perchloroethylene] stream containing TCE byproduct of 0.5% could potentially meet the TCE proposed ECEL of 0.0011 ppm" without the application of any new engineering controls or worker protections specific to TCE. HSIA RM Comments at 82, EPA-HQ-OPPT-2020-0642-0296, JA__. But rather than evaluate whether these restrictions could eliminate unreasonable risk, EPA unlawfully banned all offsite reuse of byproduct TCE.

**B.    EPA arbitrarily banned offsite reuse of byproduct TCE while simultaneously excluding identical activities from regulation.**

An agency action is arbitrary and capricious when it is "internally inconsistent" and not "reasonably explain[ed]." *World Shipping Council v. Fed. Mar. Comm'n*, 152 F.4th 215, 221 & 223 (D.C. Cir. 2025) (setting aside agency action where agency acknowledged "existence of the evident inconsistency but gave no reasonable justification for it"). Here, EPA was well aware that reuse of byproduct

TCE can occur both at the same facility at which it was generated or at other facilities. *See* RTC at 27, JA\_\_; *see also* Vinyl Inst. RM Comments at 2, EPA-HQ-OPPT-2020-0642-0318, JA\_\_. By excluding onsite reuse from the Final Rule's broader prohibition on all processing of TCE as a reactant/intermediate, EPA effectively conceded that reuse of byproduct TCE within closed equipment does not present unreasonable risk. In stark contrast, the Final Rule applies the broader prohibition on processing to *offsite* reuse of byproduct, even though EPA did not identify any record evidence suggesting that offsite reuse results in additional worker exposures or somehow presents more risk than onsite reuse. In fact, offsite reuse at receiving chlorinated organic facilities occurs under the exact same closed conditions as the facilities from which byproduct TCE is transferred. *See, e.g.*, Vinyl Inst. RM Comments at 2, EPA-HQ-OPPT-2020-0642-0318, JA\_\_; HSIA RM Comments at 78-79, EPA-HQ-OPPT-2020-0642-0296, JA\_\_-\_\_; HSIA Meeting Summary and Submissions at 1, 7-13, 21-27, EPA-HQ-OPPT-2020-0642-0034, JA\_\_, \_\_-\_\_, \_\_-\_\_.

Nor can EPA rely on the fact that offsite reuse requires loading/unloading activities, removal of TCE from a closed system, or transportation to another facility. The Final Rule does not regulate any facility that generates byproduct TCE and "isolates the TCE from the process for the sole purpose of disposal, and sends it off-site for disposal to a hazardous waste incinerator permitted under RCRA[.]" 89 Fed.

43

Reg. at 102600; *accord id.* at 102593 ("TCE that exits the site-limited, physically enclosed systems in which it was manufactured by removal from the system" is not regulated by the Final Rule if it is removed "for the purposes of disposal[.]"). By exempting removal of TCE from a closed system, transport to an incinerator, and any attendant loading/unloading activities at either site, EPA effectively acknowledges that such activities do not present unreasonable risk.

EPA cannot credibly argue that the very same activities somehow present unreasonable risk when performed in conjunction with transporting byproduct TCE to a chemical manufacturing facility for further reuse, rather than to an incineration facility. The fact is transportation to another facility for reuse under existing regulatory frameworks and industry protocols is no less safe than transportation to a waste disposal facility. Chemical manufacturing facilities rely on the same engineering and administrative controls when conducting line equipment opening activities within closed systems and shipping TCE regardless of the ultimate destination. *See* HSIA Meeting Summary and Materials at 21-27, EPA-HQ-OPPT-2020-0642-0034, JA__-__; *see also* HSIA Revised Risk Determination Comments, App. 1, EPA-HQ-OPPT-2016-0737-0138, JA__-__ (standard operating procedures for personal protection, rail tank car loading, tank truck loading, process sampling, waste packaging, and minor maintenance and line openings). This "unexplained inconsistency" is "not reasonable" and thus, the ban on offsite reuse is unlawful.

*E.g.*, *Engine Mfrs. Ass'n v. EPA*, 20 F.3d 1177, 1182 (D.C. Cir. 1994); *World Shipping Council*, 152 F.4th at 221; *Nat. Res. Def. Council v. U.S. Nuclear Reg. Comm'n*, 879 F.3d 1202, 1214 (D.C. Cir. 2018) ("Of course, it would be arbitrary and capricious for the agency's decision making to be 'internally inconsistent.'") (citation omitted).

Put simply, EPA had the "initial burden of promulgating and explaining a non-arbitrary, non-capricious rule." *Corrosion Proof Fittings*, 947 F.2d at 1214 (internal quotation marks and citation omitted). EPA failed to carry its burden when it banned offsite reuse of byproduct TCE.

## II. EPA's Prohibition on Permitted Discharges of Wastewater Containing Even *De Minimis* Concentrations of Byproduct TCE Is Unlawful.

As detailed above, EPA's exercise of its risk management authority under TSCA section 6(a) must be carefully tailored to a determination of unreasonable risk supported by substantial evidence. *See supra* 35-38. As finalized, the TCE Rule prohibits the discharge of wastewater containing any amount of TCE, even *de minimis* concentrations of byproduct TCE that results from production of other chemicals or that remains after reuse of byproduct TCE in further production processes, regardless of whether such discharges are authorized by a valid Clean Water Act permit. *See* 89 Fed. Reg. at 102623-24 (codified at 40 C.F.R. §§ 751.305(b)(4) & 751.301(c)). EPA lacked authority to impose this broad prohibition

because it effectively failed to assess whether discharges of wastewater containing trace concentrations of byproduct TCE present unreasonable risk.

EPA based its prohibition on the disposal of wastewater containing TCE on unreasonable risk to workers. *See* 88 Fed. Reg. at 74735. EPA determined "there is no unreasonable risk to the environment from all conditions of use of TCE," and it "did not evaluate risk to the general population from ambient air, water and disposal and pathways for any condition of use," because EPA extensively regulates general population exposures to TCE under various other statutes, including the Clean Water Act. Risk Evaluation at 38-39, JA__-__. Regarding worker exposures, EPA claims that it "generally evaluate[d] worker exposures to wastewater . . . [at] places where wastewater containing TCE is treated[.]" RTC at 46, JA__. Yet during Risk Evaluation, EPA's analysis of wastewater disposal used industrial hygiene data from a completely different condition of use, "Process Solvent Recycling and Worker Handling of Wastes," and it did not assess wastewater disposal under scenarios such as the processing of byproduct TCE as a reactant or the disposal of wastewater following the manufacture of chlorinated organics that generates byproduct TCE. *See* Risk Evaluation at 389-401 (Table 4-59), JA__-__; *see also id.* at 458-59, JA__-__ (explaining that EPA's determination that disposal of TCE presents an unreasonable risk is based on comparison of the risk estimates for non-cancer effects and cancer to the benchmarks summarized in Table 4-59).

EPA never explains why it is appropriate to rely on risk estimates for workers performing process solvent recycling activities—*e.g.*, repackaging of neat solvents—to assess risk to workers who perform activities related to the disposal of wastewater where TCE is present only in trace concentrations. For the former category, EPA assumed workers would use TCE "in liquid form at 99-100% concentration." Risk Evaluation at 136, JA__. That is not an appropriate surrogate to estimate risk for workers engaged in disposal of wastewater streams containing TCE at far lower concentrations. Nor did EPA examine whether facilities performing process solvent recycling have the same engineering, administrative, and personal protection controls as facilities that reuse byproduct TCE in primarily closed loop systems and subsequently dispose of wastewater containing any trace residual amounts of TCE in accordance with their Clean Water Act permits. EPA's "[m]usings and conjecture are not the stuff of which substantial evidence is made." *Corrosion Proof Fittings*, 947 F.2d at 1227 (internal quotation marks and citation omitted). Because EPA never evaluated whether disposal of wastewater containing only low concentrations of TCE presents unreasonable risk under the conditions of use, EPA exceeded its authority under 15 U.S.C. § 2605(a) when it prohibited such disposal.

EPA also unlawfully declined to apply the *de minimis* exemption (also known as the "regulatory threshold") to wastewater containing TCE and instead prohibited the disposal of wastewater containing *any* amount of TCE in the Final Rule. *See* 89

Fed. Reg. at 102623 (defining "regulatory threshold" and clarifying that "[t]his threshold does not apply to wastewater") & 102624 (§ 751.305(b)(4)). In finalizing the regulatory threshold, EPA acknowledged that "TCE is unintentionally manufactured as a byproduct in small amounts in the manufacture of chlorinated organics and . . . cannot be prevented in the production process," as well as the need to "provid[e] for very small amounts of a chemical that cannot be reasonably eliminated." *Id.* at 102591. To address these concerns, EPA codified a 0.1% regulatory threshold "for many of the reasons stated by commenters, such as the difficulty of proving the absence of a chemical (and the resulting uncertainty in various supply chains), the fact that the manufacture of chlorinated organics results in the unintentional manufacture of small amounts of TCE (and other chlorinated compounds) as a byproduct that becomes an impurity that is not feasible to remove, and the fact that it would be consistent with the OSHA Hazard Communication Standard and other programs to which industry has already calibrated its processes." *Id.* at 102592. Importantly, EPA recognized this threshold is "well below the concentration used for any products that contributed to the unreasonable risk." *Id.*

Despite finding that the regulatory threshold is necessary "to avoid impacts on numerous supply chains, particularly chlorinated organic products," EPA inexplicably concluded that "[t]hese considerations are not applicable to wastewater disposal." *Id.* at 102608; *accord* RTC at 47, JA__ (same). EPA provided no

justification, much less supporting substantial evidence, for why it is infeasible to remove byproduct TCE that is unintentionally formed in some instances, yet it somehow *is* feasible to remove trace concentrations of byproduct TCE from wastewater streams prior to discharging in accordance with valid Clean Water Act permits. Likewise, EPA ignored the glaring inconsistency between recognizing that the 0.1% regulatory threshold is "well below the concentration used for any products that contributed to the unreasonable risk" (*e.g.*, TCE in liquid form at 99-100% concentration), *compare* 89 Fed. Reg. at 102592 *with* Risk Evaluation at 136, JA__, and its decision to ban even discharges of wastewater containing only trace amounts of byproduct TCE at or below the regulatory threshold. *Cf. Bus. Roundtable v. SEC*, 647 F.3d 1144, 1153, 1156 (D.C. Cir. 2011) ("internally inconsistent" justifications are "arbitrary").

What is more, EPA's refusal to recognize that the ability to reuse byproduct TCE and to rely on the regulatory threshold depends on being able to continue disposing of wastewater with trace concentrations of TCE cannot stand. Commenters specifically urged EPA to establish a *de minimis* exemption *and* apply it to wastewater. *See* Vinyl Inst. RM Comments at 15-17, EPA-HQ-OPPT-2020-0642-0318, JA__-__; Keller & Heckman RM Comments at 5, EPA-HQ-OPPT-2020-0642-0308 (Dec. 15, 2023), JA__. As one commenter explained, "[w]ithout a corresponding *de minimis* exemption for wastewater disposal, many companies will

not be able to make use of the *de minimis* exemption." Keller & Heckman RM Comments at 5, EPA-HQ-OPPT-2020-0642-0308, JA__. It should come as no surprise that the generation of wastewater is inherent in chemical production processes and that a prohibition on disposing wastewater with any traces of TCE could preclude the production of various products. And "[w]hile some industrial processes might be able to dispose of wastewater by incineration, incineration of wastewater is costly, requires large amounts of energy, and is increasingly unavailable." *Id.*, JA__; *see also* ACC RM Comments at 4, EPA-HQ-OPPT-2020-0642-0320, JA__ (detailing how onsite thermal destruction of byproduct TCE is cost prohibitive and how hazardous waste incinerators cannot keep up with increased demand for incineration).

EPA deflected these concerns in conclusory fashion, stating that: (i) the regulatory threshold "applies only to products," and EPA "does not consider wastewater to be a product eligible for the regulatory threshold provision;" and (ii) the need for a regulatory threshold to "avoid impacts on numerous supply chains, particularly chlorinated organic products" is "not applicable to wastewater disposal." RTC at 50, JA__. This cursory treatment falls well short of the foundational principle of administrative law that agency action must be "reasonably explained." *FCC v. Prometheus Radio Project*, 592 U.S. 414, 423 (2021); *Env't Health Tr. v. FCC*, 9

F.4th 893, 903 (D.C. Cir. 2021) (agency must offer "more to justify its decision to retain its regulations than mere conclusory statements").

