**ORAL ARGUMENT NOT YET SCHEDULED**

No. 25-1079; 25-1080; 25-1081; 25-1082; 25-1083; 25-1084; 25-1098; 25-1118; 25-1132; 25-1133; 25-1144; 25-1509
MCP No. 193

---

**IN THE UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT**

---

AMERICAN CHEMISTRY COUNCIL; GEORGIA CHEMISTRY COUNCIL; ALLIANCE FOR A STRONG U.S. BATTERY SECTOR; TEXAS CHEMISTRY COUNCIL; MICROPOROUS, LLC; ENVIRONMENTAL DEFENSE FUND; OHIO CHEMISTRY TECHNOLOGY COUNCIL; OLIN CORPORATION; MISSOURI ALLIANCE FOR A STRONG US BATTERY SECTOR; CENTER FOR ENVIRONMENTAL HEALTH; TRENT CAPITAL PARTNERS, LLC; PPG INDUSTRIES, INC.; OLIN CORP.; AND VINYL INSTITUTE

*Petitioners*

v.

UNITED STATES ENVIRONMENTAL PROTECTION AGENCY, ET AL.,

*Respondents.*

---

ON PETITION FOR REVIEW OF AGENCY ACTION OF THE UNITED STATES ENVIRONMENTAL PROTECTION AGENCY

---

**RESPONDENTS' BRIEF**


ADAM R. F. GUSTAFSON
Principal Deputy Assistant Attorney General

BRADLEY CRAIGMYLE
Deputy Assistant Attorney General

LAURA J. BROWN
LAURA J. GLICKMAN

*Of Counsel:*
STEPHANIE SCHWARZ
AMANDA WELLS

Office of the General Counsel
U.S. Environmental Protection Agency
Washington, D.C.

July 20, 2026

Environmental Defense Section
Environment and Natural Resources Division
U.S. Department of Justice
P.O. Box 7611
Washington, D.C. 20044
(202) 305-5314 (Brown)
(202) 598-3056 (Glickman)
Laura.J.S.Brown@usdoj.gov
Laura.Glickman@usdoj.gov

**TABLE OF CONTENTS**

TABLE OF CONTENTS ........ i

TABLE OF AUTHORITIES ........ iii

GLOSSARY ........ ix

INTRODUCTION ........ 1

STATEMENT OF THE ISSUES ........ 4

STATEMENT OF THE CASE ........ 5

I. Statutory Overview ........ 5

A. Risk Evaluations ........ 6

B. Risk Management ........ 9

III. Procedural Background ........ 11

A. EPA's Risk Evaluation for TCE. ........ 11

B. The Proposed Rule. ........ 14

C. The Final Risk Management Rule. ........ 15

D. EPA's Reconsideration of the Rule. ........ 19

SUMMARY OF THE ARGUMENT ........ 19

STANDARD OF REVIEW ........ 22

ARGUMENT ........ 24

I. Environmental Petitioners' Petition for Review Should Be Denied ........ 24

A. The Rule Adequately Protects Fenceline Communities. ........ 24

1. EPA properly analyzed the potential risks to fenceline communities. ....25

2. TSCA does not require EPA to consider aggregate or cumulative exposures. ....33

3. EPA correctly explained that Clean Air Act standards may prevent emission increases under the Rule. ....35

B. EPA Appropriately Excluded Production of TCE Byproduct from its Risk Evaluation and Rule. ....40

C. EPA Lawfully Exempted Processing of Byproduct TCE in Site-Limited, Physically Enclosed Systems. ....43

D. EPA Appropriately Established a *De Minimis* Regulatory Threshold for TCE. ....44

1. EPA acted within its discretion to exclude *de minimis* levels of TCE from regulation. ....44

2. EPA provided adequate notice and opportunity for comment on the *de minimis* threshold. ....47

E. Environmental Petitioners' Requested Remedies Are Inappropriate. ....50

II. Industry's Petitions Are Not Prudentially Ripe. ....51

A. The Issues Raised by Industry Petitioners Are Not Fit for Judicial Decision. ....53

B. Industry Petitioners Would Not Be Harmed by an Abeyance. ....56

CONCLUSION ....57

## TABLE OF AUTHORITIES

Statutes

*Allied-Signal, Inc. v. Nuclear Regul. Comm'n*,
988 F.2d 146 (D.C. Cir. 1993) ....................................................................50

*Am. Petroleum Inst. v. EPA*,
683 F.3d 382 (D.C. Cir. 2012) ....................................................................52

*Am. Textile Mfrs. Inst., Inc. v. Donovan*,
452 U.S. 490 (1981) ....................................................................23

*Atl. States Legal Found. v. EPA*,
325 F.3d 281 (D.C. Cir. 2003) ....................................................................53

*Cent. & S. W. Servs., Inc. v. EPA*,
220 F.3d 683 (5th Cir. 2000)....................................................................51

*Conn. Light & Power Co. v. Nuclear Regul. Comm'n*,
673 F.2d 525 (D.C. Cir. 1982) ....................................................................48

*Consolo v. Fed. Mar. Comm'n*,
383 U.S. 607 (1966) ....................................................................23

*Corrosion Proof Fittings v. EPA*,
947 F.2d 1201 (5th Cir. 1991)....................................................................23

*Devia v. NRC*,
492 F.3d 421 (D.C. Cir. 2007) .................................................................... 53, 56

*FCC v. Fox Television Stations, Inc.*,
556 U.S. 502 (2009) ....................................................................39

*Horsehead Res. Dev. Co., Inc. v. Browner*,
16 F.3d 1246 (D.C. Cir. 1994) ....................................................................48

*Int'l Union, United Mine Workers of Am. v. Mine Safety & Health Admin.*,
407 F.3d 1250 (D.C. Cir. 2005) ....................................................................48

*Lab. Council for Latin Am. Advancement v. EPA*,
12 F.4th 234 (2d Cir. 2021).................................................................... 5, 53

*Loper Bright Enters. v. Raimondo*,
603 U.S. 369 (2024) .......... 23, 24

*Mid-Tex Elec. Coop., Inc. v. FERC*,
773 F.2d 327 (D.C. Cir. 1985) .......... 49

*Nat'l Ass'n of Home Builders v. Defs. of Wildlife,*
551 U.S. 644 (2007) .......... 33

*Nat'l Park Hosp. Ass'n v. Dep't of Interior*,
538 U.S. 803 (2003) .......... 52

*Nat'l Treasury Emps. Union v. United States,*
101 F.3d 1423 (D.C. Cir. 1996) .......... 52

*NVE, Inc. v. Dep't of Health & Hum. Servs.,*
436 F.3d 182 (3d Cir. 2006) .......... 48

*Prometheus Radio Project v. FCC*,
652 F.3d 431 (3d Cir. 2011) .......... 48, 49

*Prometheus Radio Project v. FCC*,
824 F.3d 33 (3d Cir. 2016) .......... 51

*Pub. Citizen Health Rsch. Grp. v. FDA*,
740 F.2d 21 (D.C. Cir. 1984) .......... 52, 53, 54, 55

*Richardson v. Perales,*
402 U.S. 389 (1971) .......... 22

*Shell Chem. Co. v. EPA*,
826 F.2d 295 (5th Cir. 1987) .......... 22

*Town of Stratford v. FAA*,
285 F.3d 84 (D.C. Cir. 2002),
*reh'g denied*, 292 F.3d 251 (D.C. Cir. 2002) .......... 56

*U.S. Sugar Corp. v. EPA*,
113 F.4th 984 (D.C. Cir. 2024) .......... 23

*Wyo. Outdoor Council v. U.S. Forest Serv.,*
165 F.3d 43 (D.C. Cir. 1999) .......... 54