EPA did not even address commenters' concerns that companies will not be able to benefit from the regulatory threshold without a corresponding *de minimis* exemption for wastewater because of limited incineration capacity, the lack of onsite destruction capacity, and the fact that non-wastewater disposal is cost-prohibitive. *E.g.*, Keller & Heckman RM Comments at 5, EPA-HQ-OPPT-2020-0642-0308, JA__; ACC RM Comments at 4, EPA-HQ-OPPT-2020-0320, JA__. Nor did EPA consider impacts on the supply of chlorinated organic products if companies unable to dispose of wastewater containing traces of TCE must shut down those production processes. That is arbitrary, capricious, and ignores an "important aspect of the problem[.]" *Motor Vehicle Mfrs. Ass'n of the U.S., Inc.*, 463 U.S. at 43. For these reasons, the Final Rule's prohibition on wastewater disposal without a *de minimis* exemption is unlawful.

III. **The Court Should Vacate the Final Rule's Prohibitions on Reuse and Wastewater Disposal of TCE Present in *De Minimis* Levels.**

"When an agency action is 'arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law,' the APA directs the reviewing court to 'hold unlawful and set aside [that] agency action.' 5 U.S.C. § 706(2)." As several circuits have noted, the "default rule is that vacatur is the appropriate remedy." *Tex. Corn Producers v. EPA*, 141 F.4th 687, 710 (5th Cir. 2024) (citation omitted);

*accord Ctr. for Biological Diversity v. EPA*, 141 F.4th 153, 182 (D.C. Cir. 2025) ("[T]he ordinary response to a violation is to vacate the unlawful agency action."); *350 Montana v. Haaland*, 50 F.4th 1254, 1273 (9th Cir. 2022) ("[V]acatur is the presumptive remedy under the APA[.]").

This Court has recognized the availability of "less drastic" remedies than vacating a challenged agency action in its entirety. *See PJM Power Providers Group v. FERC*, 88 F.4th 250, 266 n.83 (3d Cir. 2023) (citing *Belmont Mun. Light Dep't v. FERC*, 38 F.4th 173, 187-88 (D.C. Cir. 2022), which determined an agency action was severable and "vacat[ed] only one component"). Because "EPA intend[ed] that each provision of [the Final Rule] be severable," 89 Fed. Reg. at 102954, and because the remainder of the Final Rule can function sensibly without the two prohibitions that the Industry Associations challenge, the Court should sever those prohibitions and vacate them.

Sometimes, however, courts have departed from the default remedy of vacatur "based on a balancing of the seriousness of the deficiencies (and thus the extent of doubt whether the agency chose correctly) and the disruptive consequences of an interim change that may itself be changed." *Council Tree Commc'ns, Inc. v. FCC*, 619 F.3d 235, 258 & n.13 (3d Cir. 2010) ("express[ing] no view as to whether we are authorized to order this remedy" of remand without vacatur because vacatur was warranted). Remand without vacatur, however, is an

"exceptional remedy." *Bridgeport Hosp. v. Becerra*, 108 F.4th 882, 890 (D.C. Cir. 2024) (citation omitted). This is not one of those exceptional cases.

Here, there is no serious possibility that EPA can cure the defects in the Final Rule discussed above. The Industry Associations challenge two prohibitions that are fundamentally flawed because they lack the necessary predicate finding of unreasonable risk. And even if EPA had substantial evidence to support a finding of such risk, it imposed restrictions (prohibitions) calibrated to eliminate all risk from TCE, not just unreasonable risk. Assuming EPA persists in thinking reuse and wastewater disposal of *de minimis* levels of TCE must be regulated under TSCA, it must essentially start from scratch and substantiate an unreasonable risk determination and thus, the "extent of doubt whether the agency chose correctly" is significant. *Allied-Signal, Inc. v. U.S. Nuclear Regul. Comm'n*, 988 F.2d 146, 150-51 (D.C. Cir. 1993) (citation omitted).

Meanwhile, there would be no disruptive consequences from vacatur. Again, the Industry Associations only seek vacatur of two discrete aspects of the Final Rule; thus, the vast majority of restrictions would remain intact. Moreover, because the two prohibitions at issue are not premised on determinations of unreasonable risk, there is no reason to presume that vacating those prohibitions would result in increased exposures to TCE or any harm to the environment. *See* ACC IFR Comments, EPA-HQ-OPPT-2020-0642-0772 (Oct. 17, 2025), at 2-3

(summarizing 747 daily wastewater sampling events in 2024 and noting that "industrial hygiene exposure monitoring samples for employees conducting wastewater treatment tasks were less than the non-detect level of TCE of 0.000073 [parts per million]").

In fact, it is Industry Associations' members that would suffer disruptive consequences if this Court remands without vacatur. *See supra* 11-12, 25-26, 30 (detailing significant harms if EPA bans offsite reuse of byproduct TCE and if companies must incinerate or otherwise destroy beneficial intermediate streams with byproduct TCE). Finally, absent vacatur, "[t]he agency may have little or no incentive to fix the deficient rule." *Am. Pub. Gas Assoc. v. DOE*, 22 F.4th 1018, 1030 (D.C. Cir. 2022). This is because "[a] remand-only disposition is, in effect, an indefinite stay of the effectiveness of the court's decision and agencies naturally treat it as such." *Nat. Res. Def. Council v. EPA*, 489 F.3d 1250, 1262-64 (D.C. Cir. 2007) (Randolph, J., concurring).

For these reasons, the extraordinary remedy of remand without vacatur would not afford Industry Associations' members the required and necessary relief.

## CONCLUSION

For the foregoing reasons, the petitions should be granted and the Rule vacated.

Dated: May 13, 2026

Respectfully submitted,

/s/ Gregory A. Clark
Eric P. Gotting
Gregory A. Clark
Keller and Heckman LLC
1001 G Street, N.W.
Suite 500 West
Washington, D.C. 20001
(202) 434-4100
gotting@khlaw.com
clarkg@khlaw.com

*Counsel for Vinyl Institute, Inc.*
*(No. 25-1509)*

/s/ Keith Bradley
Keith Bradley
Kayla Marie Mendez
Squire Patton Boggs (US) LLP
717 17th Street, Suite 1825
Denver, CO 80202
Tel: (303) 830-1776
keith.bradley@squirepb.com
kayla.mendez@squirepb.com

Samuel B. Ballingrud
Squire Patton Boggs (US) LLP
2550 M Street, NW
Washington, DC 20037
samuel.ballingrud@squirepb.com

W. Caffey Norman
2550 M Street NW
Washington, DC 20037
(202) 460-9495
caffeynorman@outlook.com
Norman Law & Policy PLLC

/s/David Y. Chung
David Y. Chung
Crowell & Moring LLP
1001 Pennsylvania Ave., N.W.
Washington, DC 20004
(202) 624-2500
(202) 628-5116 (fax)
dchung@crowell.com

*Counsel for Petitioners American*
*Chemistry Council, Georgia*
*Chemistry Council, and Texas*
*Chemistry Council (No. 25-1079)*

/s/ David A. Terry
David A. Terry
Hunton Andrews Kurth
600 Travis Street
Suite 4200
Houston, TX 77002
(713) 220-4285
dterry@huntonak.com

*Counsel for Texas Chemistry Council*
*(No. 25-1083)*

/s/ Robert J. Karl
Robert J. Karl, Esq.
Eric B. Gallon
Porter, Wright, Morris & Arthur
L.L.P.
41 S. High Street, Suite 3000
Columbus, OH 43215
(614) 227-1925
rkarl@porterwright.com

55

egallon@porterwright.com

*Counsel for Olin Corporation (No. 25-1132)*

*Counsel for the Ohio Chemistry Technology Council (No. 25-1081)*

# CERTIFICATE OF COMPLIANCE

This petition complies with the type-volume limitations of the Federal Rules of Appellate Procedure 32 because it contains 12,128 words, excluding the parts of the Brief exempted from Federal Rule of Appellate Procedure 32(f).

This Petition complies with the typeface requirements of Federal Rule of Appellate Procedure 32(a)(5) and the type-style requirements of Federal Rule of Appellate Procedure 32(a)(6) because it has been prepared in a proportionally spaced typeface using Microsoft Word 2019 in 14-point Times New Roman font.

Pursuant to this Court's Rule 31.1(c), the text of the electronic version of this document is identical to the text of the paper copies filed with the Court.

Pursuant to this Court's Rule 31.1(c), the document has been scanned with version 1.449.569.0 of Microsoft Defender and is free of viruses.

Pursuant to this Court's Rule 46.1(e), I hereby certify that at least one attorney whose name appears on this Petition is a member in good standing of the bar of the United States Court of Appeals for the Third Circuit.

Dated: May 13, 2026

*/s/ David Y. Chung*
David Y. Chung

**CERTIFICATE OF SERVICE**

I certify that on May 13, 2026, I electronically filed the foregoing with the Clerk of Court for the United States Court of Appeals for the Third Circuit through the appellate CM/ECF system. I certify that all participants in the case are registered CM/ECF users and that service will be accomplished by the appellate CM/ECF system.

I further certify that I will mail to the Clerk of Court ten paper copies of the foregoing.

*/s/ David Y. Chung*
David Y. Chung

# **STATUTORY ADDENDUM**

# TABLE OF CONTENTS

**Addendum Page**

15 U.S.C. § 2601................................................................ADD-1

15 U.S.C. § 2602................................................................ADD-2

15 U.S.C. § 2605................................................................ADD-5

15 U.S.C. § 2618................................................................ADD-13

15 U.S.C. § 2620................................................................ADD-15

Sec.
2662.     Definitions.
2663.     EPA citizen's guide.
2664.     Model construction standards and techniques.
2665.     Technical assistance to States for radon programs.
2666.     Grant assistance to States for radon programs.
2667.     Radon in schools.
2668.     Regional radon training centers.
2669.     Study of radon in Federal buildings.
2670.     Regulations.
2671.     Additional authorizations.

SUBCHAPTER IV—LEAD EXPOSURE REDUCTION

2681.     Definitions.
2682.     Lead-based paint activities training and certification.
2683.     Identification of dangerous levels of lead.
2684.     Authorized State programs.
2685.     Lead abatement and measurement.
2686.     Lead hazard information pamphlet.
2687.     Regulations.
2688.     Control of lead-based paint hazards at Federal facilities.
2689.     Prohibited acts.
2690.     Relationship to other Federal law.
2691.     General provisions relating to administrative proceedings.
2692.     Authorization of appropriations.

SUBCHAPTER V—HEALTHY HIGH-PERFORMANCE SCHOOLS

2695.     Grants for healthy school environments.
2695a.    Model guidelines for siting of school facilities.
2695b.    Public outreach.
2695c.    Environmental health program.
2695d.    Authorization of appropriations.

SUBCHAPTER VI—FORMALDEHYDE STANDARDS FOR COMPOSITE WOOD PRODUCTS

2697.     Formaldehyde standards.

### SUBCHAPTER I—CONTROL OF TOXIC SUBSTANCES

## § 2601. Findings, policy, and intent

### (a) Findings

The Congress finds that—

(1) human beings and the environment are being exposed each year to a large number of chemical substances and mixtures;

(2) among the many chemical substances and mixtures which are constantly being developed and produced, there are some whose manufacture, processing, distribution in commerce, use, or disposal may present an unreasonable risk of injury to health or the environment; and

(3) the effective regulation of interstate commerce in such chemical substances and mixtures also necessitates the regulation of intrastate commerce in such chemical substances and mixtures.

### (b) Policy

It is the policy of the United States that—

(1) adequate information should be developed with respect to the effect of chemical substances and mixtures on health and the environment and that the development of such information should be the responsibility of those who manufacture and those who process such chemical substances and mixtures;

(2) adequate authority should exist to regulate chemical substances and mixtures which present an unreasonable risk of injury to health or the environment, and to take action with respect to chemical substances and mixtures which are imminent hazards; and

(3) authority over chemical substances and mixtures should be exercised in such a manner as not to impede unduly or create unnecessary economic barriers to technological innovation while fulfilling the primary purpose of this chapter to assure that such innovation and commerce in such chemical substances and mixtures do not present an unreasonable risk of injury to health or the environment.

### (c) Intent of Congress

It is the intent of Congress that the Administrator shall carry out this chapter in a reasonable and prudent manner, and that the Administrator shall consider the environmental, economic, and social impact of any action the Administrator takes or proposes as provided under this chapter.

(Pub. L. 94–469, title I, § 2, Oct. 11, 1976, 90 Stat. 2003; renumbered title I, Pub. L. 99–519, § 3(c)(1), Oct. 22, 1986, 100 Stat. 2989; amended Pub. L. 114–182, title I, §§ 2, 19(b), June 22, 2016, 130 Stat. 448, 505.)

#### Editorial Notes

##### AMENDMENTS

2016—Subsec. (b)(1). Pub. L. 114–182, § 19(b), substituted ''information'' for ''data'' in two places.
Subsec. (c). Pub. L. 114–182, § 2, substituted ''proposes as provided'' for ''proposes to take''.

#### Statutory Notes and Related Subsidiaries

##### EFFECTIVE DATE

Pub. L. 94–469, title I, § 31, Oct. 11, 1976, 90 Stat. 2051; renumbered title I, Pub. L. 99–519, § 3(c), Oct. 22, 1986, 100 Stat. 2989, provided that: ''Except as provided in section 4(f) [section 2603(f) of this title], this Act [enacting this chapter] shall take effect on January 1, 1977.''