Other Authorities

15 U.S.C. § 2601(b)(3) ... 6

15 U.S.C. § 2601(c) ... 6

15 U.S.C. § 2602(12) ... 7, 31

15 U.S.C. § 2602(4) ... 7

15 U.S.C. § 2605(a) ... 5, 6, 9, 34

15 U.S.C. § 2605(b) ... 31, 34

15 U.S.C. § 2605(b)(1)(B) ... 6

15 U.S.C. § 2605(b)(2)(A) ... 11

15 U.S.C. § 2605(b)(3)–(4) ... 6

15 U.S.C. § 2605(b)(4)(A) ... 7, 24, 40

15 U.S.C. § 2605(b)(4)(B) ... 12

15 U.S.C. § 2605(b)(4)(D) ... 7, 11, 41, 44, 55

15 U.S.C. § 2605(b)(4)(F) ... 11

15 U.S.C. § 2605(b)(4)(F)(i) ... 7

15 U.S.C. § 2605(b)(4)(F)(ii) ... 8, 33, 34

15 U.S.C. § 2605(b)(4)(F)(iii) ... 8

15 U.S.C. § 2605(b)(4)(F)(iv) ... 8

15 U.S.C. § 2605(b)(4)(F)(v) ... 8

15 U.S.C. § 2605(c)(2) ... 31

15 U.S.C. § 2605(c)(2)(A) ... 9, 31, 35, 44

15 U.S.C. § 2605(c)(2)(A)–(B) ... 9, 30, 45

15 U.S.C. § 2605(c)(2)(C) ... 10

15 U.S.C. § 2605(c)(3) .......... 47

15 U.S.C. § 2605(c)–(d) .......... 6

15 U.S.C. § 2605(d) .......... 10

15 U.S.C. § 2605(d)(1)(E) .......... 36

15 U.S.C. § 2605(g) .......... 36

15 U.S.C. § 2605(g)(1) .......... 10

15 U.S.C. § 2605(g)(4) .......... 11

15 U.S.C. § 2605(i)(2) .......... 11

15 U.S.C. § 2608(b) .......... 39

15 U.S.C. § 2608(b)(1) .......... 25, 41

15 U.S.C. § 2618(a)(1)(A) .......... 4, 11

15 U.S.C. § 2618(c)(1)(B)(i)(I) .......... 22

15 U.S.C. § 2625(c) .......... 34

15 U.S.C. § 2625(h) .......... 8, 34, 35

15 U.S.C. § 2625(i) .......... 9

15 U.S.C. § 2625(k) .......... 9, 35

15 U.S.C. § 2625(*o*) .......... 12

42 U.S.C. § 7412 .......... 37

42 U.S.C. § 7412(d)(1)–(4) .......... 37

42 U.S.C. § 7412(d)(6) .......... 37

42 U.S.C. § 7412(f)(2) .......... 37

5 U.S.C. § 553(b)(3) .......... 47

5 U.S.C. § 706(2)(A) .......... 22

89 Fed. Reg. at 102612 .......... 32, 33, 37, 49

Pub. L. No. 94-469, 90 Stat. 2003 (1976) .......... 9

Regulations

29 C.F.R. § 1910.1200 .......... 46

40 C.F.R. § 702.33 (2017) .......... 33

40 C.F.R. § 702.39(d)(8) .......... 34

40 C.F.R. § 702.41(a)(1) (2017) .......... 12

40 C.F.R. § 702.41(a)(1)(ii) (2017) .......... 12

40 C.F.R. § 702.41(a)(1)(iii) (2017) .......... 12

40 C.F.R. § 702.41(a)(1)(iv) (2017) .......... 12

40 C.F.R. § 702.41(d) (2017) .......... 12

40 C.F.R. § 702.41(e) (2017) .......... 12

40 C.F.R. § 702.43 (2017) .......... 12

40 C.F.R. § 751.301(b) .......... 44

40 C.F.R. § 751.301(c) .......... 16, 43

40 C.F.R. § 751.305(b)(9)(i) .......... 16, 56

40 C.F.R. § 751.305(b)(9)(iii) .......... 16

40 C.F.R. § 751.313(h) .......... 16, 56

40 C.F.R. § 751.315(b)–(c) .......... 18

40 C.F.R. § 751.315(e) .......... 18

40 C.F.R. § 751.325(b)(5) .......... 17

40 C.F.R. § 751.325(b)(6) .......... 17

40 C.F.R. pt. 63, subpt. T .......... 39

40 C.F.R. pt. 702, subpt. B (2017) ........ 12

40 C.F.R. pt. 702, subpt. B (2024) ........ 12

Federal Register

81 Fed. Reg. 91927 (Dec. 19, 2016) ........ 11

82 Fed. Reg. 33726 (July 20, 2017) ........ 12

85 Fed. Reg. 11079 (Feb. 26, 2020) ........ 12

88 Fed. Reg. 1222 (Jan. 9, 2023) ........ 13, 14

88 Fed. Reg. 74712 (Oct. 31, 2023) ........ 14, 15, 24, 27, 31, 33, 37, 40, 47, 48, 50

89 Fed. Reg. 102568 (Dec. 17, 2024) .... 4, 15, 16, 17, 18, 27, 29, 30, 38, 39, 40, 44, 45, 46

89 Fed. Reg. 37028 (May 3, 2024) ........ 12

90 Fed. Reg. 44772 (Sep. 17, 2025) ........ 16

90 Fed. Reg. 45690 (Sep. 23, 2025) ........ 12

Legislative History

S. Rep. No. 94-698 (1976), *as reprinted* in 1976 U.S.C.C.A.N. 4491 ........ 5

Other Authorities

Protecting Public Health and the Environment and Restoring Science to Tackle the Climate Crisis, Exec. Order 13990, *rescinded by* Exec. Order 14148 ........ 13

## GLOSSARY

| | |
|---|---|
| ACC | American Chemistry Council, Georgia Chemistry Council, Ohio Chemistry Technology Council, Texas Chemistry Council, Olin Corporation, and Vinyl Institute |
| Alliance | Alliance for a Strong U.S. Battery Sector, PPG Industries, Inc., and Microporous, LLC |
| Environmental Petitioners | Environmental Defense Fund and Center for Environmental Health |
| EPA | U.S. Environmental Protection Agency |
| Industry Petitioners | ACC and Alliance |
| NESHAP | National Emission Standard for Hazardous Air Pollutants |
| Proposed Rule | EPA, "Trichloroethylene (TCE); Regulation Under the Toxic Substances Control Act (TSCA)," 88 Fed. Reg. 74712 (Oct. 31, 2023) |
| Risk Evaluation | 2020 Risk Evaluation for Trichloroethylene Rule |
| Final Rule | EPA, "Trichloroethylene (TCE); Regulation Under the Toxic Substances Control Act (TSCA)," 89 Fed. Reg. 102568 (Dec. 17, 2024) |
| TSCA | Toxic Substances Control Act |
| TCE | Trichloroethylene |

## INTRODUCTION

TSCA section 6(a) directs EPA to evaluate whether a given chemical presents an unreasonable risk to human health and the environment under its conditions of use. To determine whether a chemical presents an unreasonable risk, EPA exercises its technical expertise and judgment. If EPA determines the chemical presents an unreasonable risk, TSCA gives EPA the authority to determine how to address that risk in a risk management rule. Additional provisions, such as TSCA sections 6(d) and 6(g), provide EPA the tools necessary to ensure a reasonable transition period for uses that present an unreasonable risk and to exempt uses in certain circumstances. For example, EPA may exempt a use from restrictions in the rule where those restrictions would significantly disrupt the national economy, national security, or critical infrastructure. Congress provided EPA with wide latitude to carry out TSCA in a reasonable and prudent manner within statutory and reasoned decision-making bounds.

All parties agree that TCE is a widely used volatile organic compound linked to multiple harmful health effects. Indeed, EPA reviewed the best available science on risks posed by TCE and determined that the substance poses an unreasonable risk to human health under many conditions of use. EPA thus promulgated a rule to address that unreasonable risk by banning the substance with phase-outs that allow for a reasonable transition period. EPA also granted time-

limited exemptions where the use was critical or essential and there were no substitutes currently available or the restrictions in the Rule would significantly disrupt the national economy, national security, or critical infrastructure.

Despite EPA's ban on TCE, Environmental Petitioners argue that the Rule is not protective enough. But EPA acted reasonably, using the flexibility that TSCA provides the Agency in addressing unreasonable risk. Specifically, EPA determined that, given significant uncertainties, limitations, and gaps in available scientific data, the decreasing use of TCE as the ban goes into effect and protections offered by existing protections under other environmental statutes, the Rule sufficiently protects "fenceline communities." And, given the extensive practical concerns with detecting and eliminating trace amounts of TCE, EPA reasonably exercised its statutory authority and its discretion to determine how to address the unreasonable risk when it established a regulatory threshold in the Rule that excludes products containing TCE impurities or other trace amounts—i.e., *de minimis* amounts of TCE—from regulation. Environmental Petitioners also challenge the underlying Risk Evaluation, arguing that EPA violated TSCA by excluding the manufacture and processing of TCE when it is produced during the manufacture of other chemical substances, i.e., byproduct TCE, in the Risk Evaluation. But EPA, in using its statutory discretion and technical expertise, reasonably and lawfully excluded them and elected to address TCE produced as a

byproduct during the manufacture of other chemicals as part of those other chemicals' risk evaluations.

Industry Petitioners do not challenge EPA's broader regulatory approach for TCE but instead challenge discrete aspects of the Rule. The Rule contains time-limited exemptions for the use of TCE in certain industrial processes where the use is critical or essential and there are no substitutes currently available, or the restrictions in the Rule would significantly disrupt the national economy, national security, or critical infrastructure. The Alliance challenges the conditions EPA imposed on exemptions for lead acid battery separator and specialty polymeric microporous sheet manufacturing. ACC challenges the Rule's prohibition of both the offsite reuse of TCE unintentionally produced as a byproduct and the disposal of wastewater containing TCE. Because EPA is working diligently to reconsider these aspects of the Rule, however, Industry Petitioners' challenges are not prudentially ripe. EPA anticipates publishing a proposed rule in November 2026 and a final rule in November 2027. The Court thus should defer consideration of these issues, as they may become moot during the pendency of this action.

## STATEMENT OF JURISDICTION

These consolidated petitions seek review of EPA's final rule regulating TCE, including its underlying Risk Evaluation. 89 Fed. Reg. 102568 (Dec. 17, 2024), AR 1086, JA___. This Court has jurisdiction under 15 U.S.C. § 2618(a)(1)(A).

Although the Court has jurisdiction, as described *infra* Argument Section II, the Court should hold Industry Petitioners' petitions in abeyance while EPA reconsiders the portions of the Rule that Industry challenges.

## STATEMENT OF RELATED CASES

These consolidated cases have not previously been before this Court, and Respondents are unaware of any other related case or proceeding as defined by Third Circuit Rule 28.1(a)(2).

## STATEMENT OF THE ISSUES

1. Did EPA reasonably and lawfully determine that, based on the best available science, fenceline communities are adequately protected from TCE through a combination of existing environmental regulatory requirements and a forthcoming ban on the substance?
2. Is EPA's decision to regulate TCE produced as a byproduct during manufacturing of other chemicals through regulation of those chemicals in accordance with the flexibility provided by TSCA?

3. Did EPA reasonably establish a *de minimis* regulatory threshold that exempts products containing low levels of TCE from the ban in accordance with the flexibility provided by TSCA and provide a fair opportunity to comment on that regulatory threshold?
4. Are Industry Petitioners' petitions prudentially unripe given that EPA is currently reconsidering the aspects of the Rule that those Petitioners challenge?

## STATEMENT OF THE CASE

### I. Statutory Overview

Congress originally enacted TSCA in 1976 "to prevent unreasonable risks of injury to health or the environment associated with the manufacture, processing, distribution in commerce, use, or disposal of chemical substances." S. Rep. No. 94-698, at 1 (1976), *as reprinted* in 1976 U.S.C.C.A.N. 4491. To that end, Congress authorized EPA to regulate chemical substances whose "manufacture, processing, distribution in commerce, use, or disposal . . . present[] an unreasonable risk of injury to health or the environment." 15 U.S.C. § 2605(a).

In 2016, Congress amended TSCA to "substantially increase[] EPA's obligation to evaluate and regulate dangerous chemicals." *Lab. Council for Latin Am. Advancement v. EPA*, 12 F.4th 234, 243 (2d Cir. 2021). Nonetheless, Congress stated its intent that EPA carry out the statute in a "reasonable and prudent

manner" and to "consider the environmental, economic, and social impact of any action" under TSCA. 15 U.S.C. § 2601(c). And further, for EPA to exercise its authority "in such a manner as not to impede unduly or create unnecessary economic barriers to technological innovation" while assuring that such innovation and commerce do not present an unreasonable risk. *Id.* § 2601(b)(3).

TSCA section 6 sets up a three-step process by which EPA identifies and regulates chemical substances. First, EPA designates a chemical substance as either a "high-priority substance" that may present an unreasonable risk or a "low-priority substance." *Id.* § 2605(b)(1)(B). For any chemical substance designated as high-priority, EPA must then conduct a "risk evaluation" to "determine whether a chemical substance presents an unreasonable risk of injury to health or the environment . . . under the conditions of use." *Id.* § 2605(b)(3)–(4). If, through the risk evaluation, EPA determines that the chemical substance presents an unreasonable risk of injury to health or the environment, then EPA must apply one or more of the requirements in section 6(a) so that the chemical substance no longer presents such risk. *Id.* § 2605(a), (c)–(d).

**A. Risk Evaluations**

In conducting a risk evaluation, EPA "determine[s] whether a chemical substance presents an unreasonable risk of injury to health or the environment, without consideration of costs or other nonrisk factors, including an unreasonable

risk to a potentially exposed or susceptible subpopulation identified as relevant to the risk evaluation by the Administrator, under the conditions of use." *Id.* § 2605(b)(4)(A).

The statute does not define "unreasonable risk of injury to health or the environment," *id.*, but instead provides requirements to guide EPA's consideration of the risks of a chemical substances and EPA's decision on which risks are unreasonable. EPA first publishes the scope of the risk evaluation, which includes the hazards, exposures, conditions of use, and the potentially exposed or susceptible subpopulations the Administrator expects to consider. *Id.* § 2605(b)(4)(D). When conducting the risk evaluation, EPA assesses available information on the chemical substance's hazards (the adverse human health and ecological effects) and exposures for the chemical substance's conditions of use. *Id.* § 2605(b)(4)(F)(i); *see also id.* § 2602(4) (defining "conditions of use" as "the circumstances, as determined by the Administrator, under which a chemical substance is intended, known, or reasonably foreseen to be manufactured, processed, distributed in commerce, used, or disposed of"). In doing so, EPA considers risk to "potentially exposed or susceptible subpopulations identified as relevant by the Administrator" that "due to either greater susceptibility or greater exposure, may be at greater risk than the general population of adverse health effects from exposure." *Id.* §§ 2605(b)(4)(F)(i), 2602(12). EPA also describes

whether aggregate exposures or sentinel exposures—the plausible upper bound of exposure—to a chemical substance under the conditions of use were considered, and the basis for their consideration. *Id.* § 2605(b)(4)(F)(ii). EPA must "not consider costs or other nonrisk factors." *Id.* § 2605(b)(4)(F)(iii). The risk evaluation must consider the likely duration, intensity, frequency, and number of exposures under the conditions of use. *Id.* § 2605(b)(4)(F)(iv). Finally, the risk evaluation must describe the weight of the scientific evidence of the identified hazard and exposure. *Id.* § 2605(b)(4)(F)(v).