##### SHORT TITLE OF 2016 AMENDMENT

Pub. L. 114–182, § 1(a), June 22, 2016, 130 Stat. 448, provided that: ''This Act [enacting section 280g–17 of Title 42, The Public Health and Welfare, amending this section, sections 2602 to 2611, 2613 to 2615, 2617 to 2620, 2623, 2625 to 2627, and 2629 of this title, section 6939f of Title 42, and section 254 of Title 47, Telecommunications, repealing section 2624 of this title, and enacting provisions set out as notes under this section, section 280g–17 of Title 42, and sections 254 and 609 of Title 47] may be cited as the 'Frank R. Lautenberg Chemical Safety for the 21st Century Act'.''

##### SHORT TITLE OF 2010 AMENDMENT

Pub. L. 111–199, § 1, July 7, 2010, 124 Stat. 1359, provided that: ''This Act [enacting subchapter VI of this chapter and provisions set out as a note under section 2697 of this title] may be cited as the 'Formaldehyde Standards for Composite Wood Products Act'.''

##### SHORT TITLE OF 2008 AMENDMENT

Pub. L. 110–414, § 1, Oct. 14, 2008, 122 Stat. 4341, provided that: ''This Act [enacting section 6939f of Title 42, The Public Health and Welfare, amending sections 2605 and 2611 of this title, and enacting provisions set out as a note under section 2611 of this title] may be cited as the 'Mercury Export Ban Act of 2008'.''

##### SHORT TITLE OF 1992 AMENDMENT

Pub. L. 102–550, title X, § 1021(c), Oct. 28, 1992, 106 Stat. 3924, provided that: ''This subtitle [subtitle B (§ 1021) of

title X of Pub. L. 102–550, enacting sections 2681 to 2692 of this title and amending sections 2606, 2610, 2612, 2615, 2616, 2618, and 2619 of this title] may be cited as the 'Lead-Based Paint Exposure Reduction Act'.''

#### SHORT TITLE OF 1986 AMENDMENT

Pub. L. 99–519, §1, Oct. 22, 1986, 100 Stat. 2970, provided that: ''This Act [enacting sections 2641 to 2654 of this title and section 4022 of Title 20, Education, amending sections 2614, 2618, and 2619 of this title and sections 4014 and 4021 of Title 20, and enacting provisions set out as a note under section 4014 of Title 20] may be cited as the 'Asbestos Hazard Emergency Response Act of 1986'.''

#### SHORT TITLE

Pub. L. 94–469, §1, Oct. 11, 1976, 90 Stat. 2003; renumbered title I, Pub. L. 99–519, §3(c), Oct. 22, 1986, 100 Stat. 2989, provided that: ''This Act [enacting this chapter and provisions set out as notes under this section] may be cited as the 'Toxic Substances Control Act'.''

#### MODIFICATION OF DEFINITION OF SPORT FISHING EQUIPMENT UNDER TOXIC SUBSTANCES CONTROL ACT

Pub. L. 116–188, title I, §108, Oct. 30, 2020, 134 Stat. 920, as amended by Pub. L. 118–198, title I, §107, Dec. 23, 2024, 138 Stat. 2680, provided that:

''(a) PROHIBITION.—During the period beginning on the date of enactment of the America's Conservation Enhancement Reauthorization Act of 2024 [Dec. 23, 2024] and ending on September 30, 2030, the Administrator of the Environmental Protection Agency shall not take any action to regulate the lead content of sport fishing equipment or sport fishing equipment components under the Toxic Substances Control Act (15 U.S.C. 2601 et seq.).

''(b) DEFINITION OF SPORT FISHING EQUIPMENT.—In this section, the term 'sport fishing equipment' means any sport fishing equipment (as such term is defined in section 4162(a) of the Internal Revenue Code of 1986 [26 U.S.C. 4162(a)]) the sale of which is subject to the tax imposed by section 4161(a) of such Code [26 U.S.C. 4161(a)] (determined without regard to any exemptions from such tax provided by section 4162 or 4221 or any other provision of such Code [26 U.S.C. 4162, 4221]).''

#### NO RETROACTIVITY OF PUB. L. 114–182 AMENDMENTS

Pub. L. 114–182, title I, §20, June 22, 2016, 130 Stat. 510, provided that: ''Nothing in sections 1 through 19 [amending this section, sections 2602 to 2611, 2613 to 2615, 2617 to 2620, 2623, 2625 to 2627, and 2629 of this title, and section 6939f of Title 42, The Public Health and Welfare, repealing section 2624 of this title, and enacting provisions set out as a note under this section], or the amendments made by sections 1 through 19, shall be interpreted to apply retroactively to any State, Federal, or maritime legal action filed before the date of enactment of this Act [June 22, 2016].''

### Executive Documents

#### FEDERAL COMPLIANCE WITH POLLUTION CONTROL STANDARDS

For provisions relating to the responsibility of the head of each Executive agency for compliance with applicable pollution control standards, see Ex. Ord. No. 12088, Oct. 13, 1978, 43 F.R. 47707, set out as a note under section 4321 of Title 42, The Public Health and Welfare.

### § 2602. Definitions

As used in this chapter:

(1) the [1] term ''Administrator'' means the Administrator of the Environmental Protection Agency.

(2)(A) Except as provided in subparagraph (B), the term ''chemical substance'' means any or-

ganic or inorganic substance of a particular molecular identity, including—

(i) any combination of such substances occurring in whole or in part as a result of a chemical reaction or occurring in nature, and

(ii) any element or uncombined radical.

(B) Such term does not include—

(i) any mixture,

(ii) any pesticide (as defined in the Federal Insecticide, Fungicide, and Rodenticide Act [7 U.S.C. 136 et seq.]) when manufactured, processed, or distributed in commerce for use as a pesticide,

(iii) tobacco or any tobacco product,

(iv) any source material, special nuclear material, or byproduct material (as such terms are defined in the Atomic Energy Act of 1954 [42 U.S.C. 2011 et seq.] and regulations issued under such Act),

(v) any article the sale of which is subject to the tax imposed by section 4181 of the Internal Revenue Code of 1986 [26 U.S.C. 4181] (determined without regard to any exemptions from such tax provided by section 4182 or 4221 or any other provision of such Code) and any component of such an article (limited to shot shells, cartridges, and components of shot shells and cartridges), and

(vi) any food, food additive, drug, cosmetic, or device (as such terms are defined in section 201 of the Federal Food, Drug, and Cosmetic Act [21 U.S.C. 321]) when manufactured, processed, or distributed in commerce for use as a food, food additive, drug, cosmetic, or device.

The term ''food'' as used in clause (vi) of this subparagraph includes poultry and poultry products (as defined in sections 4(e) and 4(f) of the Poultry Products Inspection Act [21 U.S.C. 453(e) and (f)]), meat and meat food products (as defined in section 1(j) of the Federal Meat Inspection Act [21 U.S.C. 601(j)]), and eggs and egg products (as defined in section 4 of the Egg Products Inspection Act [21 U.S.C. 1033]).

(3) The term ''commerce'' means trade, traffic, transportation, or other commerce (A) between a place in a State and any place outside of such State, or (B) which affects trade, traffic, transportation, or commerce described in clause (A).

(4) The term ''conditions of use'' means the circumstances, as determined by the Administrator, under which a chemical substance is intended, known, or reasonably foreseen to be manufactured, processed, distributed in commerce, used, or disposed of.

(5) The terms ''distribute in commerce'' and ''distribution in commerce'' when used to describe an action taken with respect to a chemical substance or mixture or article containing a substance or mixture mean to sell, or the sale of, the substance, mixture, or article in commerce; to introduce or deliver for introduction into commerce, or the introduction or delivery for introduction into commerce of, the substance, mixture, or article; or to hold, or the holding of, the substance, mixture, or article after its introduction into commerce.

(6) The term ''environment'' includes water, air, and land and the interrelationship which exists among and between water, air, and land and all living things.

---

[1] So in original. Probably should be capitalized.

(7) The term ''guidance'' means any significant written guidance of general applicability prepared by the Administrator.

(8) The term ''health and safety study'' means any study of any effect of a chemical substance or mixture on health or the environment or on both, including underlying information and epidemiological studies, studies of occupational exposure to a chemical substance or mixture, toxicological, clinical, and ecological studies of a chemical substance or mixture, and any test performed pursuant to this chapter.

(9) The term ''manufacture'' means to import into the customs territory of the United States (as defined in general note 2 of the Harmonized Tariff Schedule of the United States), produce, or manufacture.

(10) The term ''mixture'' means any combination of two or more chemical substances if the combination does not occur in nature and is not, in whole or in part, the result of a chemical reaction; except that such term does include any combination which occurs, in whole or in part, as a result of a chemical reaction if none of the chemical substances comprising the combination is a new chemical substance and if the combination could have been manufactured for commercial purposes without a chemical reaction at the time the chemical substances comprising the combination were combined.

(11) The term ''new chemical substance'' means any chemical substance which is not included in the chemical substance list compiled and published under section 2607(b) of this title.

(12) The term ''potentially exposed or susceptible subpopulation'' means a group of individuals within the general population identified by the Administrator who, due to either greater susceptibility or greater exposure, may be at greater risk than the general population of adverse health effects from exposure to a chemical substance or mixture, such as infants, children, pregnant women, workers, or the elderly.

(13) The term ''process'' means the preparation of a chemical substance or mixture, after its manufacture, for distribution in commerce—

(A) in the same form or physical state as, or in a different form or physical state from, that in which it was received by the person so preparing such substance or mixture, or

(B) as part of an article containing the chemical substance or mixture.

(14) The term ''processor'' means any person who processes a chemical substance or mixture.

(15) The term ''protocols and methodologies for the development of information'' means a prescription of—

(A) the—

(i) health and environmental effects, and

(ii) information relating to toxicity, persistence, and other characteristics which affect health and the environment,

for which information for a chemical substance or mixture are to be developed and any analysis that is to be performed on such information, and

(B) to the extent necessary to assure that information respecting such effects and characteristics are reliable and adequate—

(i) the manner in which such information are [2] to be developed,

(ii) the specification of any test protocol or methodology to be employed in the development of such information, and

(iii) such other requirements as are necessary to provide such assurance.

(16) The term ''State'' means any State of the United States, the District of Columbia, the Commonwealth of Puerto Rico, the Virgin Islands, Guam, the Canal Zone, American Samoa, the Northern Mariana Islands, or any other territory or possession of the United States.

(17) The term ''United States'', when used in the geographic sense, means all of the States.

(Pub. L. 94–469, title I, §3, Oct. 11, 1976, 90 Stat. 2004; Pub. L. 99–514, §2, Oct. 22, 1986, 100 Stat. 2095; renumbered title I, Pub. L. 99–519, §3(c)(1), Oct. 22, 1986, 100 Stat. 2989; Pub. L. 100–418, title I, §1214(e)(1), Aug. 23, 1988, 102 Stat. 1156; Pub. L. 114–92, div. A, title III, §315, Nov. 25, 2015, 129 Stat. 791; Pub. L. 114–182, title I, §§3, 19(c), June 22, 2016, 130 Stat. 448, 505.)

### Editorial Notes

#### REFERENCES IN TEXT

The Federal Insecticide, Fungicide, and Rodenticide Act, referred to in par. (2)(B)(ii), is act June 25, 1947, ch. 125, as amended generally by Pub. L. 92–516, Oct. 21, 1972, 86 Stat. 973, which is classified generally to subchapter II (§136 et seq.) of chapter 6 of Title 7, Agriculture. For complete classification of this Act to the Code, see Short Title note set out under section 136 of Title 7 and Tables.

The Atomic Energy Act of 1954, referred to in par. (2)(B)(iv), is act Aug. 1, 1946, ch. 724, as added by act Aug. 30, 1954, ch. 1073, §1, 68 Stat. 919, and amended, which is classified principally to chapter 23 (§2011 et seq.) of Title 42, The Public Health and Welfare. For complete classification of this Act to the Code, see Short Title note set out under section 2011 of Title 42 and Tables.

The Harmonized Tariff Schedule of the United States, referred to in par. (9), is not set out in the Code. See Publication of Harmonized Tariff Schedule note set out under section 1202 of Title 19, Customs Duties.

For definition of Canal Zone, Governor of the Canal Zone, and Panama Canal Company, referred to in par. (16), see section 3602(b) of Title 22, Foreign Relations and Intercourse.

#### AMENDMENTS

2016—Pars. (4) to (7). Pub. L. 114–182, §3(1)–(3), added pars. (4) and (7) and redesignated former pars. (4) and (5) as (5) and (6), respectively. Former pars. (6) and (7) redesignated (8) and (9), respectively.

Par. (8). Pub. L. 114–182, §19(c)(1), substituted ''information'' for ''data''.

Pub. L. 114–182, §3(1), redesignated par. (6) as (8). Former par. (8) redesignated (10).