In conducting its risk evaluations (and promulgating risk management rules discussed below), Congress directed EPA to use scientific information "in a manner consistent with the best available science." *Id.* § 2625(h). To that end, TSCA provides that, in using scientific information, procedures, measures, methods, or models, EPA is to consider whether (1) they "are reasonable for and consistent with the intended use of the information"; (2) they are "relevant for [EPA's] use in making a decision about a chemical substance or mixture"; (3) the "clarity and completeness" with which the methods employed to generate them are documented; (4) any variability and uncertainty in them has been evaluated and characterized; and (5) they have been independently verified or peer reviewed. *Id.* EPA must also consider reasonably available information and base its decisions

about risk evaluations (and risk management) on the weight of the scientific evidence. *Id.* § 2625(i), (k).

### B. Risk Management

If EPA finds in the risk evaluation that a chemical substance presents an unreasonable risk, then the Agency proceeds to the risk management phase. *Id.* § 2605(a). Section 6(a) instructs EPA to select among a menu of options in promulgating a rule that regulates the chemical substance "to the extent necessary so that the chemical substance . . . no longer presents such risk." *Id.* § 2605(a). *Cf* Pub. L. No. 94-469, § 6(a), 90 Stat. 2003, 2020 (1976) (section 6(a) previously instructed EPA to apply these requirements "to the extent necessary to protect adequately against such risk using the least burdensome requirements").

In selecting among regulatory options that could satisfy Congress's instruction in section 6(a) to "apply one or more . . . requirements . . . to the extent necessary so that the chemical substance . . . no longer presents such risk," section 6(c) requires EPA to "factor in, to the extent practicable," several considerations. 15 U.S.C. § 2605(a), (c)(2)(A)–(B). EPA publishes a statement detailing these considerations, which include the chemical substance's effects on health and the environment, the magnitude of the exposure to human beings and the environment, its benefits for various uses, and "the reasonably ascertainable economic consequences of the rule." *Id.* § 2605(c)(2)(A).

Additionally, in deciding whether to prohibit or restrict a condition of use of a chemical substance (and in setting an appropriate transition period, *id.* § 2605(d), EPA must "consider, to the extent practicable, whether technically and economically feasible alternatives that benefit health or the environment, compared to the use so proposed to be prohibited or restricted, will be reasonably available as a substitute when the proposed prohibition or other restriction takes effect." *Id.* § 2605(c)(2)(C). In other words, if EPA is considering prohibiting or effectively prohibiting a condition of use, then section 6(c)(2)(C) requires EPA to account for the possibility of regrettable substitutions (i.e., replacement of the regulated chemical with another chemical that is more hazardous) and reasonably available technically and economically feasible alternatives both when deciding how to regulate and when setting an appropriate transition period for the condition of use. *See id.*

EPA may exempt a specific condition of use from a risk management requirement if: (1) the condition of use "is a critical or essential use for which no technically and economically feasible safer alternative is available;" (2) the requirement "would significantly disrupt the national economy, national security, or critical infrastructure;" or (3) the condition of use "provides a substantial benefit to health, the environment, or public safety." *Id.* § 2605(g)(1). EPA must include conditions on those exemptions "to the extent that the Administrator determines

the conditions are necessary to protect health and the environment while achieving the purposes of the exemption." *Id.* § 2605(g)(4).

A risk management rule, including the preceding unreasonable risk determination, is a final agency action subject to judicial review. *Id.* §§ 2605(i)(2), 2618(a)(1)(A).

## III. Procedural Background

### A. EPA's Risk Evaluation for TCE.

In December 2016, EPA published a list of the first 10 chemical substances for risk evaluations in accordance with section 6(b)(2)(A). 15 U.S.C. § 2605(b)(2)(A); *see* 81 Fed. Reg. 91927 (Dec. 19, 2016). TCE was one of those chemicals. *See Scope of the Risk Evaluation for Trichloroethylene* ("Scope"), AR 1155, JA ___. In the 2017 TCE Scope, EPA explained that it intended to exercise its discretion, pursuant to section 6(b)(4)(D), 15 U.S.C. § 2605(b)(4)(D), to—on a case-by-case basis—exclude certain conditions of use and focus its efforts on those exposures that EPA believed likely to present the greatest concern. Scope at 12, JA ___. In addressing circumstances where TCE would present only *de minimis* exposures, EPA indicated that it may, on a case-by-case basis, exclude those uses or exposures from the risk evaluation. *Id.*

After identifying the relevant conditions of use, EPA conducted its risk evaluation by completing a risk assessment and then making a risk determination. Consistent with section 6(b)(4)(F), 15 U.S.C. § 2605(b)(4)(F), and EPA's risk

evaluation procedures,[1] the risk assessment included three parts: (1) a hazard assessment, *see* 40 C.F.R. § 702.41(a)(1)(ii), (d) (2017); (2) an exposure assessment, *see id.* § 702.41(a)(1)(iii), (e) (2017); and (3) a risk characterization, *see id.* §§ 702.41(a)(1)(iv), 702.43 (2017).

In February 2020 EPA released its draft risk evaluation for TCE for public comment and peer review by the TSCA Science Advisory Committee on Chemicals.[2] 85 Fed. Reg. 11079 (Feb. 26, 2020); *see also* 40 C.F.R. § 702.41(a)(1) (2017). EPA revised the draft risk evaluation, incorporating revisions and comments from peer review and public comment. *See Summary of Peer Review and Public Comments and Disposition for TCE; Response to Support Risk Evaluation of TCE*, AR 43, JA ___. In November 2020, EPA published its final, peer-reviewed risk evaluation for TCE, which concluded that 52 of TCE's 54

---

[1] Congress required EPA to "establish, by rule, a process to conduct risk evaluations." 15 U.S.C. § 2605(b)(4)(B). EPA conducted the risk evaluation for TCE consistent with the 2017 version of the TSCA Framework Rule, which lays out the components of a risk evaluation and EPA's approach to risk assessments. 40 C.F.R. pt. 702, subpt. B (2017); *see also* 82 Fed. Reg. 33726 (July 20, 2017). EPA replaced the 2017 version of the rule in 2024. 40 C.F.R. pt. 702, subpt. B (2024); *see also* 89 Fed. Reg. 37028 (May 3, 2024). EPA is currently reconsidering the 2024 version of the rule. 90 Fed. Reg. 45690 (Sep. 23, 2025).

[2] The TSCA Science Advisory Committee on Chemicals provides EPA with independent advice and recommendations on the scientific and technical aspects of issues relating to implementing TSCA. 15 U.S.C. § 2625(*o*).

conditions of use presented an unreasonable risk to human health. Risk Evaluation, AR 1234, JA ___; *see* 85 Fed. Reg. 75010 (Nov. 24, 2020).

When EPA conducted the Risk Evaluation, EPA decided to exclude certain exposure pathways (and attendant risks) that could be regulated under other EPA-administered statutes or regulatory programs (e.g., Clean Air Act, Clean Water Act). Accordingly, the Risk Evaluation did not assess certain pathways through which humans or the environment could be exposed to TCE when that pathway was or could be regulated under another EPA-administered statute. *See, e.g.*, Risk Evaluation at 62–63, JA___; *Summary of Peer Review and Public Comments*, at 90–91, JA ___–___.

In 2021, President Biden directed EPA to review certain actions taken prior to 2021, including risk evaluations under section 6. *See* Protecting Public Health and the Environment and Restoring Science to Tackle the Climate Crisis, Exec. Order 13990 § 1, *rescinded by* Exec. Order 14148 § 2. Accordingly, EPA revised the risk determination in the Risk Evaluation to incorporate several policy changes. *Revised Unreasonable Risk Determination*, AR 7, at 3–4, JA ___–___. First, EPA made a single unreasonable risk determination for the chemical substance—rather than one unreasonable risk determination for each specific condition of use—and determined that TCE represents an unreasonable risk of injury to health driven by 52 of its 54 conditions of use. *See* 88 Fed. Reg. 1222, 1223 (Jan. 9, 2023), JA___.

Second, EPA no longer based its unreasonable risk determination on an assumption that workers wore personal protective equipment. *Id.*

In 2021, EPA also altered its approach to considering exposures to TCE via surface water, drinking water, or ambient air pathways. EPA developed a draft screening level approach that it used to evaluate whether there were risks from surface water, drinking water, or ambient air pathways that were unaccounted for in the Risk Evaluation. *Id.* EPA found some potential risks to human health in that screening analysis. Proposed Rule, 88 Fed. Reg. 74712, 74723, 74768–72 (Oct. 31, 2023), AR 1085, JA___,___. However, EPA decided not to reopen the Risk Evaluation for further assessment because the Agency determined that it could consider the potential effects to fenceline communities under section 6(c)(2) and concluded that any exposure to fenceline communities—and therefore any potential risk indicated by the screening analysis—"would be eliminated" by the proposed regulation. *Id*. at 74770, 74772, JA___,___.

**B. The Proposed Rule.**

On October 31, 2023, EPA published the proposed risk management rule for TCE. 88 Fed. Reg. at 74712, AR 1085, JA___. To address the unreasonable risk identified in the Risk Evaluation, EPA proposed to: (1) prohibit all manufacture (including import), processing, and distribution in commerce of TCE and industrial and commercial use of TCE for all uses, with longer compliance timeframes and

workplace controls for certain processing and industrial and commercial uses (including proposed phaseouts and time-limited exemptions); (2) prohibit the disposal of TCE to industrial pre-treatment, industrial treatment, or publicly owned treatment works, with a time-limited exemption for cleanup projects; and (3) establish recordkeeping and downstream notification requirements. *Id.* at 74712, JA ____. In the Proposed Rule, EPA explained that the "domestic manufacture" condition of use did not apply to TCE production as a byproduct, including during the manufacture of 1,2-dichloroethane, which EPA expected to consider in the 1,2-dichloroethane risk evaluation. *Id.* at 74726, JA ___. EPA received 205 comment submissions that were unique and responsive to the request for comment on the Proposed Rule.

### C. The Final Risk Management Rule.

After consideration of public comments, EPA promulgated the final risk management rule under review here, entitled "Trichloroethylene (TCE); Regulation under the Toxic Substances Control Act (TSCA)." 89 Fed. Reg. 102568 (Dec. 17, 2024), JA ___. The Rule covers a wide range of TCE uses and "prohibits manufacture, processing, distribution in commerce, and all industrial and commercial use of TCE and TCE-containing products." *Id.* at 102595, JA ___.