Pars. (9) to (14). Pub. L. 114–182, §3(1), (4), added par. (12) and redesignated former pars. (7) to (11) as (9), (10), (11), (13), and (14), respectively. Former pars. (12) to (14) redesignated (15) to (17), respectively.

Par. (15). Pub. L. 114–182, §19(c)(2)(A), (B), in introductory provisions, substituted ''protocols and methodologies for the development of information'' for ''standards for the development of test data''.

Pub. L. 114–182, §3(1), redesignated par. (12) as (15).

Par. (15)(A). Pub. L. 114–182, §19(c)(2)(C), substituted ''on such information'' for ''on such data'' in concluding provisions.

_____

[2] So in original. Probably should be ''is''.

ADD-3

Pub. L. 114–182, §19(c)(2)(B), substituted ''for which information'' for ''for which test data'' in concluding provisions.

Par. (15)(B). Pub. L. 114–182, §19(c)(2)(C), substituted ''information'' for ''data'' wherever appearing.

Pars. (16), (17). Pub. L. 114–182, §3(1), redesignated pars. (13) and (14) as (16) and (17), respectively.

2015—Par. (2)(B)(v). Pub. L. 114–92 substituted ''and any component of such an article (limited to shot shells, cartridges, and components of shot shells and cartridges), and'' for '', and''.

1988—Par. (7). Pub. L. 100–418 substituted ''general note 2 of the Harmonized Tariff Schedule of the United States'' for ''general headnote 2 of the Tariff Schedules of the United States''.

1986—Par. (2)(B)(v). Pub. L. 99–514 substituted ''Internal Revenue Code of 1986'' for ''Internal Revenue Code of 1954''.

### Statutory Notes and Related Subsidiaries

#### EFFECTIVE DATE OF 1988 AMENDMENT

Amendment by Pub. L. 100–418 effective Jan. 1, 1989, and applicable with respect to articles entered on or after such date, see section 1217(b)(1) of Pub. L. 100–418, set out as an Effective Date note under section 3001 of Title 19, Customs Duties.

#### EFFECTIVE DATE

Section effective Jan. 1, 1977, see section 31 of Pub. L. 94–469, set out as a note under section 2601 of this title.

### § 2603. Testing of chemical substances and mixtures

#### (a) Testing requirements

(1) If the Administrator finds that—

(A)(i)(I) the manufacture, distribution in commerce, processing, use, or disposal of a chemical substance or mixture, or that any combination of such activities, may present an unreasonable risk of injury to health or the environment,

(II) there is insufficient information and experience upon which the effects of such manufacture, distribution in commerce, processing, use, or disposal of such substance or mixture or of any combination of such activities on health or the environment can reasonably be determined or predicted, and

(III) testing of such substance or mixture with respect to such effects is necessary to develop such information; or

(ii)(I) a chemical substance or mixture is or will be produced in substantial quantities, and (aa) it enters or may reasonably be anticipated to enter the environment in substantial quantities or (bb) there is or may be significant or substantial human exposure to such substance or mixture,

(II) there is insufficient information and experience upon which the effects of the manufacture, distribution in commerce, processing, use, or disposal of such substance or mixture or of any combination of such activities on health or the environment can reasonably be determined or predicted, and

(III) testing of such substance or mixture with respect to such effects is necessary to develop such information; and

(B) in the case of a mixture, the effects which the mixture's manufacture, distribution in commerce, processing, use, or disposal or any combination of such activities may have

on health or the environment may not be reasonably and more efficiently determined or predicted by testing the chemical substances which comprise the mixture;

the Administrator shall by rule, or, in the case of a chemical substance or mixture described in subparagraph (A)(i), by rule, order, or consent agreement, require that testing be conducted on such substance or mixture to develop information with respect to the health and environmental effects for which there is an insufficiency of information and experience and which is relevant to a determination that the manufacture, distribution in commerce, processing, use, or disposal of such substance or mixture, or that any combination of such activities, does or does not present an unreasonable risk of injury to health or the environment.

(2) ADDITIONAL TESTING AUTHORITY.—In addition to the authority provided under paragraph (1), the Administrator may, by rule, order, or consent agreement—

(A) require the development of new information relating to a chemical substance or mixture if the Administrator determines that the information is necessary—

(i) to review a notice under section 2604 of this title or to perform a risk evaluation under section 2605(b) of this title;

(ii) to implement a requirement imposed in a rule, order, or consent agreement under subsection (e) or (f) of section 2604 of this title or in a rule promulgated under section 2605(a) of this title;

(iii) at the request of a Federal implementing authority under another Federal law, to meet the regulatory testing needs of that authority with regard to toxicity and exposure; or

(iv) pursuant to section 2611(a)(2) of this title; and

(B) require the development of new information for the purposes of prioritizing a chemical substance under section 2605(b) of this title only if the Administrator determines that such information is necessary to establish the priority of the substance, subject to the limitations that—

(i) not later than 90 days after the date of receipt of information regarding a chemical substance complying with a rule, order, or consent agreement under this subparagraph, the Administrator shall designate the chemical substance as a high-priority substance or a low-priority substance; and

(ii) information required by the Administrator under this subparagraph shall not be required for the purposes of establishing or implementing a minimum information requirement of broader applicability.

(3) STATEMENT OF NEED.—When requiring the development of new information relating to a chemical substance or mixture under paragraph (2), the Administrator shall identify the need for the new information, describe how information reasonably available to the Administrator was used to inform the decision to require new information, explain the basis for any decision that requires the use of vertebrate animals, and, as applicable, explain why issuance of an order is



shall apply with respect to an injunction issued under subparagraph (B)'' after ''subparagraph (A)'', and struck out former subpar. (B) which read as follows: ''If the district court of the United States to which an application has been made under subparagraph (A)(ii) finds that there is a reasonable basis to conclude that the manufacture, processing, distribution in commerce, use, or disposal of the chemical substance with respect to which such application was made, or that any combination of such activities, presents or will present an unreasonable risk of injury to health or the environment before a rule promulgated under section 2605 of this title can protect against such risk, the court shall issue an injunction to prohibit the manufacture, processing, or distribution in commerce of such substance or to prohibit any combination of such activities.''

Subsec. (f)(3)(D). Pub. L. 114–182, §5(6)(C)(iv), struck out subpar. (D) which read as follows: ''If the Administrator issues an order pursuant to subparagraph (A)(i) respecting a chemical substance and objections are filed in accordance with subsection (e)(1)(C), the Administrator shall seek an injunction under subparagraph (A)(ii) respecting such substance unless the Administrator determines, on the basis of such objections, that such substance does not or will not present an unreasonable risk of injury to health or the environment.''

Subsec. (f)(4), (5). Pub. L. 114–182, §5(6)(D), added pars. (4) and (5).

Subsec. (g). Pub. L. 114–182, §5(7), amended subsec. (g) generally. Prior to amendment, text read as follows: ''If the Administrator has not initiated any action under this section or section 2605 or 2606 of this title to prohibit or limit the manufacture, processing, distribution in commerce, use, or disposal of a chemical substance, with respect to which notification or data is required by subsection (a)(1)(B) or (b), before the expiration of the notification period applicable to the manufacturing or processing of such substance, the Administrator shall publish a statement of the Administrator's reasons for not initiating such action. Such a statement shall be published in the Federal Register before the expiration of such period. Publication of such statement in accordance with the preceding sentence is not a prerequisite to the manufacturing or processing of the substance with respect to which the statement is to be published.''

Subsec. (h)(1)(A). Pub. L. 114–182, §5(8)(A), inserted '', including an unreasonable risk to a potentially exposed or susceptible subpopulation identified by the Administrator for the specific conditions of use identified in the application'' after ''health or the environment''.

Subsec. (h)(2). Pub. L. 114–182, §5(8)(B), substituted ''information'' for ''data'' wherever appearing.

Subsec. (h)(4). Pub. L. 114–182, §5(8)(C), substituted ''environment, including an unreasonable risk to a potentially exposed or susceptible subpopulation identified by the Administrator under the conditions of use'' for ''environment''. A rule promulgated under this paragraph (and any substantive amendment to, or repeal of, such a rule) shall be promulgated in accordance with paragraphs (2) and (3) of section 2605(c) of this title''.

Subsec. (i). Pub. L. 114–182, §5(9), amended subsec. (i) generally. Prior to amendment, text read as follows: ''For purposes of this section, the terms 'manufacture' and 'process' mean manufacturing or processing for commercial purposes.''

### Statutory Notes and Related Subsidiaries

#### EFFECTIVE DATE

Section effective Jan. 1, 1977, see section 31 of Pub. L. 94–469, set out as a note under section 2601 of this title.

### § 2605. Prioritization, risk evaluation, and regulation of chemical substances and mixtures

#### (a) Scope of regulation

If the Administrator determines in accordance with subsection (b)(4)(A) that the manufacture,

processing, distribution in commerce, use, or disposal of a chemical substance or mixture, or that any combination of such activities, presents an unreasonable risk of injury to health or the environment, the Administrator shall by rule and subject to section 2617 of this title, and in accordance with subsection (c)(2), apply one or more of the following requirements to such substance or mixture to the extent necessary so that the chemical substance or mixture no longer presents such risk:

(1) A requirement (A) prohibiting or otherwise restricting the manufacturing, processing, or distribution in commerce of such substance or mixture, or (B) limiting the amount of such substance or mixture which may be manufactured, processed, or distributed in commerce.

(2) A requirement—

(A) prohibiting or otherwise restricting the manufacture, processing, or distribution in commerce of such substance or mixture for (i) a particular use or (ii) a particular use in a concentration in excess of a level specified by the Administrator in the rule imposing the requirement, or

(B) limiting the amount of such substance or mixture which may be manufactured, processed, or distributed in commerce for (i) a particular use or (ii) a particular use in a concentration in excess of a level specified by the Administrator in the rule imposing the requirement.

(3) A requirement that such substance or mixture or any article containing such substance or mixture be marked with or accompanied by clear and adequate minimum warnings and instructions with respect to its use, distribution in commerce, or disposal or with respect to any combination of such activities. The form and content of such minimum warnings and instructions shall be prescribed by the Administrator.

(4) A requirement that manufacturers and processors of such substance or mixture make and retain records of the processes used to manufacture or process such substance or mixture or monitor or conduct tests which are reasonable and necessary to assure compliance with the requirements of any rule applicable under this subsection.

(5) A requirement prohibiting or otherwise regulating any manner or method of commercial use of such substance or mixture.

(6)(A) A requirement prohibiting or otherwise regulating any manner or method of disposal of such substance or mixture, or of any article containing such substance or mixture, by its manufacturer or processor or by any other person who uses, or disposes of, it for commercial purposes.

(B) A requirement under subparagraph (A) may not require any person to take any action which would be in violation of any law or requirement of, or in effect for, a State or political subdivision, and shall require each person subject to it to notify each State and political subdivision in which a required disposal may occur of such disposal.

(7) A requirement directing manufacturers or processors of such substance or mixture (A)

to give notice of such determination to distributors in commerce of such substance or mixture and, to the extent reasonably ascertainable, to other persons in possession of such substance or mixture or exposed to such substance or mixture, (B) to give public notice of such determination, and (C) to replace or repurchase such substance or mixture as elected by the person to which the requirement is directed.

Any requirement (or combination of requirements) imposed under this subsection may be limited in application to specified geographic areas.

**(b) Risk evaluations**

  **(1) Prioritization for risk evaluations**

   **(A) Establishment of process**

   Not later than 1 year after June 22, 2016, the Administrator shall establish, by rule, a risk-based screening process, including criteria for designating chemical substances as high-priority substances for risk evaluations or low-priority substances for which risk evaluations are not warranted at the time. The process to designate the priority of chemical substances shall include a consideration of the hazard and exposure potential of a chemical substance or a category of chemical substances (including consideration of persistence and bioaccumulation, potentially exposed or susceptible subpopulations and storage near significant sources of drinking water), the conditions of use or significant changes in the conditions of use of the chemical substance, and the volume or significant changes in the volume of the chemical substance manufactured or processed.

   **(B) Identification of priorities for risk evaluation**

    **(i) High-priority substances**

    The Administrator shall designate as a high-priority substance a chemical substance that the Administrator concludes, without consideration of costs or other nonrisk factors, may present an unreasonable risk of injury to health or the environment because of a potential hazard and a potential route of exposure under the conditions of use, including an unreasonable risk to a potentially exposed or susceptible subpopulation identified as relevant by the Administrator.

    **(ii) Low-priority substances**

    The Administrator shall designate a chemical substance as a low-priority substance if the Administrator concludes, based on information sufficient to establish, without consideration of costs or other nonrisk factors, that such substance does not meet the standard identified in clause (i) for designating a chemical substance a high-priority substance.