However, the Rule sets different timeframes for the implementation of the prohibition, depending on the condition of use. Relevant here, EPA prohibited

processing and reuse of byproduct TCE with a compliance date of December 18, 2026. 40 C.F.R. § 751.305(b)(9)(i); *see* 89 Fed. Reg. at 102592, JA ___ (stating EPA considered processing (including reuse) of TCE that was manufactured as a byproduct to be covered by the processing as a reactant/intermediate condition of use). However, EPA excluded from the prohibition and restrictions the processing (including reuse) of TCE that was manufactured (and reused) as a byproduct in site-limited, physically enclosed systems based on comments from chemical manufacturers. 40 C.F.R. § 751.301(c). In the preamble, EPA explained that the exclusion was based on the "significant risks to workplace safety if all facilities manufacturing TCE as a byproduct had to distill, remove, and destroy all traces of TCE before further chemical processing could commence." 89 Fed. Reg. at 102592, JA ___. The Rule also bans the disposal of wastewater containing TCE. 40 C.F.R. §§ 751.313(h); 751.305(b)(9)(iii).[3]

---

[3] In 2025, EPA revised certain compliance deadlines finalized in 2024 including the disposal of TCE to wastewater by processors of TCE and industrial and commercial users of TCE as a processing aid. Trichloroethylene: Regulation Under the Toxic Substances Control Act (TSCA); Compliance Date Extension, 90 Fed. Reg. 44772, 44772 (Sep. 17, 2025). This rule extended the compliance deadline for that disposal prohibition deadline to December 18, 2026, to align with the existing December 18, 2026 prohibition deadline for processing and reuse of byproduct TCE, which is covered by the processing as a reactant/intermediate condition of use. *Id.* at 44774. EPA anticipates further extending the December 18, 2026 compliance deadlines. Decl. of Douglas Troutman ¶ 16.

Relevant to this litigation, the Rule finalized a 20-year section 6(g) exemption from the prohibition for use of TCE as a processing aid for lead acid battery separator manufacturing because battery separators "are essential components of batteries that power vehicles and systems in the U.S. supply chain for multiple critical infrastructure sectors within the national economy." Final Rule, 89 Fed. Reg. at 102586, 102572, JA ____, ____; 40 C.F.R. § 751.325(b)(5). The Rule also finalized a 15-year section 6(g) exemption from the prohibition for use of TCE as a processing aid for specialty polymeric microporous sheet materials because they are "critical and essential uses for which no technically and economically feasible safer alternative is available." Final Rule, 89 Fed. Reg. at 102587, JA ____; 40 C.F.R. § 751.325(b)(6).

To mitigate the risks associated with the continued use of TCE during the section 6(g) exemption period or phase-out period under section 6(d), EPA also required regulated entities (and entities exempted from the Rule's prohibitions) to comply with EPA's Workplace Chemical Protection Program. Final Rule, 89 Fed. Reg. at 102579, JA ___. The Workplace Chemical Protection Program is designed to ensure that workers are not exposed to concentrations of TCE above an interim existing occupational exposure limit ("exposure limit"), thus mitigating the risks associated with exposure to TCE. *Id.* Based on scientific evidence regarding the risks posed by TCE exposure at certain concentrations, EPA proposed that no

worker be exposed to TCE in excess of an exposure limit of 0.0011 parts-per-million (ppm) (expressed as an 8-hour total working average) to the extent possible. *Id.* However, based on comments regarding the feasibility of reducing exposure below an exposure limit of 0.0011 ppm, as well as limitations in the available technology for detecting TCE levels at that concentration, EPA finalized an exposure limit of 0.2 ppm. *Id.* at 102579–80, JA ___–___. EPA explained that an exposure limit of 0.2 ppm would allow for regulated entities to meet the exposure limit using engineering controls and respiratory protection. *Id.* EPA estimated that the 0.2 ppm exposure limit would reduce estimated baseline chronic workplace exposure by 97%. *Id.* at 102581, JA ___.

To comply with the exposure limit, the Rule requires these entities to conduct exposure monitoring and develop an exposure control plan to bring exposures below the exposure limit. 40 C.F.R. § 751.315(b)–(c). In scenarios where elimination or substitution of TCE use is not feasible, and where engineering and administrative controls are not feasible or sufficiently protective to reduce air concentrations of TCE below the exposure limit, the Rule requires minimum respiratory protections to avoid exposure above the exposure limit. *Id.* at § 751.315(e).

### D. EPA's Reconsideration of the Rule.

On May 27, 2025, EPA informed this Court that it would reconsider certain aspects of the Rule. *See* Case No. 25-1055, Dkt. No. 57-2. Specifically, EPA is currently actively reconsidering:

- Conditions on the section 6(g) exemptions for use of TCE as a processing aid for lead-acid battery separator manufacturing and specialty polymeric microporous sheet materials, including the exposure limit. Troutman Decl. ¶ 11. EPA also is reconsidering the length of the exemption for battery-separator manufacturers. *Id.*
- The Rule's regulation of byproducts, which may affect the prohibition on the offsite reuse of byproduct TCE and the disposal of wastewater from byproduct TCE. *Id.* ¶12.

EPA expects to publish a proposed rule by November 2026 and a final rule by November 2027 that addresses these issues. *Id.* ¶14.

## SUMMARY OF THE ARGUMENT

**I.** The Court should deny Environmental Petitioners' petition. Environmental Petitioners challenge the Rule on three grounds: first, that EPA failed to adequately address the risks TCE poses to fenceline communities; second, that EPA improperly excluded TCE production as a byproduct in the Risk Evaluation and Rule; and third, that EPA's *de minimis* threshold for products

containing less than 0.1 percent TCE by weight was improper. None of these arguments are persuasive.

First, EPA properly addressed the potential risks that TCE poses to fenceline communities. While EPA did not consider fenceline communities a potentially exposed or susceptible subpopulation during its Risk Evaluation, EPA later conducted a screening level approach to evaluate potential exposures and risks to fenceline communities. EPA appropriately considered the results of the screening level approach when it selected among risk management options for TCE and, furthermore, when it found that the Rule's ban on the substance would address the potential risks to fenceline communities. EPA properly considered these communities in the Rule without revisiting the Risk Evaluation in a time- and resource-intensive process to formally determine whether any existing risk to fenceline communities was "unreasonable." Additionally, TSCA does not require EPA to consider aggregate or cumulative risk from exposure pathways. And it was reasonable for EPA not to consider aggregate or cumulative risk here because the science currently does not support such an approach. Finally, EPA correctly concluded that Clean Air Act standards will prevent emission increases to fenceline communities under the Rule.

Second, EPA reasonably excluded from the Risk Evaluation the manufacture of TCE when it is produced during the manufacture of other chemical substances,

i.e., byproduct TCE, and reasonably decided to evaluate any potential risk arising from byproduct TCE when addressing the manufacture of the other chemical substances. TSCA provides EPA with discretion in deciding which conditions of use to include in a risk evaluation. And EPA reasonably determined that it was more appropriate to assess the risk from unintentionally produced TCE during the manufacture of another chemical as part of that chemical's risk evaluation. EPA also did not need to regulate the processing of TCE byproduct in site-limited, physically enclosed systems.

Third, EPA properly established a *de minimis* threshold of 0.1 percent, so that products containing impurities or other trace amounts of TCE less than 0.1 percent by weight are not subject to the Rule's prohibitions. That decision was well within EPA's statutory discretion and technical expertise in determining and addressing *unreasonable* risk. And a 0.1 percent threshold aligns with the existing OSHA standard with which manufacturers already must comply. EPA also gave stakeholders fair notice and opportunity to comment on a *de minimis* threshold by explicitly seeking comment in the Proposed Rule.

**II.** Industry Petitioners' petitions are prudentially unripe and should be held in abeyance. EPA is currently actively reconsidering all of the aspects of the Rule challenged by Industry Petitioners and expects to publish a proposed rule in November 2026 and a final rule in November 2027. The Court thus should defer

consideration of these issues. Judicial review would benefit from allowing EPA to crystalize its thinking through future rulemaking regarding the issues Industry Petitioners raise and Industry Petitioners would not be harmed by an abeyance. Indeed, this litigation may immediately become moot once EPA completes that rulemaking, as the new rule may supersede this Rule on the issues Industry Petitioners challenge.

## STANDARD OF REVIEW

TSCA provides that judicial review, with one relevant exception, shall be under the standard set out in Section 706 of the Administrative Procedure Act. *See* 15 U.S.C. § 2618(c)(1)(B). Under the Administrative Procedure Act, a court will set aside agency action only if it is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A).

TSCA provides a slightly more searching standard of review for risk management rules and associated unreasonable risk determinations: Courts review those rules and "hold unlawful and set aside such rule" only "if the court finds that the rule is not supported by substantial evidence in the rulemaking record taken as a whole." 15 U.S.C. § 2618(c)(1)(B)(i)(I). Substantial evidence is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Shell Chem. Co. v. EPA*, 826 F.2d 295, 297 (5th Cir. 1987) (quoting *Richardson v. Perales,* 402 U.S. 389, 401 (1971)). But substantial evidence review is not *de novo*

review. So, although "[t]he reviewing court must take into account contradictory evidence in the record, . . . 'the possibility of drawing two inconsistent conclusions from the evidence does not prevent an administrative agency's finding from being supported by substantial evidence.'" *Am. Textile Mfrs. Inst., Inc. v. Donovan*, 452 U.S. 490, 523 (1981) (*quoting Consolo v. Fed. Mar. Comm'n*, 383 U.S. 607, 620 (1966)). And courts must "at the same time, accord appropriate deference to administrative decisions that are based on agency experience and expertise." *Corrosion Proof Fittings v. EPA*, 947 F.2d 1201, 1214 (5th Cir. 1991) (citation omitted). An agency must "cogently explain why it has exercised its discretion in a given manner" and offer a "rational connection between the facts found and the choice made." *Id.* (quotation omitted).

The Court reviews questions of statutory interpretation *de novo*. *U.S. Sugar Corp. v. EPA*, 113 F.4th 984, 991 (D.C. Cir. 2024) (citing *Loper Bright Enters. v. Raimondo*, 603 U.S. 369, 392 n.4 (2024)). In determining the "best" reading of a statute, "[c]ourts must exercise their independent judgment," but "[c]areful attention to the judgment of the Executive Branch may help inform that inquiry." *Loper Bright*, 603 U.S. at 409–10, 412–13. To resolve the meaning of disputed statutory language, a court shall adopt the interpretation that, "after applying all relevant interpretive tools, [it] concludes is best." *Id.* at 400. "[W]hen a particular statute delegates authority to an agency consistent with constitutional limits, courts

must respect the delegation, while ensuring that the agency acts within it." *Id.* at 413.

## ARGUMENT

### I. Environmental Petitioners' Petition for Review Should Be Denied.

Despite EPA banning TCE, Environmental Petitioners argue that the Rule is insufficiently stringent to comply with TSCA in the interim period before the ban is fully in effect. But EPA thoroughly considered all the component risks that TSCA requires the Agency to address and issued a Rule that effectively controls that unreasonable risk. This Court should deny Environmental Petitioners' petition for review.