   **(C) Information request and review and proposed and final prioritization designation**

   The rulemaking required in subparagraph (A) shall ensure that the time required to make a priority designation of a chemical substance be no shorter than nine months and no longer than 1 year, and that the process for such designations includes—

    (i) a requirement that the Administrator request interested persons to submit relevant information on a chemical substance that the Administrator has initiated the prioritization process on, before proposing a priority designation for the chemical substance, and provide 90 days for such information to be provided;

    (ii) a requirement that the Administrator publish each proposed designation of a chemical substance as a high- or low-priority substance, along with an identification of the information, analysis, and basis used to make the proposed designations, and provide 90 days for public comment on each such proposed designation; and

    (iii) a process by which the Administrator may extend the deadline in clause (i) for up to three months in order to receive or evaluate information required to be submitted in accordance with section 2603(a)(2)(B) of this title, subject to the limitation that if the information available to the Administrator at the end of such an extension remains insufficient to enable the designation of the chemical substance as a low-priority substance, the Administrator shall designate the chemical substance as a high-priority substance.

  **(2) Initial risk evaluations and subsequent designations of high- and low-priority substances**

   **(A) Initial risk evaluations**

   Not later than 180 days after June 22, 2016, the Administrator shall ensure that risk evaluations are being conducted on 10 chemical substances drawn from the 2014 update of the TSCA Work Plan for Chemical Assessments and shall publish the list of such chemical substances during the 180 day period.

   **(B) Additional risk evaluations**

   Not later than three and one half years after June 22, 2016, the Administrator shall ensure that risk evaluations are being conducted on at least 20 high-priority substances and that at least 20 chemical substances have been designated as low-priority substances, subject to the limitation that at least 50 percent of all chemical substances on which risk evaluations are being conducted by the Administrator are drawn from the 2014 update of the TSCA Work Plan for Chemical Assessments.

   **(C) Continuing designations and risk evaluations**

   The Administrator shall continue to designate priority substances and conduct risk evaluations in accordance with this subsection at a pace consistent with the ability of the Administrator to complete risk evaluations in accordance with the deadlines under paragraph (4)(G).

ADD-6

**(D) Preference**

In designating high-priority substances, the Administrator shall give preference to—
(i) chemical substances that are listed in the 2014 update of the TSCA Work Plan for Chemical Assessments as having a Persistence and Bioaccumulation Score of 3; and
(ii) chemical substances that are listed in the 2014 update of the TSCA Work Plan for Chemical Assessments that are known human carcinogens and have high acute and chronic toxicity.

**(E) Metals and metal compounds**

In identifying priorities for risk evaluation and conducting risk evaluations of metals and metal compounds, the Administrator shall use the Framework for Metals Risk Assessment of the Office of the Science Advisor, Risk Assessment Forum, and dated March 2007, or a successor document that addresses metals risk assessment and is peer reviewed by the Science Advisory Board.

**(3) Initiation of risk evaluations; designations**

**(A) Risk evaluation initiation**

Upon designating a chemical substance as a high-priority substance, the Administrator shall initiate a risk evaluation on the substance.

**(B) Revision**

The Administrator may revise the designation of a low-priority substance based on information made available to the Administrator.

**(C) Ongoing designations**

The Administrator shall designate at least one high-priority substance upon the completion of each risk evaluation (other than risk evaluations for chemical substances designated under paragraph (4)(C)(ii)).

**(4) Risk evaluation process and deadlines**

**(A) In general**

The Administrator shall conduct risk evaluations pursuant to this paragraph to determine whether a chemical substance presents an unreasonable risk of injury to health or the environment, without consideration of costs or other nonrisk factors, including an unreasonable risk to a potentially exposed or susceptible subpopulation identified as relevant to the risk evaluation by the Administrator, under the conditions of use.

**(B) Establishment of process**

Not later than 1 year after June 22, 2016, the Administrator shall establish, by rule, a process to conduct risk evaluations in accordance with subparagraph (A).

**(C) Requirement**

The Administrator shall conduct and publish risk evaluations, in accordance with the rule promulgated under subparagraph (B), for a chemical substance—
(i) that has been identified under paragraph (2)(A) or designated under paragraph (1)(B)(i); and
(ii) subject to subparagraph (E), that a manufacturer of the chemical substance

has requested, in a form and manner and using the criteria prescribed by the Administrator in the rule promulgated under subparagraph (B), be subjected to a risk evaluation.

**(D) Scope**

The Administrator shall, not later than 6 months after the initiation of a risk evaluation, publish the scope of the risk evaluation to be conducted, including the hazards, exposures, conditions of use, and the potentially exposed or susceptible subpopulations the Administrator expects to consider, and, for each designation of a high-priority substance, ensure not less than 12 months between the initiation of the prioritization process for the chemical substance and the publication of the scope of the risk evaluation for the chemical substance, and for risk evaluations conducted on chemical substances that have been identified under paragraph (2)(A) or selected under subparagraph (E)(iv)(II) of this paragraph, ensure not less than 3 months before the Administrator publishes the scope of the risk evaluation.

**(E) Limitation and criteria**

**(i) Percentage requirements**

The Administrator shall ensure that, of the number of chemical substances that undergo a risk evaluation under clause (i) of subparagraph (C), the number of chemical substances undergoing a risk evaluation under clause (ii) of subparagraph (C) is—
(I) not less than 25 percent, if sufficient requests are made under clause (ii) of subparagraph (C); and
(II) not more than 50 percent.

**(ii) Requested risk evaluations**

Requests for risk evaluations under subparagraph (C)(ii) shall be subject to the payment of fees pursuant to section 2625(b) of this title, and the Administrator shall not expedite or otherwise provide special treatment to such risk evaluations.

**(iii) Preference**

In deciding whether to grant requests under subparagraph (C)(ii), the Administrator shall give preference to requests for risk evaluations on chemical substances for which the Administrator determines that restrictions imposed by 1 or more States have the potential to have a significant impact on interstate commerce or health or the environment.

**(iv) Exceptions**

(I) Chemical substances for which requests have been granted under subparagraph (C)(ii) shall not be subject to section 2617(b) of this title.
(II) Requests for risk evaluations on chemical substances which are made under subparagraph (C)(ii) and that are drawn from the 2014 update of the TSCA Work Plan for Chemical Assessments shall be granted at the discretion of the Administrator and not be subject to clause (i)(II).

**(F) Requirements**

In conducting a risk evaluation under this subsection, the Administrator shall—

(i) integrate and assess available information on hazards and exposures for the conditions of use of the chemical substance, including information that is relevant to specific risks of injury to health or the environment and information on potentially exposed or susceptible subpopulations identified as relevant by the Administrator;

(ii) describe whether aggregate or sentinel exposures to a chemical substance under the conditions of use were considered, and the basis for that consideration;

(iii) not consider costs or other nonrisk factors;

(iv) take into account, where relevant, the likely duration, intensity, frequency, and number of exposures under the conditions of use of the chemical substance; and

(v) describe the weight of the scientific evidence for the identified hazard and exposure.

**(G) Deadlines**

The Administrator—

(i) shall complete a risk evaluation for a chemical substance as soon as practicable, but not later than 3 years after the date on which the Administrator initiates the risk evaluation under subparagraph (C); and

(ii) may extend the deadline for a risk evaluation for not more than 6 months.

**(H) Notice and comment**

The Administrator shall provide no less than 30 days public notice and an opportunity for comment on a draft risk evaluation prior to publishing a final risk evaluation.

**(c) Promulgation of subsection (a) rules**

**(1) Deadlines**

If the Administrator determines that a chemical substance presents an unreasonable risk of injury to health or the environment in accordance with subsection (b)(4)(A), the Administrator—

(A) shall propose in the Federal Register a rule under subsection (a) for the chemical substance not later than 1 year after the date on which the final risk evaluation regarding the chemical substance is published;

(B) shall publish in the Federal Register a final rule not later than 2 years after the date on which the final risk evaluation regarding the chemical substance is published; and

(C) may extend the deadlines under this paragraph for not more than 2 years, subject to the condition that the aggregate length of extensions under this subparagraph and subsection (b)(4)(G)(ii) does not exceed 2 years, and subject to the limitation that the Administrator may not extend a deadline for the publication of a proposed or final rule regarding a chemical substance drawn from the 2014 update of the TSCA Work Plan for Chemical Assessments or a chemical substance that, with respect to persistence and bioaccumulation, scores high for 1 and either high or moderate for the other, pursuant to the TSCA Work Plan Chemicals Methods Document published by the Administrator in February 2012 (or a successor scoring system), without adequate public justification that demonstrates, following a review of the information reasonably available to the Administrator, that the Administrator cannot complete the proposed or final rule without additional information regarding the chemical substance.

**(2) Requirements for rule**

**(A) Statement of effects**

In proposing and promulgating a rule under subsection (a) with respect to a chemical substance or mixture, the Administrator shall consider and publish a statement based on reasonably available information with respect to—

(i) the effects of the chemical substance or mixture on health and the magnitude of the exposure of human beings to the chemical substance or mixture;

(ii) the effects of the chemical substance or mixture on the environment and the magnitude of the exposure of the environment to such substance or mixture;

(iii) the benefits of the chemical substance or mixture for various uses; and

(iv) the reasonably ascertainable economic consequences of the rule, including consideration of—

(I) the likely effect of the rule on the national economy, small business, technological innovation, the environment, and public health;

(II) the costs and benefits of the proposed and final regulatory action and of the 1 or more primary alternative regulatory actions considered by the Administrator; and

(III) the cost effectiveness of the proposed regulatory action and of the 1 or more primary alternative regulatory actions considered by the Administrator.

**(B) Selecting requirements**

In selecting among prohibitions and other restrictions, the Administrator shall factor in, to the extent practicable, the considerations under subparagraph (A) in accordance with subsection (a).

**(C) Consideration of alternatives**

Based on the information published under subparagraph (A), in deciding whether to prohibit or restrict in a manner that substantially prevents a specific condition of use of a chemical substance or mixture, and in setting an appropriate transition period for such action, the Administrator shall consider, to the extent practicable, whether technically and economically feasible alternatives that benefit health or the environment, compared to the use so proposed to be prohibited or restricted, will be reasonably available as a substitute when the proposed prohibition or other restriction takes effect.

**(D) Replacement parts**

**(i) In general**

The Administrator shall exempt replacement parts for complex durable goods and complex consumer goods that are designed prior to the date of publication in the Federal Register of the rule under subsection (a), unless the Administrator finds that such replacement parts contribute significantly to the risk, identified in a risk evaluation conducted under subsection (b)(4)(A), to the general population or to an identified potentially exposed or susceptible subpopulation.

**(ii) Definitions**

In this subparagraph—

(I) the term ''complex consumer goods'' means electronic or mechanical devices composed of multiple manufactured components, with an intended useful life of 3 or more years, where the product is typically not consumed, destroyed, or discarded after a single use, and the components of which would be impracticable to redesign or replace; and

(II) the term ''complex durable goods'' means manufactured goods composed of 100 or more manufactured components, with an intended useful life of 5 or more years, where the product is typically not consumed, destroyed, or discarded after a single use.

**(E) Articles**

In selecting among prohibitions and other restrictions, the Administrator shall apply such prohibitions or other restrictions to an article or category of articles containing the chemical substance or mixture only to the extent necessary to address the identified risks from exposure to the chemical substance or mixture from the article or category of articles so that the substance or mixture does not present an unreasonable risk of injury to health or the environment identified in the risk evaluation conducted in accordance with subsection (b)(4)(A).

**(3) Procedures**

When prescribing a rule under subsection (a) the Administrator shall proceed in accordance with section 553 of title 5 (without regard to any reference in such section to sections 556 and 557 of such title), and shall also—

(A) publish a notice of proposed rulemaking stating with particularity the reason for the proposed rule;

(B) allow interested persons to submit written data, views, and arguments, and make all such submissions publicly available;

(C) promulgate a final rule based on the matter in the rulemaking record; and

(D) make and publish with the rule the determination described in subsection (a).

**(d) Effective date**

(1) IN GENERAL.—In any rule under subsection (a), the Administrator shall—

(A) specify the date on which it shall take effect, which date shall be as soon as practicable;

(B) except as provided in subparagraphs (C) and (D), specify mandatory compliance dates for all of the requirements under a rule under subsection (a), which shall be as soon as practicable, but not later than 5 years after the date of promulgation of the rule, except in a case of a use exempted under subsection (g);

(C) specify mandatory compliance dates for the start of ban or phase-out requirements under a rule under subsection (a), which shall be as soon as practicable, but not later than 5 years after the date of promulgation of the rule, except in the case of a use exempted under subsection (g);

(D) specify mandatory compliance dates for full implementation of ban or phase-out requirements under a rule under subsection (a), which shall be as soon as practicable; and

(E) provide for a reasonable transition period.

(2) VARIABILITY.—As determined by the Administrator, the compliance dates established under paragraph (1) may vary for different affected persons.