#### A. The Rule Adequately Protects Fenceline Communities.

The Rule sufficiently protects fenceline communities. *Contra* Env. Br. at 39. TSCA instructs EPA to evaluate "whether a chemical substance presents an unreasonable risk of injury to health . . . including an unreasonable risk to a potentially exposed or susceptible subpopulation identified as relevant to the risk evaluation by the Administrator." 15 U.S.C. § 2605(b)(4)(A). During the rulemaking, EPA indicated that fenceline communities might be potentially exposed or susceptible subpopulations for TCE, but the Administrator did not identify fenceline communities as such during the Risk Evaluation. *See* Proposed Rule, 88 Fed. Reg. at 74729–30, JA ___–___. Contrary to Environmental

Petitioners' argument, the record makes clear that EPA adequately addressed the risks to that group and appropriately decided not to revisit the Risk Evaluation.

### *1. EPA properly analyzed the potential risks to fenceline communities.*

In the Risk Evaluation, EPA properly excluded certain exposure pathways, such as ambient air, that are regulated by other EPA-administered statutes (e.g., the Clean Air Act). TSCA expressly permits that approach, as it requires EPA to coordinate actions taken under TSCA with actions taken under other EPA-administered statutes, and instructs EPA to use those EPA-administered statutes to address risk if it determines that those statutes could eliminate or sufficiently reduce that risk. 15 U.S.C. § 2608(b)(1).

Nevertheless, following the Risk Evaluation, EPA announced it would develop a screening level approach to evaluate potential exposures and risks to fenceline communities due to several changes in policy between administrations. *See EPA Announces Path Forward for TSCA Chemical Risk Evaluations* (June 30, 2021) ("Path Forward"), AR 44, JA ___. EPA announced that the screening level approach would allow EPA to evaluate if (1) there was "potential for unreasonable risk to these fenceline" communities, (2) if there may be potential risk to the communities that may be addressed in risk management, or (3) if there "may be unreasonable risk . . . that cannot be addressed without supplementing the risk evaluation or through risk management approaches [EPA was] already

considering." *See* Path Forward, AR 44, at 3, JA ___. This approach to addressing EPA's changed position on how to consider air, water, and disposal exposures to the general population was reasonable because reopening the time- and resource-intensive risk evaluations would have frustrated Congress' desire for EPA to address risks from toxic chemicals expeditiously for both those exposed to toxic chemicals and the regulated community.

EPA designed the Screening Level Approach to allow the Agency to consider whether there are risks from multiple chemicals, including TCE, through air and water pathways that were not evaluated in the Risk Evaluation. *See Draft TSCA Screening Level Approach for Assessing Ambient Air and Water Exposures to Fenceline Communities Version 1.0* (2022) ("Screening Level Approach"), AR 1157, at 16–17, JA ___. As part of the Screening Level Approach, EPA evaluated ambient air exposures and surface and drinking water exposures to fenceline communities to determine whether the communities were exposed, and if so at what level of exposure. *See* Path Forward, AR 44, JA ___. Critically, however, the Screening Level Approach neither mandated risk-related conclusions about fenceline communities nor any particular risk management actions or rulemaking activities, and instead provided a methodology to evaluate potential exposures and associated potential risks to fenceline communities. *See* Screening Level Approach, AR 1157 at 9–10, JA ___. EPA presented its Screening Level Approach

to the Science Advisory Committee on Chemicals and tailored the approach in response to the Science Advisory Committee on Chemicals' comments. *See* Final Rule, 89 Fed. Reg. at 102612, JA___.

Ultimately, based on the Screening Level Approach, EPA was unable to determine whether the potential risks to fenceline communities that were identified by the Approach contributed to the unreasonable risk from TCE because of the assessment's limitations and uncertainties associated with the information used to inform the analysis. *See* 88 Fed. Reg. at 74769, JA___; Final Rule, 89 Fed. Reg. at 102612, JA___. However, EPA did consider the results of screening-level assessments when selecting among risk management options for TCE, and, furthermore, found that the Rule would address the potential risks to fenceline communities identified in the Screening Level Approach. Final Rule, 89 Fed. Reg. at 102612, JA___.

Environmental Petitioners argue that EPA "contradicted" its Screening Level Approach (which Environmental Petitioners refer to as EPA's "Assessment Methodology" or "Methodology") by stating that the Screening Level Approach methodologies were not developed for EPA to make an unreasonable risk determination. Env. Br. 48–50. Specifically, Environmental Petitioners argue that EPA announced in the Screening Level Approach that it would pursue one of five specified outcomes whenever EPA calculates risks to fenceline communities that

are above benchmark levels. *Id.* at 51. Environmental Petitioners allege that EPA failed to pursue any of those specified outcomes here, *id.* at 52, and argue that this purported failure amounts to an impermissible departure from EPA's past position. *Id.* at 50. But Environmental Petitioners' arguments rest on a fundamental misunderstanding of the Screening Level Approach.

The Screening Level Approach did not enumerate the full range of possible responses that EPA would take in response to the outcome of the screening level assessment. EPA took care to explain that it was offering only "simplified hypothetical examples" of possible outcomes and "only to provide insight into the next steps following completion of a screening level analysis." Screening Level Approach at 18, JA ___. In other words, EPA's examples were illustrative, not prescriptive. And though the Screening Level Approach suggests five possible "outcomes" of EPA responses to the illustrative hypothetical scenarios, *id.* at 19–20, JA ___–___, EPA expressly disclaimed reliance on these hypotheticals and stated that the possible outcomes were not final agency actions, *id.* at 18, JA ___. Indeed, the "outcomes" themselves refer repeatedly to EPA's example scenarios and are themselves plainly intended as hypotheticals. *See id.* at 19–20, JA ___–___.

As it happens, EPA's chosen approach—considering the potential risks to fenceline communities under section 6(c)(2) when deciding how to regulate

conditions of use for which EPA had found unreasonable risk—*did* end up resembling Outcomes Two and Three. *See id.* Thus, even if Environmental Petitioners were correct in their assertion that EPA was required to apply one or more of its "simplified hypothetical examples," their argument still would fail. And regardless, Environmental Petitioners' characterization of EPA's hypothetical "outcomes" as a binding menu of regulatory options is off-base and warrants no further consideration.

EPA adequately considered and addressed the risks to fenceline communities in the Rule. Informed by its application of the Screening Level Approach to TCE, EPA considered existing TCE exposures in those communities, as well as the expected reduction in exposures brought about by the Rule, when considering the relevant health effects and the magnitude of human exposure under section 6(c)(2)(A)(i). Though EPA identified some potential risk to fenceline communities, it ultimately determined that the Rule's prohibitions for manufacturing, processing, and distribution in commerce for all consumer and all commercial use—many of which occurred within one year of the effective date—would adequately address that potential risk. *See* Final Rule, 89 Fed. Reg. at 102612, JA___. That reasonable determination is within the discretion Congress delegated to EPA when deciding how to address unreasonable risk and is supported by substantial evidence.

*First*, EPA properly factored its findings from the Screening Level Approach into the Rule's restrictions rather than revisiting its Risk Evaluation. TSCA instructs EPA to consider a variety of human health, environmental, and economic factors when proposing and finalizing a risk management rule. 15 U.S.C. § 2605(c)(2)(A)–(B). Here, EPA evaluated its screening level findings in conjunction with those factors and determined that the Rule would address the unreasonable risk from TCE and the potential risks to fenceline communities. *See* Final Rule, 89 Fed. Reg. at 102612–14, JA ___–___. And based on those considerations, EPA determined that the Rule's "ultimate prohibition of manufacture, processing, distribution in commerce, use, and disposal of TCE [was] expected to address the risks identified in the screening analysis to any general population or fenceline communities close to facilities engaging in TCE use." *Id.* at 102614, JA ___. EPA therefore appropriately concluded that it did not need to reopen the Risk Evaluation to fully assess the potential risks to fenceline communities. *See id.*

Environmental Petitioners object to the lack of a formal determination as to whether TCE's risk to fenceline communities was "unreasonable." Env. Br. at 40, 42–43. But TSCA does not compel EPA to make such a determination. TSCA instructs EPA to determine whether a chemical substance presents an unreasonable risk, including "an unreasonable risk to a potentially exposed or susceptible

subpopulation identified as relevant to the risk evaluation by the Administrator." *See* 15 U.S.C. § 2605(b); § 2602(12). As discussed above, EPA did not identify fenceline communities as potentially exposed or susceptible subpopulations relevant to the Risk Evaluation because EPA had (reasonably) excluded ambient air, drinking water, and surface water exposure pathways to the general population from the Risk Evaluation.

While developing the Rule, EPA decided to categorize fenceline communities as a subset of the general population rather than reopen the Risk Evaluation and further delay its ability to address the unreasonable risk from TCE. *See* Proposed Rule, 88 Fed. Reg. at 74730, 74768–69, JA ___, ___–___. But, ultimately, EPA could not ascertain whether the risks to fenceline communities assessed in the Screening Level Approach contributed to the unreasonable risk. *Id.* Section 6(c)(2)(A) requires EPA, in proposing and promulgating section 6(a) rules, to "consider and publish a statement based on reasonably available information" with respect to, among other things, "the effects . . . on health and the magnitude of the exposure of human beings." 15 U.S.C. § 2605(c)(2)(A). Here, EPA did just that: EPA opted to factor in the potential risks to fenceline communities identified by the Screening Level Approach as an effect that informed the Rule's choice of restrictions, pursuant to its authority under section 6(c)(2). Proposed Rule, 88 Fed. Reg. at 74768, JA___ (citing 15 U.S.C. § 2605(c)(2)). Because EPA has discretion

in how to address unreasonable risks, including the consideration of non-risk factors at the risk management stage, this decision was proper and consistent with TSCA.

*Second*, the record supports EPA's determination that the Rule will address potential risk to fenceline communities from ambient air and water exposures indicated by the screening analysis. Final Rule, 89 Fed. Reg. at 102612, JA ___. EPA's fenceline screening assessment indicated some existing risk from ambient air and water exposure to fenceline communities. *Id.* However, because under the Rule, all conditions of use will eventually be prohibited, EPA reasonably concluded that the risk indicated in the screening assessment will be eliminated. *Id.* Because the Rule's risk management measures are sufficient to address risks to those communities from ambient air and water exposure, EPA saw no need to conduct a supplemental risk evaluation on that issue. *See id*.

*Third*, Environmental Petitioners do not, and cannot, contend that EPA would have adopted any more stringent requirements had it formally determined whether TCE's risk to fenceline communities is "unreasonable." Therefore, even if EPA's decision not to revisit the Risk Evaluation to identify fenceline communities as potentially exposed or susceptible subpopulations and formally determine whether TCE presents an unreasonable risk to those communities were error, it had

"no effect" on the Final Rule, so was harmless. *Nat'l Ass'n of Home Builders v. Defs. of Wildlife,* 551 U.S. 644, 659 (2007).

In short, EPA analyzed the potential risks to fenceline communities. Proposed Rule, 88 Fed. Reg. at 74723, 74768–72, JA ___, ___–___. EPA thoroughly explained the results of this analysis in the Proposed Rule. *Id*. Based on those findings, EPA reasonably determined that the ban adopted in the Rule provides adequate protection for fenceline communities and fully explained its assessment. Final Rule, 89 Fed. Reg. at 102611–14, JA ____–____.