(3)(A) The Administrator may declare a proposed rule under subsection (a) to be effective, and compliance with the proposed requirements to be mandatory, upon publication in the Federal Register of the proposed rule and until the compliance dates applicable to such requirements in a final rule promulgated under section 2605(a) of this title or until the Administrator revokes such proposed rule, in accordance with subparagraph (B), if—

(i) the Administrator determines that—

(I) the manufacture, processing, distribution in commerce, use, or disposal of the chemical substance or mixture subject to such proposed rule or any combination of such activities is likely to result in an unreasonable risk of serious or widespread injury to health or the environment before such effective date without consideration of costs or other non-risk factors; and

(II) making such proposed rule so effective is necessary to protect the public interest; and

(ii) in the case of a proposed rule to prohibit the manufacture, processing, or distribution of a chemical substance or mixture because of the risk determined under clause (i)(I), a court has in an action under section 2606 of this title granted relief with respect to such risk associated with such substance or mixture.

Such a proposed rule which is made so effective shall not, for purposes of judicial review, be considered final agency action.

(B) If the Administrator makes a proposed rule effective upon its publication in the Federal Register, the Administrator shall, as expeditiously as possible, give interested persons prompt notice of such action in accordance with subsection (c), and either promulgate such rule (as proposed or with modifications) or revoke it.

**(e) Polychlorinated biphenyls**

(1) Within six months after January 1, 1977, the Administrator shall promulgate rules to—

(A) prescribe methods for the disposal of polychlorinated biphenyls, and

ADD-9

(B) require polychlorinated biphenyls to be marked with clear and adequate warnings, and instructions with respect to their processing, distribution in commerce, use, or disposal or with respect to any combination of such activities.

Requirements prescribed by rules under this paragraph shall be consistent with the requirements of paragraphs (2) and (3).

(2)(A) Except as provided under subparagraph (B), effective one year after January 1, 1977, no person may manufacture, process, or distribute in commerce or use any polychlorinated biphenyl in any manner other than in a totally enclosed manner.

(B) The Administrator may by rule authorize the manufacture, processing, distribution in commerce or use (or any combination of such activities) of any polychlorinated biphenyl in a manner other than in a totally enclosed manner if the Administrator finds that such manufacture, processing, distribution in commerce, or use (or combination of such activities) will not present an unreasonable risk of injury to health or the environment.

(C) For the purposes of this paragraph, the term ''totally enclosed manner'' means any manner which will ensure that any exposure of human beings or the environment to a polychlorinated biphenyl will be insignificant as determined by the Administrator by rule.

(3)(A) Except as provided in subparagraphs (B) and (C)—

(i) no person may manufacture any polychlorinated biphenyl after two years after January 1, 1977, and

(ii) no person may process or distribute in commerce any polychlorinated biphenyl after two and one-half years after such date.

(B) Any person may petition the Administrator for an exemption from the requirements of subparagraph (A), and the Administrator may grant by rule such an exemption if the Administrator finds that—

(i) an unreasonable risk of injury to health or environment would not result, and

(ii) good faith efforts have been made to develop a chemical substance which does not present an unreasonable risk of injury to health or the environment and which may be substituted for such polychlorinated biphenyl.

An exemption granted under this subparagraph shall be subject to such terms and conditions as the Administrator may prescribe and shall be in effect for such period (but not more than one year from the date it is granted) as the Administrator may prescribe.

(C) Subparagraph (A) shall not apply to the distribution in commerce of any polychlorinated biphenyl if such polychlorinated biphenyl was sold for purposes other than resale before two and one half years after October 11, 1976.

(4) Any rule under paragraph (1), (2)(B), or (3)(B) shall be promulgated in accordance with paragraph (3) of subsection (c).

(5) This subsection does not limit the authority of the Administrator, under any other provision of this chapter or any other Federal law, to take action respecting any polychlorinated biphenyl.

**(f) Mercury**

**(1) Prohibition on sale, distribution, or transfer of elemental mercury by Federal agencies**

Except as provided in paragraph (2), effective beginning on October 14, 2008, no Federal agency shall convey, sell, or distribute to any other Federal agency, any State or local government agency, or any private individual or entity any elemental mercury under the control or jurisdiction of the Federal agency.

**(2) Exceptions**

Paragraph (1) shall not apply to—

(A) a transfer between Federal agencies of elemental mercury for the sole purpose of facilitating storage of mercury to carry out this chapter; or

(B) a conveyance, sale, distribution, or transfer of coal.

**(3) Leases of Federal coal**

Nothing in this subsection prohibits the leasing of coal.

**(g) Exemptions**

**(1) Criteria for exemption**

The Administrator may, as part of a rule promulgated under subsection (a), or in a separate rule, grant an exemption from a requirement of a subsection (a) rule for a specific condition of use of a chemical substance or mixture, if the Administrator finds that—

(A) the specific condition of use is a critical or essential use for which no technically and economically feasible safer alternative is available, taking into consideration hazard and exposure;

(B) compliance with the requirement, as applied with respect to the specific condition of use, would significantly disrupt the national economy, national security, or critical infrastructure; or

(C) the specific condition of use of the chemical substance or mixture, as compared to reasonably available alternatives, provides a substantial benefit to health, the environment, or public safety.

**(2) Exemption analysis and statement**

In proposing an exemption under this subsection, the Administrator shall analyze the need for the exemption, and shall make public the analysis and a statement describing how the analysis was taken into account.

**(3) Period of exemption**

The Administrator shall establish, as part of a rule under this subsection, a time limit on any exemption for a time to be determined by the Administrator as reasonable on a case-by-case basis, and, by rule, may extend, modify, or eliminate an exemption if the Administrator determines, on the basis of reasonably available information and after adequate public justification, the exemption warrants extension or modification or is no longer necessary.

**(4) Conditions**

As part of a rule promulgated under this subsection, the Administrator shall include

conditions, including reasonable record-keeping, monitoring, and reporting requirements, to the extent that the Administrator determines the conditions are necessary to protect health and the environment while achieving the purposes of the exemption.

**(h) Chemicals that are persistent, bioaccumulative, and toxic**

**(1) Expedited action**

Not later than 3 years after June 22, 2016, the Administrator shall propose rules under subsection (a) with respect to chemical substances identified in the 2014 update of the TSCA Work Plan for Chemical Assessments—

(A) that the Administrator has a reasonable basis to conclude are toxic and that with respect to persistence and bioaccumulation score high for one and either high or moderate for the other, pursuant to the TSCA Work Plan Chemicals Methods Document published by the Administrator in February 2012 (or a successor scoring system), and are not a metal or a metal compound, and for which the Administrator has not completed a Work Plan Problem Formulation, initiated a review under section 5, or entered into a consent agreement under section 2603 of this title, prior to June 22, 2016; and

(B) exposure to which under the conditions of use is likely to the general population or to a potentially exposed or susceptible subpopulation identified by the Administrator, or the environment, on the basis of an exposure and use assessment conducted by the Administrator.

**(2) No risk evaluation required**

The Administrator shall not be required to conduct risk evaluations on chemical substances that are subject to paragraph (1).

**(3) Final rule**

Not later than 18 months after proposing a rule pursuant to paragraph (1), the Administrator shall promulgate a final rule under subsection (a).

**(4) Selecting restrictions**

In selecting among prohibitions and other restrictions promulgated in a rule under subsection (a) pursuant to paragraph (1), the Administrator shall address the risks of injury to health or the environment that the Administrator determines are presented by the chemical substance and shall reduce exposure to the substance to the extent practicable.

**(5) Relationship to subsection (b)**

If, at any time prior to the date that is 90 days after June 22, 2016, the Administrator makes a designation under subsection (b)(1)(B)(i), or receives a request under subsection (b)(4)(C)(ii), such chemical substance shall not be subject to this subsection, except that in selecting among prohibitions and other restrictions promulgated in a rule pursuant to subsection (a), the Administrator shall both ensure that the chemical substance meets the rulemaking standard under subsection (a) and reduce exposure to the substance to the extent practicable.

**(i) Final agency action**

Under this section and subject to section 2617 of this title—

(1) a determination by the Administrator under subsection (b)(4)(A) that a chemical substance does not present an unreasonable risk of injury to health or the environment shall be issued by order and considered to be a final agency action, effective beginning on the date of issuance of the order; and

(2) a final rule promulgated under subsection (a), including the associated determination by the Administrator under subsection (b)(4)(A) that a chemical substance presents an unreasonable risk of injury to health or the environment, shall be considered to be a final agency action, effective beginning on the date of promulgation of the final rule.

**(j) Definition**

For the purposes of this chapter, the term "requirement" as used in this section shall not displace statutory or common law.

(Pub. L. 94–469, title I, §6, Oct. 11, 1976, 90 Stat. 2020; renumbered title I, Pub. L. 99–519, §3(c)(1), Oct. 22, 1986, 100 Stat. 2989; amended Pub. L. 109–364, div. A, title III, §317(a), Oct. 17, 2006, 120 Stat. 2142; Pub. L. 110–414, §3, Oct. 14, 2008, 122 Stat. 4342; Pub. L. 114–182, title I, §6, June 22, 2016, 130 Stat. 460.)

### Editorial Notes

#### AMENDMENTS

2016—Pub. L. 114–182, §6(1), substituted "Prioritization, risk evaluation, and regulation of chemical substances and mixtures" for "Regulation of hazardous chemical substances and mixtures" in section catchline.

Subsec. (a). Pub. L. 114–182, §6(2)(A)–(D), in introductory provisions, substituted "determines in accordance with subsection (b)(4)(A)" for "finds that there is a reasonable basis to conclude" and "so that the chemical substance or mixture no longer presents such risk" for "to protect adequately against such risk using the least burdensome requirements", struck out "or will present" after "presents", and inserted "and subject to section 2617 of this title, and in accordance with subsection (c)(2)," after "shall by rule".

Subsec. (a)(1)(A), (2)(A). Pub. L. 114–182, §6(2)(E), inserted "or otherwise restricting" after "prohibiting".

Subsec. (a)(3). Pub. L. 114–182, §6(2)(F), inserted "minimum" before "warnings" in two places.

Subsec. (a)(4). Pub. L. 114–182, §6(2)(G), substituted "or monitor or conduct tests" for "and monitor or conduct tests".

Subsec. (a)(7). Pub. L. 114–182, §6(2)(H), substituted "such determination" for "such unreasonable risk of injury" in subpar. (A) and for "such risk of injury" in subpar. (B).

Subsec. (b). Pub. L. 114–182, §6(3), amended subsec. (b) generally. Prior to amendment, subsec. (b) related to quality control procedures in the manufacturing or processing of a chemical substance or mixture to prevent unreasonable risk of injury to health or the environment.

Subsec. (c). Pub. L. 114–182, §6(4), amended subsec. (c) generally. Prior to amendment, subsec. (c) related to promulgation of subsection (a) rules.

Subsec. (d)(1), (2). Pub. L. 114–182, §6(5)(B), added pars. (1) and (2) and struck out former par. (1) which read as follows: "The Administrator shall specify in any rule under subsection (a) the date on which it shall take effect, which date shall be as soon as feasible." Former par. (2) redesignated (3).

ADD-11

Subsec. (d)(3). Pub. L. 114–182, §6(5)(A), redesignated par. (2) as (3).

Subsec. (d)(3)(A). Pub. L. 114–182, §6(5)(C)(i)(I), in introductory provisions, substituted '', and compliance with the proposed requirements to be mandatory, upon publication in the Federal Register of the proposed rule and until the compliance dates applicable to such requirements in a final rule promulgated under section 2605(a) of this title or until the Administrator revokes such proposed rule, in accordance with subparagraph (B), if'' for ''upon its publication in the Federal Register and until the effective date of final action taken, in accordance with subparagraph (B), respecting such rule if''.

Subsec. (d)(3)(A)(i)(I). Pub. L. 114–182, §6(5)(C)(i)(II), inserted ''without consideration of costs or other non-risk factors'' after ''effective date''.

Subsec. (d)(3)(B). Pub. L. 114–182, §6(5)(C)(ii), substituted ''in accordance with subsection (c), and either promulgate such rule (as proposed or with modifications) or revoke it.'' for '', provide reasonable opportunity, in accordance with paragraphs (2) and (3) of subsection (c), for a hearing on such rule, and either promulgate such rule (as proposed or with modifications) or revoke it; and if such a hearing is requested, the Administrator shall commence the hearing within five days from the date such request is made unless the Administrator and the person making the request agree upon a later date for the hearing to begin, and after the hearing is concluded the Administrator shall, within ten days of the conclusion of the hearing, either promulgate such rule (as proposed or with modifications) or revoke it.''

Subsec. (e)(4). Pub. L. 114–182, §6(6), substituted ''paragraph (3)'' for ''paragraphs (2), (3), and (4)''.

Subsecs. (g) to (j). Pub. L. 114–182, §6(7), added subsecs. (g) to (j).

2008—Subsec. (f). Pub. L. 110–414 added subsec. (f).

2006—Subsec. (e)(3)(A). Pub. L. 109–364, §317(a)(1), (b), temporarily substituted ''subparagraphs (B), (C), and (D)'' for ''subparagraphs (B) and (C)'' in introductory provisions. See Termination Date of 2006 Amendment note below.