*2. TSCA does not require EPA to consider aggregate or cumulative exposures.*

Environmental Petitioners also argue that EPA's Screening Level Approach underestimated risk to fenceline communities because EPA failed to evaluate the risk from the aggregate exposure to TCE from multiple exposure routes or pathways or the cumulative exposures from TCE and other chemical substances that may occur in fenceline communities. *See* Env. Br. at 60–61. While EPA has the authority to consider aggregate exposures where appropriate, Congress specifically declined to require EPA to consider risk from aggregate exposures in risk evaluations. 15 U.S.C. § 2605(b)(4)(F)(ii) (instructing EPA to "describe *whether* aggregate . . . exposures to a chemical substance under the conditions of use were considered, and the basis for that consideration" (emphasis added)); *see also* 40 C.F.R. § 702.33 (2017) (defining aggregate exposures as "combined

exposures to an individual from a single chemical substance across multiple routes and across multiple pathways”).

Section 6(a) states only that “if” EPA determines that a “combination” of activities presents an unreasonable risk, then the Agency shall adopt appropriate regulations to address any such risk. 15 U.S.C. § 2605(a). However, at no point does section 6(a) *require* EPA to consider risk from such aggregate exposures in the first instance. *See generally id.* Nor does section 6(b)—the core of EPA’s mandate to conduct risk evaluations—contain any reference to “combinations” of activities beyond its reference to explaining whether aggregate exposures were considered. *See generally id.* § 2605(b).

Regarding cumulative exposure, EPA may consider exposure to multiple chemicals if consistent with best available science. *See id.* § 2625(h); *cf. id.* § 2625(c) (authorizing EPA to look at “categories” of chemical substances). However, Environmental Petitioners cannot point to any statutory requirement indicating that EPA must consider risks from cumulative exposure.

In other words, TSCA’s risk evaluation requirements make it quite clear: EPA does not have the *obligation* to consider aggregate or cumulative exposures. *Id.* § 2605(b)(4)(F)(ii), § 2625(h); *see also* 40 C.F.R. § 702.39(d)(8) (subsequent version of the TSCA risk evaluation rule, laying out when EPA will consider aggregate exposures).

For TCE specifically, EPA explained in its response to comments for the Risk Evaluation that there is "low confidence" in the science on aggregate exposures to TCE. *See Summary of External Peer Review and Public Comments and Disposition for TCE*, AR 1888, ("RE RTC") at 95, JA ___. Reflecting TSCA's instruction that EPA must rely on the "best available science" and "take into consideration information . . . that is reasonably available" when conducting risk evaluations, 15 U.S.C. § 2625(h), (k), EPA opted to address known unreasonable risks now rather than wait to see how the science on aggregate or cumulative exposure risk might develop. RE RTC at 41–42, JA ____–____. That determination was reasonable, consistent with TSCA, and supported by substantial evidence. It should be upheld.

*3. EPA correctly explained that Clean Air Act standards may prevent emission increases under the Rule.*

EPA's decision not to require interim protections for fenceline communities during the phaseout or time-limited exemption of certain uses of TCE because Clean Air Act standards, may, in some situations, prevent emission increases under the Rule is supported by a reasoned explanation.

Section 6(c)(2) presents numerous considerations for EPA when selecting the appropriate requirements to address unreasonable risk, including the risks and benefits of a chemical substance and the economic consequences of the regulation. 15 U.S.C. § 2605(c)(2)(A). Further, Congress was not so prescriptive in section 6

as to require EPA to immediately eliminate the unreasonable risk. Section 6(d)(1)(E) directs EPA to provide a reasonable transition period for any restriction (including a ban or phase-out of the chemical substance) under section 6(a). *Id.* § 2605(d)(1)(E). And under section 6(g), EPA may grant an exemption from a requirement for a specific condition of use with conditions, if necessary to protect health and the environment while achieving the purposes of the exemption. *Id.* § 2605(g). In other words, some of TSCA's requirements not only allow but indeed compel EPA to account for feasibility for the regulated industry.

Environmental Petitioners speculate that to comply with the Rule, the facilities that are permitted to continue using TCE for time-limited exemptions will likely ventilate more TCE outside the facility to reduce workplace exposure within the facility, thus exposing fenceline communities to higher levels of airborne TCE. *See* Env. Br. 29. But EPA fully considered this concern. After assessing feasibility issues and that the Clean Air Act's NESHAPs could limit exempted facilities' leeway to vent TCE into the outside air, EPA reasonably explained that such exposure may be limited through the Clean Air Act and determined that facility

resources should be focused on transitioning as quickly as possible to alternatives to TCE.[4] Final Rule, 89 Fed. Reg. at 102613–14.

*First*, in the Proposed Rule, EPA requested comment on whether industry anticipated increased releases of TCE to outdoor air associated with the implementation of the Proposed Rule. 88 Fed. Reg. at 74740, JA ____. Relatedly, the Agency also sought input on whether operators should be required to attest in their exposure control plan that the engineering controls selected do not increase TCE emissions to outside ambient air, including how such a requirement could impact the availability, feasibility, or cost of engineering controls as a means to reduce workplace exposures to or below the proposed exposure limit. *Id.*

While EPA received some comments supporting additional monitoring or attestation that emissions would not increase, other commenters disagreed, stating

---

[4] Section 112 of the Clean Air Act establishes a two-stage regulatory process to develop standards for emissions of listed hazardous air pollutants, including TCE, from stationary sources and requires EPA to regulate source categories by restricting and banning emissions (if appropriate). 42 U.S.C. § 7412. Generally, the first stage involves establishing the maximum degree of reduction in emissions that is deemed achievable for major sources, with the minimum stringency based on the best performing sources without considering cost. *Id.* § 7412(d)(1)–(4). The second stage involves evaluating those standards within eight years to determine whether additional standards are needed to address any remaining risk associated with the hazardous air pollutants (again without considering cost). *Id.* § 7412(f)(2). Further, section 112 also requires the EPA to review the standards every eight years and "revise as necessary," taking into account developments in practices, processes, and control technologies (including cost considerations). *Id.* § 7412(d)(6).

that attestations or monitoring would be burdensome or redundant with requirements under Clean Air Act standards that regulate TCE. Final Rule, 89 Fed. Reg. at 102614, JA___; ACC Comments at 22, JA ____ (explaining that NESHAPs for TCE will mitigate potential general population exposures that could occur as a result of greater workplace controls ventilating TCE outside of facilities); AIHA Comments at 10, JA ____ (same); CUC Comments at 4–5, JA ____ (stating that attestations would be another burdensome documentation requirement that complicates compliance). Another commenter suggested that facilities install continuous monitoring systems to ensure no breakthrough of TCE to fenceline communities but conceded such controls may not be feasible. *Response to Comments*, AR1328, ("RTC") at 132, JA___.

After considering these comments, EPA agreed that installation of continuous monitoring systems was likely infeasible given the sheer volume of monitoring required to surround such a facility. *Id.* EPA also determined that industry resources should be focused on transitioning as quickly as possible to TCE alternatives, and that additional attestation or monitoring requirements could divert resources from this effort. *Id.*

EPA also explained that it expects existing Clean Air Act regulations for TCE, e.g., the NESHAPs, and state-issued air permits to, in some situations, limit the leeway of facilities with phase-outs or time-limited exemptions to vent TCE

into the outside air. *See id.* In response, Environmental Petitioners now argue that because the NESHAPs were in effect when EPA conducted its fenceline assessment and failed to eliminate TCE emissions, they are irrelevant. Env. Br. at 56. But Environmental Petitioners' argument misses the import of NESHAPs. Because any facility may be subject to NESHAP permits that limit TCE emissions, those facilities likely cannot increase their emissions of TCE beyond those limits to reduce exposure inside. Final Rule, 89 Fed. Reg. at 102613, JA___ (expecting facility compliance with existing NESHAP permits to limit TCE emissions where efforts to reduce exposures in the workplace could lead to adoption of engineering controls that ventilate more TCE outside); *see, e.g.* 40 C.F.R. pt. 63, subpt. T (limiting facility-wide emissions of solvents including TCE). As such, EPA's expectation that the Clean Air Act restricts facilities' ability to reduce exposure *inside* the facility by increasing emissions *outside* is supported by reasoned explanation. *FCC v. Fox Television Stations, Inc.*, 556 U.S. 502, 515 (2009).

Moreover, EPA's decision to regulate the existing TCE emissions to the environment via the Clean Air Act NESHAPs is consistent with TSCA section 9(b), 15 U.S.C. § 2608(b). *Contra* Env. Br. at 56. Section 9(b) requires that EPA coordinate actions taken pursuant to TSCA with the other statutes it administers. 15 U.S.C. § 2608(b). Here, EPA explained that "although several EPA statutes have been used to limit TCE exposure, regulations under those EPA statutes

largely regulate *releases to the environment*, rather than occupational or consumer exposures." Final Rule, 89 Fed. Reg. at 102616, JA ___ (emphasis added). EPA further explained that "[w]hile these limits on releases *to the environment are protective* in the context of their respective statutory authorities, regulation under TSCA is also appropriate for occupational and consumer exposures . . . .". *Id.* (emphasis added). Thus, "EPA emphasize[d] that actions to reduce occupational exposures are less likely to result in an increase in fugitive air emissions, because of existing NESHAPs and state-issued air permits." RTC at 132, JA___.

### B. EPA Appropriately Excluded Production of TCE Byproduct from its Risk Evaluation and Rule.

When EPA conducted the Risk Evaluation, EPA recognized that manufacture of chemicals *other* than TCE may result in the production of TCE. *See* Proposed Rule, 88 Fed. Reg. at 74726, JA___. But contrary to Environmental Petitioners' assertions, EPA reasonably and lawfully elected to focus the Risk Evaluation underpinning the Rule on TCE manufacturing, and to consider manufacture of TCE as a byproduct in future risk evaluations of the primary chemical manufactured. *Id.*

EPA must determine whether a chemical substance presents an unreasonable risk of injury to health or the environment under the conditions of use when conducting risk evaluations. 15 U.S.C. § 2605(b)(4)(A). But EPA disagrees with Environmental Petitioners that byproducts would have been included with any

single risk determination because EPA can make exclusions from the scope of a risk evaluation. The statute gives EPA discretion on scope and timing. Specifically, section 6(b)(4)(D) provides EPA discretion to decide which conditions of use will be considered in a particular risk evaluation. 15 U.S.C. § 2605(b)(4)(D). The statute makes clear that EPA must identify which conditions of use, as determined by the Administrator, the Agency "expects to consider" in a risk evaluation, thus authorizing EPA to select a subset of conditions of use to evaluate at any particular time. *Id.*; *see also id.* § 2608(b)(1).

Here, EPA reasonably determined that it was more appropriate to assess the risk from TCE produced during the manufacture of another chemical as part of that other chemical's risk evaluation. Given the statute's ambitious deadlines and the structure of a risk evaluation for a high-priority chemical, which focuses on a single chemical, it is inefficient and impracticable to conduct additional, albeit limited, risk evaluations for each of the resulting byproduct chemicals within the overarching risk evaluation for the high-priority chemical. This could cause confusion and result in potentially conflicting information for the byproduct chemicals if EPA must evaluate the same byproducts (e.g., TCE, carbon tetrachloride) in many risk evaluations for many chemicals. Instead, EPA took a manageable approach.