Subsec. (e)(3)(B). Pub. L. 109–364, §317(a)(2), (b), temporarily substituted ''but not more than 1 year from the date it is granted, except as provided in subparagraph (D)'' for ''but not more than one year from the date it is granted'' in concluding provisions. See Termination Date of 2006 Amendment note below.

Subsec. (e)(3)(D). Pub. L. 109–364, §317(a)(3), (b), temporarily added subpar. (D) which read as follows: ''The Administrator may extend an exemption granted pursuant to subparagraph (B) that has not yet expired for a period not to exceed 60 days for the purpose of authorizing the Secretary of Defense and the Secretaries of the military departments to provide for the transportation into the customs territory of the United States of polychlorinated biphenyls generated by or under the control of the Department of Defense for purposes of their disposal, treatment, or storage in the customs territory of the United States if those polychlorinated biphenyls are already in transit from their storage locations but the Administrator determines, in the sole discretion of the Administrator, they would not otherwise arrive in the customs territory of the United States within the period of the original exemption. The Administrator shall promptly publish notice of such extension in the Federal Register.'' See Termination Date of 2006 Amendment note below.

### Statutory Notes and Related Subsidiaries

#### TERMINATION DATE OF 2006 AMENDMENT

Pub. L. 109–364, div. A, title III, §317(b), Oct. 17, 2006, 120 Stat. 2142, provided that: ''The amendments made by subsection (a) [amending this section] shall cease to have effect on September 30, 2012. The termination of the authority to grant exemptions pursuant to such amendments shall not effect the validity of any exemption granted prior to such date.''

EFFECTIVE DATE

Section effective Jan. 1, 1977, see section 31 of Pub. L. 94–469, set out as a note under section 2601 of this title.

### § 2606. Imminent hazards

#### (a) Actions authorized and required

(1) The Administrator may commence a civil action in an appropriate district court of the United States—

(A) for seizure of an imminently hazardous chemical substance or mixture or any article containing such a substance or mixture,

(B) for relief (as authorized by subsection (b)) against any person who manufactures, processes, distributes in commerce, or uses, or disposes of, an imminently hazardous chemical substance or mixture or any article containing such a substance or mixture, or

(C) for both such seizure and relief.

A civil action may be commenced under this paragraph notwithstanding the existence of a determination under section 2604 or 2605 of this title, a rule under section 2603, 2604, or 2605 of this title or subchapter IV, an order under section 2603, 2604, or 2605 of this title or subchapter IV, or a consent agreement under section 2603 of this title, and notwithstanding the pendency of any administrative or judicial proceeding under any provision of this chapter.

(2) If the Administrator has not made a rule under section 2605(a) of this title immediately effective (as authorized by section 2605(d)(3)(A)(i) of this title) with respect to an imminently hazardous chemical substance or mixture, the Administrator shall commence in a district court of the United States with respect to such substance or mixture or article containing such substance or mixture a civil action described in subparagraph (A), (B), or (C) of paragraph (1).

#### (b) Relief authorized

(1) The district court of the United States in which an action under subsection (a) is brought shall have jurisdiction to grant such temporary or permanent relief as may be necessary to protect health or the environment from the unreasonable risk (as identified by the Administrator without consideration of costs or other nonrisk factors) associated with the chemical substance, mixture, or article involved in such action.

(2) In the case of an action under subsection (a) brought against a person who manufactures, processes, or distributes in commerce a chemical substance or mixture or an article containing a chemical substance or mixture, the relief authorized by paragraph (1) may include the issuance of a mandatory order requiring (A) in the case of purchasers of such substance, mixture, or article known to the defendant, notification to such purchasers of the risk associated with it; (B) public notice of such risk; (C) recall; (D) the replacement or repurchase of such substance, mixture, or article; or (E) any combination of the actions described in the preceding clauses.

(3) In the case of an action under subsection (a) against a chemical substance, mixture, or article, such substance, mixture, or article may be proceeded against by process of libel for its sei-

Editorial Notes

REFERENCES IN TEXT

Section 2605(b)(4)(D) of this title, referred to in subsec. (a)(1)(B)(i), (ii), was in the original ''section (6)(b)(4)(D)'', and was translated as meaning section 6(b)(4)(D) of title I of Pub. L. 94–469 to reflect the probable intent of Congress.

The Frank R. Lautenberg Chemical Safety for the 21st Century Act, referred to in subsecs. (d)(1)(A), (2) and (g)(1), (2)(A), is Pub. L. 114–182, June 22, 2016, 130 Stat. 492. The effective date of the Frank R. Lautenberg Chemical Safety for the 21st Century Act probably means the date of the enactment of the Act, which was approved June 22, 2016. For complete classification of this Act to the Code, see Short Title of 2016 Amendment note set out under section 2601 of this title and Tables.

AMENDMENTS

2016—Subsec. (a). Pub. L. 114–182, §13(1), amended subsec. (a) generally. Prior to amendment, subsec. (a) related to effect of chapter on State law.

Subsec. (b). Pub. L. 114–182, §13(2), amended subsec. (b) generally. Prior to amendment, subsec. (b) related to exemption from required testing of chemical substances or mixtures.

Subsecs. (c) to (g). Pub. L. 114–182, §13(3), added subsecs. (c) to (g).

**Statutory Notes and Related Subsidiaries**

EFFECTIVE DATE

Section effective Jan. 1, 1977, see section 31 of Pub. L. 94–469, set out as a note under section 2601 of this title.

## § 2618. Judicial review

### (a) In general

(1)(A) Except as otherwise provided in this subchapter, not later than 60 days after the date on which a rule is promulgated under this subchapter, subchapter II, or subchapter IV, or the date on which an order is issued under section 2603, 2604(e), 2604(f), or 2605(i)(1) of this title,,[1] any person may file a petition for judicial review of such rule or order with the United States Court of Appeals for the District of Columbia Circuit or for the circuit in which such person resides or in which such person's principal place of business is located. Courts of appeals of the United States shall have exclusive jurisdiction of any action to obtain judicial review (other than in an enforcement proceeding) of such a rule or order if any district court of the United States would have had jurisdiction of such action but for this subparagraph.

(B) Except as otherwise provided in this subchapter, courts of appeals of the United States shall have exclusive jurisdiction of any action to obtain judicial review (other than in an enforcement proceeding) of an order issued under this subchapter, other than an order under section 2603, 2604(e), 2604(f), or 2605(i)(1) of this title, if any district court of the United States would have had jurisdiction of such action but for this subparagraph.

(C)(i) Not later than 60 days after the publication of a designation under section 2605(b)(1)(B)(ii) of this title, any person may commence a civil action to challenge the designation.

[1] So in original.

(ii) The United States Court of Appeals for the District of Columbia Circuit shall have exclusive jurisdiction over a civil action filed under this subparagraph.

(2) Copies of any petition filed under paragraph (1)(A) shall be transmitted forthwith to the Administrator and to the Attorney General by the clerk of the court with which such petition was filed. The provisions of section 2112 of title 28 shall apply to the filing of the record of proceedings on which the Administrator based the rule or order being reviewed under this section and to the transfer of proceedings between United States courts of appeals.

### (b) Additional submissions and presentations; modifications

If in an action under this section to review a rule, or an order under section 2603, 2604(e), 2604(f), or 2605(i)(1) of this title, the petitioner or the Administrator applies to the court for leave to make additional oral submissions or written presentations respecting such rule or order and shows to the satisfaction of the court that such submissions and presentations would be material and that there were reasonable grounds for the submissions and failure to make such submissions and presentations in the proceeding before the Administrator, the court may order the Administrator to provide additional opportunity to make such submissions and presentations. The Administrator may modify or set aside the rule or order being reviewed or make a new rule or order by reason of the additional submissions and presentations and shall file such modified or new rule or order with the return of such submissions and presentations. The court shall thereafter review such new or modified rule or order.

### (c) Standard of review

(1)(A) Upon the filing of a petition under subsection (a)(1) for judicial review of a rule or order, the court shall have jurisdiction (i) to grant appropriate relief, including interim relief, as provided in chapter 7 of title 5, and (ii) except as otherwise provided in subparagraph (B), to review such rule or order in accordance with chapter 7 of title 5.

(B) Section 706 of title 5 shall apply to review of a rule or order under this section, except that—

(i) in the case of review of—

(I) a rule under section 2603(a), 2604(b)(4), 2605(a) (including review of the associated determination under section 2605(b)(4)(A)), or 2605(e) of this title, the standard for review prescribed by paragraph (2)(E) of such section 706 shall not apply and the court shall hold unlawful and set aside such rule if the court finds that the rule is not supported by substantial evidence in the rulemaking record taken as a whole; and

(II) an order under section 2603, 2604(e), 2604(f), or 2605(i)(1) of this title, the standard for review prescribed by paragraph (2)(E) of such section 706 shall not apply and the court shall hold unlawful and set aside such order if the court finds that the order is not supported by substantial evidence in the record taken as a whole; and

(ii) the court may not review the contents and adequacy of any statement of basis and

purpose required by section 553(c) of title 5 to be incorporated in the rule or order, except as part of the record, taken as a whole.

(2) The judgment of the court affirming or setting aside, in whole or in part, any rule or order reviewed in accordance with this section shall be final, subject to review by the Supreme Court of the United States upon certiorari or certification, as provided in section 1254 of title 28.

### (d) Fees and costs

The decision of the court in an action commenced under subsection (a), or of the Supreme Court of the United States on review of such a decision, may include an award of costs of suit and reasonable fees for attorneys and expert witnesses if the court determines that such an award is appropriate.

### (e) Other remedies

The remedies as provided in this section shall be in addition to and not in lieu of any other remedies provided by law.

(Pub. L. 94–469, title I, §19, Oct. 11, 1976, 90 Stat. 2039; renumbered title I and amended Pub. L. 99–519, §3(b)(2), (c)(1), Oct. 22, 1986, 100 Stat. 2989; Pub. L. 102–550, title X, §1021(b)(8), Oct. 28, 1992, 106 Stat. 3923; Pub. L. 114–182, title I, §§14, 19(m), June 22, 2016, 130 Stat. 498, 508.)

#### Editorial Notes

##### AMENDMENTS

2016—Subsec. (a)(1)(A). Pub. L. 114–182, §19(m)(1)(A), substituted ''Except as otherwise provided in this subchapter, not later than 60 days after the date on which a rule is promulgated under this subchapter, subchapter II, or subchapter IV, or the date on which an order is issued under section 2603, 2604(e), 2604(f), or 2605(i)(1) of this title,'' for ''Not later than 60 days after the date of the promulgation of a rule under section 2603(a), 2604(a)(2), 2604(b)(4), 2605(a), 2605(e), or 2607 of this title, or under subchapter II or IV'', ''such rule or order'' for ''such rule'', and ''such a rule or order'' for ''such a rule''.

Subsec. (a)(1)(B). Pub. L. 114–182, §19(m)(1)(B), substituted ''Except as otherwise provided in this subchapter, courts'' for ''Courts'' and ''this subchapter, other than an order under section 2603, 2604(e), 2604(f), or 2605(i)(1) of this title,'' for ''subparagraph (A) or (B) of section 2605(b)(1) of this title''.

Subsec. (a)(1)(C). Pub. L. 114–182, §14(1), added subpar. (C).

Subsec. (a)(2). Pub. L. 114–182, §19(m)(1)(C), substituted ''record'' for ''rulemaking record'' and ''based the rule or order'' for ''based the rule''.

Subsec. (a)(3). Pub. L. 114–182, §14(2), struck out par. (3) which defined ''rulemaking record''.

Subsec. (b). Pub. L. 114–182, §19(m)(2), substituted ''review a rule, or an order under section 2603, 2604(e), 2604(f), or 2605(i)(1) of this title,'' for ''review a rule'', ''such rule or order'' for ''such rule'', ''the rule or order'' for ''the rule'', ''new rule or order'' for ''new rule'' in two places, and ''modified rule or order'' for ''modified rule''.

Subsec. (c)(1)(A). Pub. L. 114–182, §19(m)(3)(A)(i), substituted ''a rule or order'' for ''a rule'' and ''such rule or order'' for ''such rule''.

Subsec. (c)(1)(B). Pub. L. 114–182, §19(m)(3)(A)(ii)(I), substituted ''a rule or order'' for ''a rule'' in introductory provisions.

Pub. L. 114–182, §19(m)(3)(A)(ii)(III), struck out concluding provisions which read as follows: ''The term 'evidence' as used in clause (i) means any matter in the rulemaking record.''

Subsec. (c)(1)(B)(i). Pub. L. 114–182, §19(m)(3)(A)(ii)(II), amended cl. (i) generally. Prior to amendment, cl. (i) read as follows: ''in the case of review of a rule under section 2603(a), 2604(b)(4), 2605(a), or 2605(e) of this title, the standard for review prescribed by paragraph (2)(E) of such section 706 shall not apply and the court shall hold unlawful and set aside such rule if the court finds that the rule is not supported by substantial evidence in the rulemaking record (as defined in subsection (a)(3)) taken as a whole;''.