With respect to chlorinated solvents, including TCE, EPA evaluated these under the same parent chemical, 1,2-DCA, in a byproduct analysis. *See* Byproducts Assessment for 1,2-Dichloroethane.[5] For TCE produced in the manufacture of 1,2-dichloroethane, EPA explained that the "regulatory tools under TSCA section 6(a) are better suited to address any unreasonable risks that might arise from these activities through regulation of the activities that generate 1,2-dichloroethane than they are to addressing them through direct regulation of TCE." RE RTC at 124, JA___. And in the final risk evaluation scope document for 1,2-dichloroethane, EPA explained that it would evaluate the potential risk of byproduct TCE and four other byproducts chlorinated solvents, formed during the manufacture of that chemical. RTC at 36, JA___; *see also* 1,2 DCA Risk Assessment at 13 (evaluating risks resulting from exposure to byproduct produced during the manufacture of 1,2-dichloroethane including TCE). In sum, Environmental Petitioners' complaints regarding EPA's evaluation of the manufacture of byproduct TCE amount to form over substance. EPA has acknowledged that it will address the manufacture of byproduct TCE in the risk evaluation for 1,2-DCA.

---

[5] Available at https://www.epa.gov/system/files/documents/2026-05/04-1-2-dichloroethane-byproducts-assess-public-release-april-2026v2.pdf (last accessed on July 7, 2026).

### C. EPA Lawfully Exempted Processing of Byproduct TCE in Site-Limited, Physically Enclosed Systems.

Environmental Petitioners also take issue with the Rule's allowance for the processing of byproduct TCE "within site-limited, physically enclosed systems that is part of the same manufacturing process from which TCE was generated." Env. Br. at 69 (quoting 40 C.F.R. § 751.301(c)).

EPA was not obligated to regulate site-limited, physically enclosed systems. As EPA explained in the Rule and its response to comments, requiring all facilities to distill, remove, and destroy byproduct TCE before processing with the intentionally manufactured chemicals would not decrease any potential risks to workplace safety. RTC at 27, JA___. Multiple industry commenters explained how TCE is produced as a byproduct in the manufacturing of various other chlorinated solvents, and how the byproduct waste stream is processed back into hydrochloric acid, which is then reused as a feedstock in the manufacturing process. *Id.* EPA also explained that for the manufacturing of two chemicals—perchloroethylene and carbon tetrachloride—which may produce TCE as a byproduct, EPA requires a worker chemical protection program, which generally provides a level of protection for any potential risk from TCE while addressing the unreasonable risk from those chemicals. *Id.* And as discussed above, TCE produced as a byproduct during manufacture of 1,2-dichloroethane, will be addressed in that chemical's risk management rule.

### D. EPA Appropriately Established a *De Minimis* Regulatory Threshold for TCE.

#### *1. EPA acted within its discretion to exclude* de minimis *levels of TCE from regulation.*

EPA reasonably established a *de minimis* threshold for TCE, which excludes from the Rule's ban any products containing TCE present as an impurity or other trace amounts, i.e., products that are less than 0.1 percent TCE by weight. 40 C.F.R. § 751.301(b).[6]

*First*, TSCA does not demand that EPA root out every last molecule of TCE or any possible risk. *Contra* Env. Br. at 71. Again, section 6(b)(4)(D) provides EPA discretion in determining the scope of a risk evaluation, i.e., deciding which conditions of use to consider. 15 U.S.C. § 2605(b)(4)(D). Consequently, EPA may exclude certain activities from the Risk Evaluation—including uses that present only de minimis exposures—in order to focus its analytical efforts on those exposures that are likely to present the greatest concern and consequently merit an unreasonable risk determination. *See id.* Further, in crafting the Rule, EPA established a regulatory threshold to aid the regulated community with implementing the prohibitions of TCE and to account for TCE as an impurity. 89 Fed. Reg. 102592, JA___; *see also* 15 U.S.C. § 2605(c)(2)(A). Here, EPA excluded *de minimis* levels of TCE from the Risk Management Rule by setting a

---

[6] The *de minimis* threshold does not apply to wastewater. *Id.*

*de minimis* threshold of 0.1 percent, which "is well below the concentration used for any products that contributed to the unreasonable risk." Final Rule, 89 Fed. Reg. at 102592, JA___.

A *de minimis* threshold is not inconsistent with EPA's regulatory framework. Although Environmental Petitioners argue that EPA's 2024 risk evaluation framework rule precludes EPA from establishing such a threshold, Env. Br. at 72, that rule addressed risk evaluations only—not risk management rules. Moreover, it was not in place when EPA conducted the Risk Evaluation underpinning this Rule, and EPA is currently reconsidering the 2024 framework rule. *See United Steel v. EPA*, No. 24-1151 (D.C. Cir. May 21, 2024), Dkt. No. 2113775 (order); Dkt. No. 2104767 (motion).

Moreover, Environmental Petitioners erroneously state that EPA cannot consider cost in risk management rules. Env. Br. at 74. To the contrary, TSCA instructs EPA to consider, to the extent practicable, "the reasonably ascertainable economic consequences" of risk management rules, including the costs and benefits. 15 U.S.C. § 2605(c)(2)(A)–(B). For example, here the *de minimis* threshold allows the continued use in corn production of a chemical that protects crops from herbicide injuries and may contain TCE as an impurity. *See* RTC at 140, JA ___.

*Second*, practical concerns warrant establishing a *de minimis* threshold of 0.1 percent. As EPA explained in the Rule, it is not feasible to remove TCE at levels below 0.1 percent. Final Rule, 89 Fed. Reg. at 102592, JA___. This is because, as one commenter observed, levels below 0.1 percent are not required to be reported on Safety Data Sheets—which, as mandated by the Occupational Safety and Health Administration's Hazard Communication Standard, provide information on the properties and hazards of a chemical. *Id.*at 102591, JA___. As a result, manufacturers are likely unaware that certain of their products may contain TCE at levels below 0.1 percent. *Id.* Moreover, as one chemical manufacturer explained, it may not be technically feasible to eliminate TCE impurities entirely. *Id.*

The *de minimis* threshold also aligns with the Hazard Communication Standard, which sets 0.1 percent as the threshold in mixture classification. 89 Fed. Reg. at 102592, JA___; 29 C.F.R. § 1910.1200. Industry has already calibrated its processes to a 0.1 percent standard to comply with the Hazard Communication Standard and other programs. 89 Fed. Reg. at 102592, JA___. Thus, the *de minimis* threshold will increase regulatory certainty and ease implementation of the prohibition of TCE.[7] *Id.*

---

[7] EPA did not rely on any analysis evaluating occupational exposure levels below 0.1 percent because those levels would not have provided the same regulatory compliance and implementation benefits as that of the 0.1 percent threshold.

*2. EPA provided adequate notice and opportunity for comment on the* de minimis *threshold.*

EPA provided adequate notice and opportunity for stakeholders to comment on the *de minimis* regulatory threshold included in the Rule.

As relevant here, TSCA incorporates the procedural requirements of the Administrative Procedure Act. 15 U.S.C. § 2605(c)(3). The Administrative Procedure Act, in turn, requires only that a notice of proposed rulemaking contain "*either* the terms or substance of the proposed rule or a description of the subjects and issues involved." 5 U.S.C. § 553(b)(3) (emphasis added). The Proposed Rule provided exactly that. Specifically, EPA "request[ed] comment on whether it should consider a *de minimis* level of TCE in formulations to account for impurities (*e.g.,* 0.1% or 0.5%) when finalizing the prohibitions described in this unit, and, if so, information on and rationale for any level that should be considered *de minimis*." Proposed Rule, 88 Fed. Reg. at 74733, JA___. This plainly provided sufficient notice to elicit comments as demonstrated by the 17 substantive comments EPA received on this issue. *See* RTC at 48–50, JA___–___.

Environmental Petitioners contend that this was insufficient because the Proposed Rule provided two options that EPA was considering rather than proposing a single *de minimis* threshold. Env. Br. at 76. But the Administrative Procedure Act does not require this level of specificity. What the Administrative Procedure Act requires is that the proposed rule "adequately frame the subjects for

discussion," *Conn. Light & Power Co. v. Nuclear Regul. Comm'n*, 673 F.2d 525, 533 (D.C. Cir. 1982), so that it affords exposure to diverse public comment, fairness to affected parties, and an opportunity to develop evidence in the record. *Prometheus Radio Project v. FCC*, 652 F.3d 431, 449 (3d Cir. 2011) (quoting *Int'l Union, United Mine Workers of Am. v. Mine Safety & Health Admin.*, 407 F.3d 1250, 1259 (D.C. Cir. 2005)).

The Proposed Rule provided "enough information to comment and for the agency to consider and respond to the comments." *See Prometheus*, 652 F.3d at 450. Specifically, the Proposed Rule (1) sought comment on whether EPA should consider a *de minimis* threshold and "information on and rationale for" any such threshold; (2) explained that the purpose of a *de minimis* threshold would be "to account for impurities"; and (3) gave two potential regulatory thresholds, including the 0.1 percent threshold EPA ultimately selected. 88 Fed. Reg. at 74733, JA ___; *contra* Env. Br. at 76. Thus, the request for comment was "sufficient to fairly apprise interested parties of all significant subjects and issues involved." *NVE, Inc. v. Dep't of Health & Hum. Servs.,* 436 F.3d 182, 191 (3d Cir. 2006).

EPA also met its obligation to "describe the range of alternatives being considered with reasonable specificity." *See Prometheus*, 652 F.3d at 450 (quoting *Horsehead Res. Dev. Co., Inc. v. Browner*, 16 F.3d 1246, 1268 (D.C. Cir. 1994)). Indeed, the Rule adopted one of the *de minimis* thresholds noted in the Proposed

Rule. 89 Fed. Reg. at 102591–92, JA ____-____; *see Mid-Tex Elec. Coop., Inc. v. FERC*, 773 F.2d 327, 339 (D.C. Cir. 1985) (finding adequate notice where agency provided notice that it might adopt the alternative it ultimately chose). Environmental Petitioners quibble that the Proposed Rule did not "discuss the factors EPA would apply in choosing among [the possible *de minimis* thresholds] or explain why they would satisfy the requirements of TSCA." Env. Br. at 76–77. But they have not pointed to any authority that required EPA to do so.

Environmental Petitioners contend that the Proposed Rule mirrored the notice this Court found defective in *Prometheus*. *Id.* at 76. But this is incorrect. The notice at issue in *Prometheus* was comprised of an op-ed and a press release that were not published in the Federal Register and reflected the views of only the Federal Communications Commission Chairman and not the Commission itself. *Prometheus*, 652 F.3d at 450. And the Commission voted just days after it received comments. *Id.* Moreover, the op-ed and press release were "too open-ended to allow for meaningful comment." *Id.* Here, in contrast, EPA explicitly solicited feedback on a *de minimis* threshold in a notice of proposed rulemaking published in the Federal Register—the standard method for notifying the public of a proposed course of action and soliciting comment. Moreover, the notice explained the purpose of a potential *de minimis* threshold and sought comment on two

different potential thresholds. Proposed Rule, 88 Fed. Reg. at 74733, JA___. EPA thus plainly complied with its notice-and-comment obligations.

Even if EPA should have spelled out further its request for comment on a *de minimis* threshold, Environmental Petitioners have not shown that the Proposed Rule lacked enough detail for them to provide comments.