Subsec. (c)(1)(B)(ii), (iii). Pub. L. 114–182, §19(m)(3)(A)(ii)(III), added cl. (ii) and struck out former cls. (ii) and (iii) which related to review of rules under section 2605(a) of this title and statements not subject to court review, respectively.

Subsec. (c)(1)(C). Pub. L. 114–182, §19(m)(3)(A)(iii), struck out subpar. (C) which read as follows: ''A determination, rule, or ruling of the Administrator described in subparagraph (B)(ii) may be reviewed only in an action under this section and only in accordance with such subparagraph.''

Subsec. (c)(2). Pub. L. 114–182, §19(m)(3)(B), substituted ''any rule or order'' for ''any rule''.

1992—Subsec. (a)(1)(A). Pub. L. 102–550, §1021(b)(8)(A), substituted ''subchapter II or IV'' for ''subchapter II''.

Subsec. (a)(3)(B). Pub. L. 102–550, §1021(b)(8)(B), inserted before semicolon at end ''and in the case of a rule under subchapter IV, the finding required for the issuance of such a rule''.

1986—Subsec. (a)(1)(A). Pub. L. 99–519 inserted reference to subchapter II of this chapter.

#### Statutory Notes and Related Subsidiaries

##### EFFECTIVE DATE

Section effective Jan. 1, 1977, see section 31 of Pub. L. 94–469, set out as a note under section 2601 of this title.

### § 2619. Citizens' civil actions

#### (a) In general

Except as provided in subsection (b), any person may commence a civil action—

   (1) against any person (including (A) the United States, and (B) any other governmental instrumentality or agency to the extent permitted by the eleventh amendment to the Constitution) who is alleged to be in violation of this chapter or any rule promulgated under section 2603, 2604, or 2605 of this title, or subchapter II or IV, or order issued under section 2603 or 2604 of this title or subchapter II or IV to restrain such violation, or

   (2) against the Administrator to compel the Administrator to perform any act or duty under this chapter which is not discretionary.

Any civil action under paragraph (1) shall be brought in the United States district court for the district in which the alleged violation occurred or in which the defendant resides or in which the defendant's principal place of business is located. Any action brought under paragraph (2) shall be brought in the United States District Court for the District of Columbia, or the United States district court for the judicial district in which the plaintiff is domiciled. The district courts of the United States shall have jurisdiction over suits brought under this section, without regard to the amount in controversy or the citizenship of the parties. In any civil action under this subsection process may be served on a defendant in any judicial district in which the defendant resides or may be found and subpoenas for witnesses may be served in any judicial district.



**(b) Limitation**

No civil action may be commenced—

(1) under subsection (a)(1) to restrain a violation of this chapter or rule or order under this chapter—

(A) before the expiration of 60 days after the plaintiff has given notice of such violation (i) to the Administrator, and (ii) to the person who is alleged to have committed such violation, or

(B) if the Administrator has commenced and is diligently prosecuting a proceeding for the issuance of an order under section 2615(a)(2) of this title to require compliance with this chapter or with such rule or order or if the Attorney General has commenced and is diligently prosecuting a civil action in a court of the United States to require compliance with this chapter or with such rule or order, but if such proceeding or civil action is commenced after the giving of notice, any person giving such notice may intervene as a matter of right in such proceeding or action;

(2) under subsection (a)(2) before the expiration of 60 days after the plaintiff has given notice to the Administrator of the alleged failure of the Administrator to perform an act or duty which is the basis for such action or, in the case of an action under such subsection for the failure of the Administrator to file an action under section 2606 of this title, before the expiration of ten days after such notification, except that no prior notification shall be required in the case of a civil action brought to compel a decision by the Administrator pursuant to section 2617(f)(3)(B) of this title; or

(3) in the case of a civil action brought to compel a decision by the Administrator pursuant to section 2617(f)(3)(B) of this title, after the date that is 60 days after the deadline specified in section 2617(f)(3)(B) of this title.

Notice under this subsection shall be given in such manner as the Administrator shall prescribe by rule.

**(c) General**

(1) In any action under this section, the Administrator, if not a party, may intervene as a matter of right.

(2) The court, in issuing any final order in any action brought pursuant to subsection (a), may award costs of suit and reasonable fees for attorneys and expert witnesses if the court determines that such an award is appropriate. Any court, in issuing its decision in an action brought to review such an order, may award costs of suit and reasonable fees for attorneys if the court determines that such an award is appropriate.

(3) Nothing in this section shall restrict any right which any person (or class of persons) may have under any statute or common law to seek enforcement of this chapter or any rule or order under this chapter or to seek any other relief.

**(d) Consolidation**

When two or more civil actions brought under subsection (a) involving the same defendant and the same issues or violations are pending in two or more judicial districts, such pending actions, upon application of such defendants to such actions which is made to a court in which any such action is brought, may, if such court in its discretion so decides, be consolidated for trial by order (issued after giving all parties reasonable notice and opportunity to be heard) of such court and tried in—

(1) any district which is selected by such defendant and in which one of such actions is pending,

(2) a district which is agreed upon by stipulation between all the parties to such actions and in which one of such actions is pending, or

(3) a district which is selected by the court and in which one of such actions is pending.

The court issuing such an order shall give prompt notification of the order to the other courts in which the civil actions consolidated under the order are pending.

(Pub. L. 94–469, title I, §20, Oct. 11, 1976, 90 Stat. 2041; renumbered title I and amended Pub. L. 99–519, §3(b)(3), (c)(1), Oct. 22, 1986, 100 Stat. 2989; Pub. L. 102–550, title X, §1021(b)(9), Oct. 28, 1992, 106 Stat. 3923; Pub. L. 114–182, title I, §§15, 19(n), June 22, 2016, 130 Stat. 498, 509.)

### Editorial Notes

#### AMENDMENTS

Subsec. (a)(1). Pub. L. 114–182, §19(n), substituted ''order issued under section 2603 or 2604 of this title'' for ''order issued under section 2604 of this title''.

Subsec. (b)(2), (3). Pub. L. 114–182, §15, substituted '', except that no prior notification shall be required in the case of a civil action brought to compel a decision by the Administrator pursuant to section 2617(f)(3)(B) of this title; or'' for period at end of par. (2) and added par. (3).

1992—Subsec. (a)(1). Pub. L. 102–550 substituted ''subchapter II or IV'' for ''subchapter II'' in two places.

1986—Subsec. (a)(1). Pub. L. 99–519 inserted references to subchapter II of this chapter.

### Statutory Notes and Related Subsidiaries

#### EFFECTIVE DATE

Section effective Jan. 1, 1977, see section 31 of Pub. L. 94–469, set out as a note under section 2601 of this title.

### § 2620. Citizens' petitions

**(a) In general**

Any person may petition the Administrator to initiate a proceeding for the issuance, amendment, or repeal of a rule under section 2603, 2605, or 2607 of this title or an order under section 2603 or 2604(e) or (f) of this title.

**(b) Procedures**

(1) Such petition shall be filed in the principal office of the Administrator and shall set forth the facts which it is claimed establish that it is necessary to issue, amend, or repeal a rule under section 2603, 2605, or 2607 of this title or an order under section 2603 or 2604(e) or (f) of this title.

(2) The Administrator may hold a public hearing or may conduct such investigation or proceeding as the Administrator deems appropriate in order to determine whether or not such petition should be granted.

(3) Within 90 days after filing of a petition described in paragraph (1), the Administrator shall

either grant or deny the petition. If the Administrator grants such petition, the Administrator shall promptly commence an appropriate proceeding in accordance with section 2603, 2604, 2605, or 2607 of this title. If the Administrator denies such petition, the Administrator shall publish in the Federal Register the Administrator's reasons for such denial.

(4)(A) If the Administrator denies a petition filed under this section (or if the Administrator fails to grant or deny such petition within the 90-day period) the petitioner may commence a civil action in a district court of the United States to compel the Administrator to initiate a rulemaking proceeding as requested in the petition. Any such action shall be filed within 60 days after the Administrator's denial of the petition or, if the Administrator fails to grant or deny the petition within 90 days after filing the petition, within 60 days after the expiration of the 90-day period.

(B) In an action under subparagraph (A) respecting a petition to initiate a proceeding to issue a rule under section 2603, 2605, or 2607 of this title or an order under section 2603 or 2604(e) or (f) of this title, the petitioner shall be provided an opportunity to have such petition considered by the court in a de novo proceeding. If the petitioner demonstrates to the satisfaction of the court by a preponderance of the evidence that—

(i) in the case of a petition to initiate a proceeding for the issuance of a rule under section 2603 of this title or an order under section 2603 or 2604(e) of this title—

(I) information available to the Administrator is insufficient to permit a reasoned evaluation of the health and environmental effects of the chemical substance to be subject to such rule or order; and

(II) in the absence of such information, the substance may present an unreasonable risk to health or the environment, or the substance is or will be produced in substantial quantities and it enters or may reasonably be anticipated to enter the environment in substantial quantities or there is or may be significant or substantial human exposure to it; or

(ii) in the case of a petition to initiate a proceeding for the issuance of a rule under section 2605(a) or 2607 of this title or an order under section 2604(f) of this title, the chemical substance or mixture to be subject to such rule or order presents an unreasonable risk of injury to health or the environment, without consideration of costs or other nonrisk factors, including an unreasonable risk to a potentially exposed or susceptible subpopulation, under the conditions of use.[1]

the court shall order the Administrator to initiate the action requested by the petitioner. If the court finds that the extent of the risk to health or the environment alleged by the petitioner is less than the extent of risks to health or the environment with respect to which the Administrator is taking action under this chapter and there are insufficient resources available

to the Administrator to take the action requested by the petitioner, the court may permit the Administrator to defer initiating the action requested by the petitioner until such time as the court prescribes.

(C) The court in issuing any final order in any action brought pursuant to subparagraph (A) may award costs of suit and reasonable fees for attorneys and expert witnesses if the court determines that such an award is appropriate. Any court, in issuing its decision in an action brought to review such an order, may award costs of suit and reasonable fees for attorneys if the court determines that such an award is appropriate.

(5) The remedies under this section shall be in addition to, and not in lieu of, other remedies provided by law.

(Pub. L. 94–469, title I, § 21, Oct. 11, 1976, 90 Stat. 2042; renumbered title I, Pub. L. 99–519, § 3(c)(1), Oct. 22, 1986, 100 Stat. 2989; amended Pub. L. 114–182, title I, § 19(*o*), June 22, 2016, 130 Stat. 509.)

### Editorial Notes

#### AMENDMENTS

2016—Subsec. (a). Pub. L. 114–182, § 19(*o*)(1), substituted ''order under section 2603 or 2604(e) or (f) of this title'' for ''order under section 2604(e) or 2605(b)(2) of this title''.

Subsec. (b)(1). Pub. L. 114–182, § 19(*o*)(2)(A), substituted ''order under section 2603 or 2604(e) or (f) of this title'' for ''order under section 2604(e), 2605(b)(1)(A), or 2605(b)(1)(B) of this title''.

Subsec. (b)(4)(B). Pub. L. 114–182, § 19(*o*)(2)(B)(i), substituted ''order under section 2603 or 2604(e) or (f) of this title'' for ''order under section 2604(e) or 2605(b)(2) of this title'' in introductory provisions.

Subsec. (b)(4)(B)(i). Pub. L. 114–182, § 19(*o*)(2)(B)(ii), substituted ''order under section 2603 or 2604(e) of this title'' for ''order under section 2604(e) of this title'' in introductory provisions.

Subsec. (b)(4)(B)(ii). Pub. L. 114–182, § 19(*o*)(2)(B)(iii), substituted ''section 2605(a) or 2607 of this title or an order under section 2604(f) of this title, the chemical substance or mixture to be subject to such rule or order presents an unreasonable risk of injury to health or the environment, without consideration of costs or other nonrisk factors, including an unreasonable risk to a potentially exposed or susceptible subpopulation, under the conditions of use'' for ''section 2605 or 2607 of this title or an order under section 2605(b)(2) of this title, there is a reasonable basis to conclude that the issuance of such a rule or order is necessary to protect health or the environment against an unreasonable risk of injury to health or the environment''.

### Statutory Notes and Related Subsidiaries

#### EFFECTIVE DATE

Section effective Jan. 1, 1977, see section 31 of Pub. L. 94–469, set out as a note under section 2601 of this title.

### § 2621. National defense waiver

The Administrator shall waive compliance with any provision of this chapter upon a request and determination by the President that the requested waiver is necessary in the interest of national defense. The Administrator shall maintain a written record of the basis upon which such waiver was granted and make such record available for in camera examination when relevant in a judicial proceeding under this chapter. Upon the issuance of such a waiver,

---

[1] So in original. The period probably should be a semicolon.