**E. Environmental Petitioners' Requested Remedies Are Inappropriate.**

Environmental Petitioners ask the Court "vacate and remand" their challenged portions of the Final Rule. Env. Br. at 70, 78. Environmental Petitioners further request that the Court order EPA to conduct a new or supplemental risk evaluation addressing the risks of manufacturing and processing TCE byproducts. *Id.* at 70.

As detailed above, EPA's decisions on these issues are consistent with TSCA and should be upheld. But even if the Court were to identify some flaw in EPA's analysis, it should not vacate those parts of the Rule but instead should remand and allow those parts of the Rule to remain in place pending prompt completion of remand proceedings. *See Allied-Signal, Inc. v. Nuclear Regul. Comm'n*, 988 F.2d 146, 150 (D.C. Cir. 1993) (explaining that "[a]n inadequately supported rule . . . need not necessarily be vacated").

In deciding whether to vacate unlawful agency action, this Court considers: (1) whether it is conceivable if the agency can create a supportable rule on remand;

and (2) the disruptive consequences that might flow from vacatur of the action. *Prometheus*, 824 F.3d at 52. Here, both prongs show that remand without vacatur is proper.

On remand, EPA could further explain its action regarding its decision not to evaluate the manufacture of byproduct TCE and the *de minimis* threshold. Vacatur also would be disruptive to the regulated community. *See Cent. & S. W. Servs., Inc. v. EPA*, 220 F.3d 683, 692 (5th Cir. 2000) (determining that vacatur was inappropriate where rule applied to other members of a regulated community and therefore would be disruptive). By contrast, remanding the Rule without vacatur would enable EPA to make any necessary adjustments to the Rule while maintaining the Rule's protections, ensuring stability for regulated parties and the general public, and respecting Congress' desire for prompt regulation of toxic substances.

## II. Industry's Petitions Are Not Prudentially Ripe.

Industry Petitioners have challenged multiple aspects of the Rule. But EPA is actively reconsidering each of those issues. Troutman Decl. ¶ 11–12. These issues thus are not prudentially ripe and the Court should hold Industry Petitioners' case in abeyance while EPA reconsiders those aspects of the Rule, subject to regular status reports from the Agency.

Courts have recognized that although a case may be "constitutionally ripe," there may also be "prudential reasons for refusing to exercise jurisdiction." *Am. Petroleum Inst. v. EPA*, 683 F.3d 382, 386 (D.C. Cir. 2012) (quoting *Nat'l Park Hosp. Ass'n v. Dep't of Interior*, 538 U.S. 803, 808 (2003)). "In the context of agency decision making, letting the administrative process run its course before binding parties to a judicial decision prevents courts from 'entangling themselves in abstract disagreements over administrative policies, and . . . protect[s] the agencies from judicial interference' in an ongoing decision-making process." *Am. Petroleum Inst.*, 683 F.3d at 386 (quoting *Abbott Lab'ys v. Gardner*, 387 U.S. 136, 148 (1967)). Postponing review can also conserve judicial resources, and it "comports with our theoretical role as the governmental branch of last resort." *Nat'l Treasury Emps. Union v. United States,* 101 F.3d 1423, 1431 (D.C. Cir. 1996).

For instance, declining jurisdiction over a dispute while there is still time for the challenging party to "convince the agency to alter a tentative position" provides the agency "an opportunity to correct its own mistakes and to apply its expertise," potentially eliminating the need for (and costs of) judicial review. *Pub. Citizen Health Rsch. Grp. v. FDA*, 740 F.2d 21, 30–31 (D.C. Cir. 1984) (citation omitted). Even if the challenger fails to persuade the agency, permitting the administrative process to reach its end can narrow the legal issues at play, allowing for more

intelligent resolution of any remaining claims and avoiding inefficient and unnecessary "piecemeal review." *Id.* at 30 (internal quotation marks omitted). Put simply, the doctrine of prudential ripeness ensures that Article III courts make decisions only when necessary, and then, only once. *See Devia v. NRC*, 492 F.3d 421, 424 (D.C. Cir. 2007); *Pub. Citizen Health Rsch. Grp.*, 740 F.2d at 30–31.

In assessing prudential ripeness, courts consider the "fitness of the issues for judicial decision" and the extent to which withholding a decision will cause "hardship to the parties." *Abbott Lab'ys,* 387 U.S. at 149. Here, both aspects support deferring consideration of Industry Petitioners' petitions while EPA completes its rulemaking.

### A. The Issues Raised by Industry Petitioners Are Not Fit for Judicial Decision.

EPA is working diligently to reconsider the portions of the Rule challenged by Industry Petitioners. Troutman Decl. ¶ 11–14. The arguments challenging these portions of the Rule are almost entirely record-based and not purely legal arguments of the proper interpretation of TSCA. *See Lab. Council for Latin Am. Advancement*, 12 F.4th at 254. Because the Court will be in a better position to adjudicate these issues (if necessary) following further factual development, they are not fit for judicial decision at this time. *See id.* ; *see also Atl. States Legal Found. v. EPA*, 325 F.3d 281, 284 (D.C. Cir. 2003).

*First*, the Alliance argues that the record before EPA does not support the conditions of the section 6(g) exemptions that EPA set for use of TCE as a processing aid for lead acid battery separator manufacturing and specialty polymeric microporous sheet materials, including the exposure limit, and the duration of the exemption for lead acid battery separators. All. Br. at 32–60. EPA is currently reevaluating the record and reconsidering these aspects of the Rule. Troutman Decl. ¶ 11. At a minimum, reconsideration would ensure that EPA has the opportunity to "crystalliz[e] its policy before that policy is subjected to judicial review." *Wyo. Outdoor Council v. U.S. Forest Serv.,* 165 F.3d 43, 49 (D.C. Cir. 1999). And if EPA does revise the exposure limit, this litigation would immediately become moot, as the new rule would supersede this rule on these issues. *Akiachak Native Cmty. v. U.S. Dep't of Interior*, 827 F.3d 100, 113 (D.C. Cir. 2016) (A "well-settled principle of law" is that "when an agency has rescinded and replaced a challenged regulation, litigation over the legality of the original regulation becomes moot."). Moreover, any litigation on the new rule would be reviewable only on the record generated for that rule, not the record here. And it is possible that all petitioners will find a new decision acceptable, thereby rendering *any* judicial review of these issues unnecessary. *See Pub. Citizen Health Rsch. Grp.*, 740 F.2d at 31. But regardless, litigation of the issues in *this* rule would necessarily become improper.

*Second*, ACC challenges the Rule's prohibition of both disposal of wastewater containing TCE and offsite reuse of TCE unintentionally produced as a byproduct. ACC Br. at 35–51. EPA's reconsideration rule will affect both these issues. Troutman Decl. ¶ 12. The Court's consideration of these issues similarly would benefit from allowing EPA to fully crystallize its thinking.

As part of its challenge to the Rule's prohibition on offsite reuse of TCE unintentionally produced as a byproduct, ACC argues that EPA was precluded from promulgating the prohibition because the Risk Evaluation did not find that this use presented an unreasonable risk. ACC Br. at 39–41. EPA acknowledges that it did not evaluate processing and disposal of TCE byproduct in the Risk Evaluation; indeed, EPA has discretion to decide whether to evaluate byproducts in the risk evaluation for a particular substance. 15 U.S.C. § 2605(b)(4)(D). Nonetheless, because EPA is reconsidering the Rule's regulation of the processing of TCE as a byproduct, it is possible that such reconsideration will render judicial review unnecessary for not only that aspect of the Rule but also the Risk Evaluation. *See Pub. Citizen Health Rsch. Grp.*, 740 F.2d at 31.

For these reasons, the issues raised by Industry Petitioners are unfit for judicial decision.[8]

### B. Industry Petitioners Would Not Be Harmed by an Abeyance.

Neither of the Industry Petitioners will be harmed by an abeyance. The Alliance will not be harmed because the requirements it challenges are stayed pending resolution of this litigation. Troutman Decl., Ex. A. And ACC will not be harmed because EPA anticipates extending the current December 18, 2026, compliance deadlines for the Rule's prohibition on the disposal of wastewater containing TCE and offsite reuse of TCE unintentionally produced as a byproduct. Troutman Decl. ¶ 16; *see* 40 C.F.R. §§ 751.305(b)(9)(i), 751.313(h). Moreover, EPA plans to publish a proposed rule in November 2026 and a final rule in November 2027 that address all aspects of the Rule currently under reconsideration.

The Court thus should hold Industry's challenge to the case in abeyance while EPA reconsiders the Rule, subject to 60-day status reports from Agency. *See, e.g.*, *Devia*, 492 F.3d at 426; *Town of Stratford v. FAA*, 285 F.3d 84 (D.C. Cir. 2002), *reh'g denied*, 292 F.3d 251 (D.C. Cir. 2002).

[8] If Court reaches Industry Petitioners' arguments and agrees with them on the merits, then any remedy, including vacatur, should be limited to the issues that Industry Petitioners raise.

**CONCLUSION**

For these reasons, the Court should deny Environmental Petitioners' petitions and hold Industry Petitioners' petitions in abeyance, subject to regular status reports from EPA.

Respectfully submitted,

ADAM R. F. GUSTAFSON
*Principal Deputy Assistant Attorney General*

BRADLEY CRAIGMYLE
*Deputy Assistant Attorney General*

*/s/ Laura J. Brown*
LAURA J. BROWN
LAURA J. GLICKMAN
Environment and Natural Resources Division
U.S. Department of Justice
P.O. Box 7611
Washington, D.C. 20044
(202) 305-5314 (Brown)
(202) 598-3056 (Glickman)
*Laura.J.S.Brown@usdoj.gov*
*Laura.Glickman@usdoj.gov*

*Of Counsel:*

STEPHANIE SCHWARZ
AMANDA WELLS
Office of General Counsel
U.S. Environmental Protection Agency
Washington, D.C.

July 20, 2026

## CERTIFICATE OF COMPLIANCE

1. This document complies with Fed. R. App. P. 32(a)(5) and (6) and 3d Cir. R. 32.1 because it uses 14-point Times New Roman, a proportionally spaced font, with 1-inch margins.

2. This document complies with Fed. R. App. P. 32(a)(7)(B)(i) because according to Microsoft Word's count, it has 12,506 words, excluding the parts of exempted under Fed. R. App. P. 32(f).

3. Pursuant to 3d Cir. R. 31.1(c), this document was scanned with a virus detection program (Microsoft Defender, version 1.453.124.0) on July 20, 2026, and no virus was detected.

4. Pursuant to 3d Cir. R. 31.1(c), I certify that the text of this electronic brief is identical to the text in the paper copies submitted to the Court.

5. Pursuant to this 3d Cir. R. 46.1(e), I hereby certify that at least one attorney whose name appears on this Petition is a member in good standing of the bar of the United States Court of Appeals for the Third Circuit.

Dated: July 20, 2026

*/s/ Laura J. Brown*

## CERTIFICATE OF SERVICE

I hereby certify that on July 20, 2026, I electronically filed the foregoing with the Clerk of the Court by using the appellate CM/ECF system. Service by the appellate CM/ECF system will be accomplished on the participants in this case that are registered CM/ECF users and have entered an appearance.

*/s/ Laura J. Brown*