**IN THE UNITED STATES COURT OF APPEALS**
**FOR THE THIRD CIRCUIT**

**Case No. 25-1055**
(consolidated with Case Nos. 25-1079, 25-1080, 25-1081, 25-1082, 25-1083, 25-1084, 25-1093, 25-1098, 25-1118, 25-1132, 25-1133, and 25-1144)

---

**UNITED STEEL PAPER and FORESTRY, RUBBER, MANUFACTURING, ENERGY, ALLIED INDUSTRIAL and SERVICE WORKERS INTERNATIONAL UNION, AFL-CIO, ET AL.,**

*Petitioners*

v.

**UNITED STATES ENVIRONMENTAL PROTECTION AGENCY,**

*Respondent*.

---

On Petition for Review of Final Agency Action of the United States Environmental Protection Agency

---

# FINAL BRIEF OF INTERVENORS CENTER FOR ENVIRONMENTAL HEALTH and ENVIRONMENTAL DEFENSE FUND IN RESPONSE TO CHEMICAL INDUSTRY PETITION

---

**September 21, 2026**

Samantha Liskow
ENVIRONMENTAL DEFENSE FUND
257 PARK AVE S N.W.
NEW YORK, NY 10010
(212) 616-1247
sliskow@edf.org
*Counsel for Intervenor Environmental Defense Fund*

Robert M. Sussman
SUSSMAN & ASSOCIATES
310 Garfield St., N.W.
Washington, D.C. 20008
(202) 716-0118
bobsussman@comcast.net
*Counsel for Intervenor Center for Environmental Health*

## CORPORATE DISCLOSURE STATEMENT AND STATEMENT OF FINANCIAL INTEREST (FRAP 26.1)

Pursuant to Federal Rule of Appellate Procedure 26.1 and Third Circuit Local Appellate Rule 26.1, Petitioners Center for Environmental Health and Environmental Defense Fund make the following statements:

1) For non-governmental corporate parties, please list all parent corporations:
   **None/not applicable**.

2) For non-governmental corporate parties, please list all publicly held companies that hold 10% or more of the company's stock.
   **None/not applicable**.

3) If there is a publicly held corporation which is not a party to the proceeding before this Court but which has a financial interest in the outcome of the proceeding, please identify all such parties and specify the nature of the financial interest or interests.
   **None/not applicable**.

September 21, 2026

s/ Samantha Liskow
Samantha Liskow
*Counsel for Intervenor Environmental Defense Fund*

s/ Robert Sussman
Robert Sussman
*Counsel for Intervenor Center for Environmental Health*

**TABLE OF CONTENTS**

TABLE OF CONTENTS .......... iii

GLOSSARY .......... viii

INTRODUCTION .......... 1

SUMMARY OF ARGUMENT .......... 3

I. Background .......... 5

A. EPA determined that a ban of TCE under TSCA was necessary due to its health risks .......... 5

B. EPA relaxed various proposed restrictions on TCE .......... 6

II. Industry's Reading of Amended TSCA is Not Textually Supported and Would Leave People Subject to Unreasonable Risk .......... 8

A. Congress gave EPA full authority to regulate chemicals "to the extent necessary" in order to eliminate unreasonable risk .......... 9

B. Industry's demand for minuscule risk determinations must be rejected as inconsistent with TSCA and EPA's ability to provide full protection from unreasonable risk .......... 18

III. EPA's Prohibition of Offsite Processing of Byproduct TCE Satisfies its TSCA Mandate and is Supported by Substantial Evidence .......... 27

A. Industry did not submit comments during the rulemaking regarding the need to process TCE byproduct offsite .......... 30

B. Industry's attacks on the validity of EPA's risk findings must be rejected 33

C. Industry's challenge to EPA's restrictions on byproduct TCE processing should be rejected .......... 39

D. EPA's allowance of byproduct TCE disposal is consistent with its conditions on byproduct reuse .......... 41

E. Industry has alternatives to off-site processing of TCE byproduct .......... 43

IV. EPA's Prohibition of Wastewater Containing TCE is Lawful .......... 45

A. EPA's Prohibition is Supported by Ample Evidence in the Record .......... 46

B. The *de minimis* exemption provides no rationale for overturning EPA's restrictions on TCE-containing wastewater .......... 49

C. Factors such as cost to industry and the existence of Clean Water Act regulation are not lawful bases for EPA to decline to eliminate the unreasonable risk of TCE in wastewater ....51

D. Industry's request to engage in unrestricted TCE wastewater disposal must be rejected ....52

V. INDUSTRY'S REQUEST FOR VACATUR SHOULD BE DENIED ....53

CONCLUSION ....54

COMBINED CERTIFICATIONS ....56

CERTIFICATE OF SERVICE ....57

## TABLE OF AUTHORITIES

**Cases**

*Cen v. AG United States*,
825 F.3d 177 (3d Cir. 2016) ........................................................11

*Center for Biological Diversity v. EPA*,
141 F.4th 153 (D.C. Cir. 2025) ....................................................54

*Corrosion Proof Fittings v. EPA*,
947 F.2d 1201 (5th Cir. 1991) ......................................................12

*DHS v. MacLean*,
574 U.S. 383 (2015) .....................................................................11

*Essintial Enter. Sols. v. United States SBA*,
166 F.4th 380 (3d Cir. 2026) ........................................................14

*Fertilizer Institute v. Browner*,
163 F.3d 774 (3d Cir. 1998) ........................................................47

*FS Credit Opportunities Corp. v. Saba Capital Master Fund*,
225 L. Ed. 2d 184 (Supreme Court, June 11, 2026)................................13

*In re Yellow Corp.*,
152 F.4th 191 (3d Cir. 2025) ...................................................21, 42

*Keystone-Conemaugh Projects v. EPA,*
100 F.4th 434 (3d Cir. 2024) ..........................................................1

*Labor Council for Latin Am. Advancement v. EPA*,
12 F.4th 243 (2d. Cir. 2021) ..........................................................13

*Logic Tech Dev. v. FDA*,
84 F.4th 537 (3rd Cir. 2023) ..........................................................43

*Michelin v. Warden Moshannon Valley Corr. Ctr.*,
169 F.4th 418 (3d Cir. 2026) ..............................................10, 14, 17

*Northside Sanitary Landfill, Inc. v. Thomas*,
849 F.2d 1516 (D.C. Cir. 1988) ......33

*PJM Power Providers Group v. FERC*,
88 F.4th 250 (3d Cir. 2023) ......53

*Sierra Club v. EPA*,
972 F.3d 290 (3d Circ. 2020) ......48

*Southwestern. Pa. Growth Alliance v. Browner*,
121 F.3d 106 (3d Cir. 1997) ......33

*United States v. Jicarilla Apache Nation*,
564 U.S. 162 (2011) ......11

*United States v. Pelullo*,
399 F.3d 197 (3d Cir. 2005) ......30

**Statutes**

15 U.S.C. § 2601(b)(3) ......14

15 U.S.C. § 2602(12) ......38

15 U.S.C. § 2605(a) ......5, 10, 12, 13, 17, 18

15 U.S.C. § 2605(a)(1) ......15

15 U.S.C. § 2605(a)(5) ......16

15 U.S.C. § 2605(b) ......22

15 U.S.C. § 2605(b)(4)(A) ......19, 20, 25

15 U.S.C. § 2605(b)(4)(F)(i) ......19

15 U.S.C. § 2605(b)(4)(F)(iii) ......51

15 U.S.C. § 2605(c) ......13

15 U.S.C. § 2605(c)(2)(A) ......13

15 U.S.C. § 2605(c)(2)(B) ......13

15 U.S.C. § 2605(c)(2)(E) ......11, 12

15 U.S.C. § 2605(d) ....................6

15 U.S.C. § 2605(g) ....................6

15 U.S.C. § 2625(k) ....................41

**Regulations**

40 C.F.R. § 403.5(b)(7) ....................52

40 C.F.R. § 704.3....................11

40 C.F.R. § 751.301(c) ....................32

40 C.F.R. § 751.305(b)(4) ....................7

40 C.F.R. § 751.305(b)(14) ....................7

40 C.F.R. § 751.305(b)(23) ....................7

40 C.F.R. § 751.305(b)(24) ....................7

40 C.F.R. § 751.5....................49

**Federal Register**

EPA, "Designation of Ten Chemical Substances for Initial Risk Evaluations under the Toxic Substances Control Act," 81 Fed. Reg. 91,927 (Dec. 19, 2016) .......21

EPA, *Notice - Toxic Substances Control Act Determination: Trichlorethyelene*, 88 Fed. Reg. 1222 (Jan. 9, 2023) ....................16

**Legislative Materials**

Pub. L. No. 94-469, § 6(a), 90 Stat. 2003, 2020 (1976) ....................12

**Other Authorities**

EPA, *Byproducts Assessment for 1,2-Dichlorethane* (April 2026), https://www.regulations.gov/document/EPA-HQ-OPPT-2018-0427-0185 ........35

EPA, *National Primary Drinking Water Regulations*, https://www.epa.gov/ground-water-and-drinking-water/national-primary-drinking-water-regulations ....................36

## GLOSSARY

| | |
|---|---|
| ACC | American Chemistry Council |
| EPA | Respondent United States Environmental Protection Agency |
| HSIA | Halogenated Solvents Industry Alliance |
| JA | Joint Appendix |
| Rule | United States Environmental Protection Agency, “Trichloroethylene (TCE); Regulation Under the Toxic Substances Control Act (TSCA),” 89 Fed. Reg. 102,568 (Dec. 17, 2024) |
| TCE | Trichloroethylene |
| TSCA | Toxic Substances Control Act |

## INTRODUCTION

The chemical industry petitioners claim that they do not seek to undermine EPA's finding that the toxic chemical TCE poses unreasonable risk. This assertion is belied by the industry's frontal attack on the provisions of TSCA Section 6, which Congress amended in 2016 to strengthen EPA's ability to protect people from the unreasonable risk of toxic chemicals. In order to achieve their stated purposes, which are to use byproduct chemical streams containing TCE with no restrictions and to dispose freely of TCE-containing waste, the petitioners insist that Section 6 imposes cumbersome processes and limitations on EPA that would make identifying and protecting against chemicals' harms highly difficult, if not impossible. But the statute's text simply does not support the petitioners' reading, and those arguments should be rejected.

Industry petitioners also disagree with EPA's scientific analyses and TCE risk management decisions. But the path that EPA took to its challenged restrictions is discernable and supported by the record, and such scientific determinations of a federal agency are "especially" owed deference. *See Keystone-Conemaugh Projects v. EPA,* 100 F.4th 434, 445 (3d Cir. 2024).

Intervenors, who seek to maintain the health protections in the Rule, ask the Court to deny the industry petitioners' challenge.[1]

---

[1] In this brief, Intervenors Center for Environmental Health and Environmental Defense Fund are responding to the Opening Brief of American Chemistry Council, Georgia Chemistry Council, Ohio Chemistry Technology Council, Texas Chemistry Council, Olin Corporation, and Vinyl Institute ("Industry Petitioners" or "Industry"). Dckt. No. 75 (Case No. 25-1132). The remaining Intervenors – United Steel Paper and Forestry, Rubber, Manufacturing, Energy, Allied Industrial and Service Workers International Union, AFL-CIO – will be responding to the Initial Opening Brief of the Alliance for a Strong U.S. Battery Sector, et al. Dckt. No. 97 (Case No. 25-1083).

## SUMMARY OF ARGUMENT

The Industry Petitioners seek to overturn EPA's restriction on the processing of byproduct TCE transferred between facilities and the release of TCE to wastewater. To justify vacating these protections, they advance extreme interpretations of TSCA Section 6. First, they claim that TSCA requires a specific unreasonable risk determination for *every* TCE "condition of use" (activity) and that the restrictions imposed on the use must be no more stringent than necessary to address this *use-specific risk*. But while TSCA envisions a use-by-use risk analysis, this analysis is the foundation for determining whether the chemical *as a whole* presents an unreasonable risk under the totality of its conditions of use. Once EPA makes that determination, EPA has discretion to impose restrictions that, in combination, meet the statutory goal of eliminating the unreasonable risk of the chemical. TSCA does not provide what Industry erroneously demand: that EPA narrowly focus on the specific risk of the use in isolation without regard to the overall unreasonable risk from all the chemical's conditions of use.

To support their request for vacatur of the two Rule provisions, Industry propose an interpretation of Congress' mandate to EPA to eliminate unreasonable risk of a toxic chemical "to the extent necessary" that turns the instruction on its head. Petitioners portray it as a limiting instruction, in contravention of the plain

text of Section 6, Congress' strengthening of EPA's risk management authority, and TSCA's purpose to assure that chemicals do not present unreasonable risk.

Furthermore, contrary to Industry's assertions, EPA did analyze the risks from TCE byproduct streams and releases to wastewater. EPA examined these activities, which expose people to TCE, and considered at length the information submitted by Industry but also took into account data about TCE from analogous conditions of use and its overall conclusion that all TCE use conditions must be prohibited to address the unreasonable risk of the whole chemical. The challenged provisions were the product of rational Agency decision making that was not arbitrary or capricious and was supported by substantial evidence. Industry's petition should be denied.

If the Court were however to agree with Industry Petitioners' arguments on the merits, it should reject their request for vacatur of the two challenged provisions and instead remand to the Agency for further consideration.

## STANDARD OF REVIEW

The standard of review applicable to Industry Petitioners' challenge to the Rule is properly described by Environmental Protection Agency in their response brief. Dckt. No. 95-1 (Case No. 25-1079) at 22-24.

## ARGUMENT

### I. Background

#### A. EPA determined that a ban of TCE under TSCA was necessary due to its health risks[2]

In its years-long, peer reviewed scientific assessment of the "highly toxic" chemical TCE, JA817 (EPA Response to Comments at 41), EPA identified "sever[e] … risks associated with TCE exposure, including developmental toxicity, reproductive toxicity, liver toxicity, kidney toxicity, immunotoxicity, neurotoxicity, and cancer." JA829 (EPA Response to Comments at 53). *See also* Environmental Petitioners' Brief at 15-24.

In light of these severe threats to health and TCE's risks of harm at very low levels of exposure, EPA determined that TCE as a whole chemical presented an unreasonable risk of injury under TSCA Section 6(a) and that "full prohibition is necessary to protect human health from unreasonable risk resulting from TCE under the conditions of use." JA808 (EPA Response to Comments at 32). *See also* EPA Response to Comments at 14 (a ban is "the only risk management tool that will fully address the unreasonable risk"). However, for certain TCE "conditions of use," EPA delayed the effectiveness of these prohibitions, allowing TCE

---

[2] Additional statutory and rulemaking background is contained in the brief of Petitioners Center for Environmental Health and Environmental Defense Fund, and we incorporate that background here. *See* Dckt. No. 84-1 (Case No. 25-1082) ("Environmental Petitioners Brief"), at 9-32 (May 13, 2026).

manufacture and processing for these activities to continue for set periods but required them ultimately to be phased out. JA81-85 (Rule at 102,594-98).

EPA proposed an air occupational exposure limit that would protect workers fully from harmful effects of TCE pending the complete cessation of TCE use. But some commenters pushed back, claiming that this limit was infeasible and that TCE exposures created unreasonable risks at levels below what then-available monitoring methods could reliably detect. *See* JA67 (Rule at 102,580). As a result, in the final Rule, EPA adopted significantly higher "interim" workplace limits that it found to be "feasible" but acknowledged not to be fully protective. *Id.* These limits partially reduce the unreasonable risk but do not eliminate it, leaving workers and other at-risk populations exposed to harm from the most serious health effects identified by EPA in the period before a full ban takes effect. JA88, 68 (Rule at 102,601 and 102,581).

**B. EPA relaxed various proposed restrictions on TCE**

At the urging of industry, EPA relaxed numerous proposed restrictions on the use of TCE. Relevant to Industry's petitions in this case, EPA made the following changes between the proposed and final rules:

- For companies allowed to continue to use TCE under either an "exemption" per 15 U.S.C. § 2605(g) or a delayed phaseout date per 15 U.S.C. § 2605(d), EPA finalized the required interim worker protection "existing chemical exposure

limit" at a level 180 times more relaxed than proposed. JA66-68 (Rule at 102,579-81).

- EPA finalized an exemption allowing the lead acid battery separator industry 20 additional years to use TCE, twice as long as what EPA had proposed. JA73 (Rule at 102,586).
- Adopting a less stringent alternative than its primary proposal, the Agency gave the makers of "specialty polymeric microporous sheet material" 15 additional years to continue using TCE. JA74 (Rule at 102,587).
- EPA proposed to prohibit the disposal of TCE-containing wastewater within one year of the regulation's finalization, but in the Rule permitted the lead acid battery separator industry to continue disposing of TCE wastewater for 20 years and allowed the microporous sheet materials industry to do so for 15 years. JA74, 77-78, 84-85 (Rule at 102,587; 102,590-91; 102,597-98); 40 C.F.R. §§ 751.305(b)(4), (14), (23), (24).
- EPA did not propose a "*de minimis*" exemption for TCE; instead, it requested comment on whether the Agency should consider some *de minimis* exemption level. *See* Environmental Petitioner Brief at 70-71. In the final Rule, after industry told EPA in rulemaking that the manufacture of chlorinated organic chemicals results in the unintentional manufacture of purportedly "small amounts" of TCE as byproducts, EPA established an across-the-board *de*

*minimis* exemption allowing any products containing TCE at less than 0.1% by weight to be free from prohibition or restriction. JA78-79 (Rule at 102,591-92).

- Although EPA proposed to prohibit all processing (or, "reuse") of TCE, the Agency reversed itself in the Rule, based on the urging of Petitioner American Chemistry Council ("ACC"), and permitted all industries to process byproduct TCE "when that byproduct TCE is processed within a site-limited, physically enclosed system that is part of the same overall manufacturing process" that generates the byproduct. JA79, 105 (Rule at 102,592 and 102,618).
- EPA "clarified" in the Rule that it was permitting all manufacture of TCE as a byproduct. JA826-27 (EPA Response to Comments at 50-51).

Thus, EPA took significant steps to show responsiveness to comments made by industry groups.

## II. Industry's Reading of Amended TSCA is Not Textually Supported and Would Leave People Subject to Unreasonable Risk

In their brief, Industry Petitioners disregard the Rule's fundamental underpinning: that the nature and magnitude of TCE's risks to humans are so harmful that a ban is the sole regulatory option that can satisfy TSCA's obligation to protect against unreasonable risk. *See* JA809 (EPA Response to Comments at 33). Instead of directly challenging EPA's conclusion that it must ban TCE to protect against its unreasonable risks, Industry seek to undermine regulatory requirements imposed on certain uses of the chemical. Petitioners do so by

proposing readings of TSCA that are contradicted by the statute's plain text and its central purpose of protecting people and the environment from toxic chemical harms.

### A. Congress gave EPA full authority to regulate chemicals "to the extent necessary" in order to eliminate unreasonable risk

The language "to the extent necessary," along with the other portions of TSCA Section 6(a), is a mandate to eliminate risk. In the Industry Petitioners' conception of the statute, the Agency must constantly restrain its attempts to fulfill its obligation to regulate toxic chemicals, lest it do "too much." The text of the statute, however, does not support this. In the Rule, EPA correctly articulated TSCA's mandate:

> Under TSCA section 6(a), if the Administrator determines through a TSCA section 6(b) risk evaluation that a chemical substance presents an unreasonable risk of injury to health or the environment, without consideration of costs or other non-risk factors, including an unreasonable risk to a [potentially exposed or susceptible subpopulation] identified as relevant to the Agency's risk evaluation, under the conditions of use, EPA must by rule apply one or more of the section 6(a) requirements to the extent necessary so that the chemical substance no longer presents such risk.

JA63 (Rule at 102,576) (emphasis added). Industry spend much of their brief trying to isolate "to the extent necessary" from the statute and recast it as a limiting instruction, rather than acknowledging what that phrase and its surrounding statutory language do: require EPA to eliminate the unreasonable risk identified by EPA in its risk evaluation by using the authorities granted by Congress.

As this Court has recently observed: "[W]e do not read statutes in isolation. 'A statutory provision is not ambiguous simply because, by itself, it is susceptible to differing constructions … Rather, in examining statutory language, we take account of the specific context in which that language is used.'" *Michelin v. Warden Moshannon Valley Corr. Ctr.*, 169 F.4th 418, 429 (3d Cir. 2026) (citing *Hayes v. Harvey*, 903 F.3d 32, 41 (3d Cir. 2018) (en banc). TSCA requires that EPA "<u>shall</u> by rule ... apply one or more of the following requirements to such substance or mixture to the extent necessary <u>so that</u> the chemical substance or mixture no longer presents such risk." 15 U.S.C. § 2605(a) (emphasis added). The statutory language explicitly imposes an obligation on EPA to regulate "so that" the chemical no longer presents an unreasonable risk.

Industry fail to acknowledge the key fact that Congress made the decision not to insert a word that Industry clearly want in the statute – indeed, need, to support its interpretation: "only." Instead of acknowledging the absence of the word, Petitioners insert it. Industry state in their brief that "EPA can only regulate '*to the extent necessary* so that the chemical substance or mixture no longer presents such risk.'" Industry Brief at 35. If Congress meant for the Agency to follow Industry's interpretation they could have added "only" before "to the extent necessary."

Notably, Congress used the word "only" in another part of Section 6. Section 6(c)(2)(E) requires EPA to regulate articles[3] and categories of articles "*only* to the extent necessary," 15 U.S.C. § 2605(c)(2)(E) (emphasis added). Industry do not acknowledge the significant distinction Congress made – limiting EPA to "only" in one nearby provision and not another – between Congress' otherwise identical instructions. *See* Industry Brief at 35 (asserting that 6(a) means that "EPA must carefully tailor risk management requirements by choosing *only* those requirements needed to eliminate the identified unreasonable risk, but no more" (emphasis added)). The fact that Congress uses a word or words in one provision and not another is generally presumed to be intentional. *See DHS v. MacLean*, 574 U.S. 383, 392 (2015) (discussing the "interpretive canon that Congress acts intentionally when it omits language included elsewhere"); *Cen v. AG United States*, 825 F.3d 177, 193-94 (3d Cir. 2016). Importing "only" into Section 6(a) also would render the additional restriction in Section 6(c)(2)(E) redundant, contrary to another canon. *See United States v. Jicarilla Apache Nation*, 564 U.S. 162, 185 (2011) ("we are hesitant to adopt an interpretation of a congressional enactment which renders superfluous another portion of that same law"). In sum, if Congress meant

[3] In an EPA regulation, an article is defined essentially as a manufactured item formed to a specific shape or design that has end use functions dependent on that shape or design – for example, a book or a table – and which has no change of chemical composition during its end use separate from its commercial purpose as an article. 40 C.F.R. § 704.3.

for Section 6(a) to restrict EPA in the way Industry seek, Congress would have used the word "only," as it did in Section 6(c)(2)(E).

Industry's blinkered view of the statutory requirements was definitively rejected by Congress in its overhaul of TSCA. Environmental Petitioners' Brief at 10-15. As the Agency wrote in this rulemaking, "… the 2016 amendments to TSCA purposefully eliminated the requirement that TSCA Section 6(a) rules use the 'least burdensome' requirement to protect against risk" and directed EPA not to consider "cost or other non-risk factors" in determining whether risks are "unreasonable." JA789, 847 (EPA Response to Comments at 6 and 153).[4] Congress' direction to regulate "to the extent necessary so that the chemical substance or mixture no longer presents such risk [i.e., unreasonable risk]" replaced the former text, "to the extent necessary to protect adequately against such risk *using the least burdensome requirements*." Pub. L. No. 94-469, § 6(a), 90 Stat. 2003, 2020 (1976) (emphasis added). Not only did Congress drop the reference to "least burdensome requirements," it dropped the "protect adequately" language, replaced it with a command to the Agency to regulate so that the chemical "no longer presents" an unreasonable risk, and also explicitly precluded EPA from

[4] The backdrop for these changes was the 1991 decision of the Fifth Circuit overturning EPA's ban of asbestos because it did not balance costs and benefits and failed to impose the "least burdensome" requirements. *Corrosion Proof Fittings v. EPA*, 947 F.2d 1201 (5th Cir. 1991).

considering "cost or other non-risk factors" when determining if a risk is "unreasonable." Thus, Congress significantly strengthened TSCA's environmental and health protections. *See Labor Council for Latin Am. Advancement v. EPA*, 12 F.4th 243, 243 (2d. Cir. 2021) (the TSCA amendments "substantially increased EPA's obligation to evaluate and regulate dangerous chemicals.")[5] Environmental Petitioners' Brief at 10-14. The extensive revisions to Section 6 represented fundamental repairs of TSCA, serving as "a renovation, not a new coat of paint." *FS Credit Opportunities Corp. v. Saba Capital Master Fund*, 225 L. Ed. 2d 184, at *196 (Supreme Court June 11, 2026) (finding significant meaning in amendments to the Investment Company Act in which a section was "entirely reworked").

Industry reference Congress' overhaul, but seek to turn it on its head, putting forth an interpretation of Section in which the Agency must constantly be on guard to seek out the least burdensome means of dealing with risk. *See* Industry Brief at

---

[5] Industry attempt to water down Congress' major transformation of TSCA risk management by pointing to Section 2605(c). But as EPA recently observed in its defense of its regulation of asbestos under TSCA, that provision in no way mitigates EPA's responsibilities under Section 2605(a), which defines the universe of minimally acceptable restrictions. Section 2605(c), in turn, guides EPA's selection from within that menu. *See* Brief of EPA, Dckt. No. 267 (Case No. 24-60193), Jan. 16, 2026, at 112 (5th Cir.). The provision requires only that EPA "factor in, *to the extent practicable*," the listed considerations, including health and environmental effects from the magnitude of exposure to the chemical, its benefits for various uses, and the "reasonably ascertainable economic consequences of the rule," including its "cost effectiveness." 15 U.S.C. § 2605(c)(2)(A), (B) (emphasis added). These considerations do not override the requirement to eliminate the "unreasonable risk." *Id.* at § 2605(a); EPA Brief, Case No. 24-60193, at 13.

37-38. But as is plain in the text of the amended statute, Congress rejected such an under-protective approach to the management of toxic chemicals. "[S]tatutes, no matter how impenetrable, do—in fact, must—have a single, best meaning." *Essintial Enter. Sols. v. United States SBA*, 166 F.4th 380, 384 (3d Cir. 2026) (citing *Loper Bright Enters. v. Raimondo*, 603 U.S. 369, 400 (2024)). In light of the "text and the context" of the amendments, Industry's reading of the statute is plainly not its "single, best meaning." *Michelin*, 169 F.4th at 432.

Moreover, in determining the meaning of "to the extent necessary," the Court should take into account that the primary purpose of TSCA is to "assure" that chemicals do not present unreasonable risks. Congress instructed that EPA's

> authority over chemical substances and mixtures should be exercised in such a manner as not to impede unduly or create unnecessary economic barriers to technological innovation while fulfilling the *primary purpose of [TSCA] to assure that such innovation and commerce in such chemical substances and mixtures do not present an unreasonable risk of injury to health or the environment.*

15 U.S.C. § 2601(b)(3) (emphasis added.) To be sure, Congress cautioned EPA not to impede innovation "unduly" or create "unnecessary economic barriers to technological innovation." *Id.* A requirement that eliminates a chemical's unreasonable risk would not be unnecessary, as it fulfills EPA's mandate under TSCA and its primary purpose of protecting people and the environment from

chemicals that pose unreasonable risks.[6] When EPA fulfills the statute's primary purpose of eliminating unreasonable risk, by regulating to the "extent necessary," it may involve what Industry would label over-regulation. In light of uncertainties present in the assessment of risks and the effectiveness of requirements that reduce exposure, adopting only those restrictions that Industry might assert are the bare minimum needed may well not be sufficient to fulfill EPA's statutory obligation to eliminate unreasonable risks.

Further standing the statute on its head, Industry bizarrely cast the lengthy menu of risk management options as a constraint on the Agency's discretion to select the restrictions that will best eliminate unreasonable risk. Industry Brief at 18, 36. However, even a cursory look at the options Congress furnished EPA demonstrates the opposite. For example, the first option grants EPA the discretion to issue a requirement "*prohibiting or otherwise restricting* the manufacturing, processing, or distribution in commerce of such substance or mixture." 15 U.S.C. § 2605(a)(1) (emphasis added). This expansive language encompasses a broad array

---

[6] Industry portray legislative history as confirming "that Congress intended to limit regulation to just what is necessary, while 'ensur[ing] that the competitive advantage of the U.S. chemical industry is not eroded by regulatory mandates[.]' S. Rep. No. 114-67, at 2." Industry Brief at 37-38. Industry thus rewrite the statutory ordering of priorities, which explicitly states that protection of health and the environment is the primary purpose, proposing instead that protecting the chemical industry's competitive advantage, and ensuring that it is not negatively impacted by regulations, should be the statute's primary purpose.

of approaches to eliminating harm, including a full ban, a partial ban, and/or limitations on human exposure or environmental releases. *See also* 15 U.S.C. § 2605(a)(5) (allowing EPA to issue a "requirement prohibiting or otherwise regulating any manner or method of commercial use of such substance or mixture"). Moreover, Industry's proposed minimalist approach is countered by Congress' direction to the Agency to "apply one or more" of the regulatory options. Congress gave EPA the discretion to choose from broad categories of restrictions, and to mix and match as many of the authorized restrictions as it found necessary to satisfy its risk management responsibilities.

EPA did not determine in its risk determination or the Rule whether particular individual activities presented an unreasonable risk; EPA instead properly followed the whole chemical approach, by which it assessed whether individual conditions of use contributed to the unreasonable risk that it determined was posed by TCE. *See* JA62 (Rule at 102,575); Section II.B, *infra*. EPA stated that its "unreasonable risk determination for TCE as a chemical substance is driven by risks associated with the [all but two] conditions of use, considered singularly or in combination with other exposures." *Notice - Toxic Substances Control Act Determination: Trichlorethyelene*, 88 Fed. Reg. 1222, 1226 (Jan. 9, 2023). EPA went on to explain that its risk management actions may address activities that EPA did not find to be drivers of the unreasonable risk determination:

> Consistent with the statutory requirements of TSCA section 6(a), EPA will propose a risk management regulatory action to the extent necessary so that TCE no longer presents an unreasonable risk. EPA expects to focus its risk management action on the conditions of use that drive the unreasonable risk. However, it should be noted that, under TSCA section 6(a), EPA is not limited to regulating the specific activities found to drive unreasonable risk and may select from among a suite of risk management requirements in section 6(a) related to manufacture (including import), processing, distribution in commerce, commercial use, and disposal as part of its regulatory options to address the unreasonable risk. As a general example, EPA may regulate upstream activities (e.g., processing, distribution in commerce) to address downstream activities (e.g., consumer uses) driving unreasonable risk, even if the upstream activities do not drive the unreasonable risk.

*Id.* EPA's view was that the statute does not require it to make unreasonable risk determinations for individual conditions of use, as Industry assert is required. *See infra,* Section II.B. Consequently, EPA's actions in not including certain conditions of use in its determination were in no way consistent with Industry's reading of the statute.

In sum, the "specific context," *Michelin*, 169 F.4th at 429, of Section 6(a)'s "to the extent necessary" direction is Congress's goal of assuring that the protections EPA affords do not fall short of addressing the unreasonable risk. In such a context, "necessary" is not a limitation but an injunction to eliminate the entire unreasonable risk – and nothing less.

### B. Industry's demand for minuscule risk determinations must be rejected as inconsistent with TSCA and EPA's ability to provide full protection from unreasonable risk

Industry endeavor to limit Congress' direction to EPA that it must eliminate unreasonable risk by reading Section 6 to require the Agency to engage in exhaustive analyses to find unreasonable risk for each condition of use by itself before it can regulate that use. Such a reading is simply incorrect: the Section 6 unreasonable risk determination is about the toxic chemical itself. As much as Industry may want EPA to make unreasonable risk determinations for each individual use or activity, such an approach is nowhere compelled in the statute.

Specifically, Industry attempt sleight of hand to shift the focus away from the statutory text that obligates EPA to eliminate unreasonable risk posed by the chemical substance to Industry's preferred focus on the alleged need for EPA to determine that an individual activity or condition of use, by itself, presents an unreasonable risk before it can regulate it:

> Congress's prescription of a specific and exclusive list of risk management requirements in section 6(a) reinforces that EPA must align such requirements to the activities—namely, 'manufacture, processing, distribution in commerce, use, or disposal . . . or [] any combination of such activities'—that actually 'present[] an unreasonable risk[.]' 15 U.S.C. § 2605(a). Thus, if a particular activity does not present unreasonable risk, EPA cannot impose risk management requirements under section 6(a), as such requirements would not be necessary to eliminate unreasonable risk.

Industry Brief at 36. Industry creatively paraphrase the statute by omitting the phrase making it clear that it is the chemical at issue that presents an unreasonable

risk. Industry's focus on whether a particular activity presents an unreasonable risk continues in the form of an argument that EPA cannot impose requirements on a particular activity if it does not by itself present unreasonable risk because "such requirements would not be necessary to eliminate unreasonable risk." *Id.* That is plainly fallacious, as a chemical might present unreasonable risk when multiple activities are considered together, but no single one of them present unreasonable risk on its own. Industry's interpretation would in that scenario render EPA's authority deficient to accomplish the statute's purposes. EPA, on the other hand, correctly focused on the activities' "contribution" to the chemical's unreasonable risk, and the necessity of imposing proper restrictions on such activities to eliminate the unreasonable risk posed by the chemical as a whole. See JA58 (Rule at 102,571).

Equally important, section 6(b)(4)(A), which governs how EPA must perform risk evaluations, directs EPA "to determine whether *a chemical substance* presents an unreasonable risk … under the conditions of use." 15 U.S.C. § 2605(b)(4)(A) (emphasis added). Thus, the statute does not tie the unreasonable risk determination to an evaluation of "each" condition of use, but to an evaluation of the chemical substance under the "conditions of use" collectively. In fact, TSCA directs the Agency to "integrate and assess available information on hazards and exposures for the conditions of use." 15 U.S.C. § 2605(b)(4)(F)(i). But Industry

ignore the key Section 6(b)(4) text. *See* Industry Brief at 8 (focusing on the use and not the chemical: "Even if the record had supported a conclusion that *offsite reuse* presents unreasonable risk, EPA still regulated beyond what was necessary to eliminate the unreasonable risk") (emphasis added) and 16 ("TSCA section 6 … directs EPA through a two-step process to regulate *conditions of using* a chemical substance that present an unreasonable risk of injury") (emphases added).

Industry assert that the fact that section 6(b)(4)(A) states that in its risk evaluation EPA is to determine unreasonable risk, not just any risk, supports its view that EPA must find that any condition of use it seeks to regulate itself presents an unreasonable risk. Industry Brief at 36. That assertion fails for reasons already explained above. Section 6(b)(4)(A) states that EPA is "to determine whether a chemical substance presents an unreasonable risk." That does not mean that EPA must determine that an individual condition of use presents an unreasonable risk before that use can be regulated for risk management purposes. It means that EPA must determine that the chemical taken as a whole presents an unreasonable risk after an analysis of the risks posed by the chemical "under the conditions of use."

Thus, as much as Industry may want EPA to be required to make unreasonable risk determinations as to each individual use or activity, such an approach would be plainly inconsistent with the statute. TSCA's unreasonable risk determination concerns the *chemical*, not a particular use of that chemical, and

EPA here regulated accordingly. *See In re Yellow Corp.*, 152 F.4th 191, 503 (3d Cir. 2025) ("Our 'appropriate deference' is owed to 'agency decisionmaking,' not to Yellow's efforts to convince us it would have gone about the rulemaking another way") (citing *FDA v. Wages & White Lion Invs.*, 145 S. Ct. 898, 917 (2025)).

In addition to the plain inconsistency with TSCA's text, Industry's reading would take EPA down the path of a multiplicity of unreasonable risk determinations regarding particular uses that could delay, complicate, and hinder – if not make impossible – EPA's ability to fully evaluate and eliminate unreasonable risk posed by any toxic chemical. Proceeding under the correct Section 6 procedure, and not Industry's proposed process, EPA nevertheless spent years evaluating and regulating TCE. *See* EPA, "Designation of Ten Chemical Substances for Initial Risk Evaluations under the Toxic Substances Control Act," 81 Fed. Reg. 91,927 (Dec. 19, 2016) (initiating the risk evaluation process for TCE).

EPA "determined that all industrial, commercial, and consumer uses of TCE evaluated in the 2020 Risk Evaluation for TCE contribute to the unreasonable risk of injury to health." JA63 (Rule at 102,576). EPA then determined that "prohibition is the best way to address the unreasonable risk" posed by TCE as a whole chemical because lesser restrictions would not "sufficiently address the unreasonable risk across the broad range of occupational environments and

activities" represented by industrial and commercial uses of TCE, "and the irreversible health effects associated with TCE exposures." JA143-144 (Proposed Rule at 74,732-33). Despite Industry's contrary claims, the statute fully supported this approach.

Industry insists that this is not enough; in their view, the Agency must have made individual unreasonable risk determinations for each of the over 50 "conditions of use" of the toxic chemical. *See* Industry Brief at 7 ("EPA effectively failed to assess whether reuse of byproduct TCE presents unreasonable risk.") Not only would such a requirement present a difficult if not insuperable burden for EPA to overcome to regulate any toxic chemical, it presumably would also present an even higher mountain to climb for those chemicals, like TCE, with widespread national uses. Moreover, such an approach could leave public health and the environment at risk, as the health or environmental consequences of individual conditions of use may be less than the unreasonable risks presented as a whole. Requiring unreasonable risk determinations for uses in isolation would also undercut EPA's ability to protect people from aggregate risks due to multiple routes of exposure stemming from different conditions of use.

In addition, Industry's (mis)reading of TSCA would undermine risk evaluations. 15 U.S.C. § 2605(b). As Industry would have it, even after the Agency performs a full risk evaluation of the chemical and determines that it poses

unreasonable risk, EPA would have to revisit that determination, on a sub-use-by-sub-use basis, to reevaluate and potentially allow one or more sub-uses of the toxic chemical, whenever a chemical company asserts that some use by itself may not present a certain magnitude of risk. *See* Industry Brief at 53 (asking the Court to require EPA to "essentially start from scratch and substantiate an unreasonable risk determination" for the use restrictions they challenge here). Industry's interpretation poses serious problems of unworkability and lack of finality, leading to an endless loop of evaluation, risk determination, re-evaluation, and re-determination. In reality, Section 6 requires that EPA fully regulate a chemical that, under its uses, is unreasonably risky, and to do so to the extent necessary to eliminate that risk.

In their brief, Industry take no account of EPA's 2023 revised risk determination. In that determination, EPA shifted from the previous Administration's risk determination "for each individual condition of use" to an evaluation of the "whole chemical." JA62 (Rule at 102,575). So, although it does not say so, Industry have in essence mounted an attack on what EPA has called the "whole chemical approach," which EPA applied in evaluating the risks of TCE. JA801-02 (EPA Response to Comments at 25-26).[7] However, at least one industry

[7] In the rulemaking, petitioner ACC did not argue that this approach was contrary to the statute, but instead asked EPA to reconsider its "policy choice[]" to deem

commenter appeared to acknowledge that EPA has the proper reading of the statute: "Section 6(a) permits EPA to limit, condition, and prohibit the use of any chemical substance where it presents an unreasonable risk." JA589 (Halogenated Solvents Industry Alliance ("HSIA") Risk Management Comments, EPA-HQ-OPPT-2020-0642-0296, at 6). *See also* Brief of Petitioners Alliance for a Strong U.S. Battery Sector, Microporous, and PPG Industries, Dckt. No. 97 (Case No. 25-1083), at 11-12 (acknowledging that EPA's unreasonable risk determination is based on the chemical TCE and not its individual uses).

What Industry are looking for with their novel interpretation of TSCA is a special dispensation: a do-over scientific evaluation and risk management for certain of its TCE-using activities that they would like to continue in perpetuity. But in seeking this, Industry Petitioners do not address the relevant question under Section 6: whether and why EPA's decision to ban TCE, as a whole chemical, and then prohibit all activities contributing to the overall unreasonable risk is unsupported. Without demonstrating that the prohibition is unlawful, Industry's quest for special treatment must be denied.

Industry attempt to support their start-from-scratch request by pointing to the impact of the prohibition on profitability. *See* Industry Brief at 6, 11-12, 50-51. By

---

TCE as presenting unreasonable risk as a "whole chemical." JA706 (ACC Risk Management Comments, EPA-HQ-OPPT-2020-0642-0320, at 3).

doing so, Industry introduce into the TSCA unreasonable risk determination what the Petitioners themselves acknowledge as impermissible considerations of cost and other "non-risk factors." Industry Brief at 16 (citing 15 U.S.C. § 2605(b)(4)(A)).

In addition, even though EPA considered "processing (including reuse) of TCE that was manufactured as a byproduct to be under the processing as a reactant/intermediate condition of use of TCE," JA79 (Rule at 102,592), Petitioners appear to argue that EPA should have created new processing conditions of use, and under these new conditions of use completed a risk evaluation of the processing of byproduct TCE in chlorinated solvent production streams for various chemicals, such as perchloroethylene. *See* Industry Brief at 41-42. Industry apparently expect EPA to individually evaluate the processing of the *same* chemical, but by different processors or even at different facilities owned by the same company. *See id.* at 42. In fact, the Petitioners appear to insist that the scientific evaluation should be based on the characterization provided by the companies who own the facilities themselves, not on EPA's expert independent judgement and assessment of all pertinent evidence. Under such a conception of EPA's TSCA responsibilities to regulated parties, there would be nothing stopping each company who uses a regulated toxic chemical from challenging EPA's regulation of that substance as to their own operation because *their* process

supposedly poses less-than-unreasonable risk. Besides the fact that this approach finds no support in the statute, EPA appropriately rejected this idea on the grounds of patent unworkability:

> EPA cannot reasonably be expected to do company-specific rulemakings, particularly for chemicals with uses that are diverse and widespread and used by hundreds or more companies and this final rule is appropriately more broadly applicable.

JA829 (EPA Response to Comments at 53). As EPA additionally stated, "TSCA requires consideration of the conditions of use, but it does not require the agency to define them at any particular level of specificity or generality." JA840 (EPA Response to Comments at 126).

The Petitioners do not – and cannot – reconcile their insistence that TSCA requires use-by-use risk determinations with the clear statutory authorization for a whole chemical framework for risk evaluation and risk management. Nor do they acknowledge or address the logical corollary of the whole chemical approach, that EPA need not base regulation on unreasonable risk determinations for individual conditions of use but may make an unreasonable risk determination for the whole chemical and then regulate all uses that contribute to the whole chemical risk.

In short, Industry's principal contention – that EPA violated TSCA by failing to specifically determine unreasonable risk for processing of byproduct TCE received from other facilities and discharges of TCE to wastewater – must fall of its own weight because the statute does not support it. And similarly, Industry's

second argument – that EPA could only regulate these activities to the extent warranted by their stand-alone unreasonable risks – must fail for the simple reason that it had no obligation to make unreasonable risk determinations for these activities to begin with.

For all these reasons, Industry's statutory arguments must be rejected. However, even if these arguments were accepted, Industry must still lose on their requests to overturn certain portions of EPA's Rule, because EPA's decisions were reasonable and supported by substantial evidence, as described below.

## III. EPA's Prohibition of Offsite Processing of Byproduct TCE Satisfies its TSCA Mandate and is Supported by Substantial Evidence

Industry Petitioners have told the Court that it considers "feedstock streams containing byproduct TCE" to be "extremely valuable." Industry Brief at 6. These "streams" are processed to make chemicals, like vinyl chloride, that are then used to make plastics, such as PVC. *See* JA684 (Vinyl Institute Risk Management Comments, EPA-HQ-OPPT-2020-0642-0318, at 2).

In the Rule, EPA permits companies to indefinitely process their byproduct TCE so long as it is site limited and physically enclosed. "Site limited" has a specific definition, incorporated from a previous EPA regulation, that prohibits the distribution for further use of the chemical stream outside the site where it is manufactured. *See* JA79-81 (Rule at 102,592-94). As for "physically enclosed," EPA aligned the Rule's definition with another of its regulations, which requires

that a system be "designed, constructed, and operated in a manner which prevents emissions, or the release of any chemical substance into the facility or environment during the production process." JA80 (Rule at 102,593). In contrast, EPA determined that companies' processing of byproduct TCE in chlorinated solvent production streams outside of such protective contexts "could lead to exposures [of TCE] to workers, the public, or the environment" through "fugitive" or other emissions. *Id.*[8]

Petitioners characterize EPA's Rule as a "partial ban" of byproduct processing (rather than an allowance of byproduct TCE processing at any concentration with minimally-necessary health protections), Industry Brief at 6, and seek to leverage EPA's allowance of certain TCE byproduct processing in service of their argument that they should be permitted to use TCE byproducts unfettered by any restrictions under TSCA. Such injurious overreach, unsupported by the record or allowed under TSCA, must be rejected.

Industry Petitioners challenge EPA's prohibition on processing of byproduct TCE produced at one facility and used at another as arbitrary and capricious. This

---

[8] "Fugitive emissions" are defined in EPA Clean Air Act regulations as "those air emissions which could not reasonably pass through a stack, chimney, vent, or other functionally-equivalent opening." Notice of Lodging of Consent Decree, Appendix, Case No. 2:26-cv-00418, Dckt. No. 2-3 (S.D.W.V. June 24, 2026), at 7, https://www.epa.gov/system/files/documents/2026-06/chemours-cd.pdf (citing 40 C.F.R. §§ 70.2 and 71.2).

argument essentially repackages Industry's meritless statutory claim that EPA was required to make a separate unreasonable risk determination for these processing activities. However, as demonstrated above, since EPA's whole chemical risk determination for TCE was in accordance with TSCA, its failure to make separate unreasonable risk determinations could not possibly be arbitrary and capricious because such determinations were not required by the statute.

EPA rejected industry's insistence that all byproduct TCE processing operations must be exempted from the Rule. Instead, it reaffirmed that "[o]nce removed or relocated, any TCE manufactured as a byproduct would be subject to the restrictions and prohibitions of this final rule." JA813 (EPA Response to Comments at 37). EPA emphasized that, in assessing such byproducts, the "risk evaluation used information reasonably available to EPA, including during the development of occupational exposure scenarios." JA803 (EPA Response to Comments at 27). In these analyses, EPA explained, it relied on "data from TCE manufacturing . . . to assess exposures from TCE when it is processed as a reactant." *Id.* Taking issue with industry comments, the Agency "disagree[d] that the way in which the TCE was manufactured should impact downstream exposure assessments, such as for the processing of the TCE manufactured as a byproduct." *Id.*

Thus, EPA clearly was concerned about the risks of processing byproducts outside of enclosed site-limited processes. These concerns were not hypothetical but based on estimates in its evaluation of risks to workers in TCE manufacturing and processing operations. For this reason and the reasons described below, Industry's challenge to the restrictions on byproduct must be denied.

### A. Industry did not submit comments during the rulemaking regarding the need to process TCE byproduct offsite

A threshold barrier to Industry's quest to vacate the restrictions on offsite byproduct processing is their failure, during the rulemaking, to put EPA on notice that it sought to process TCE-containing byproduct offsite of the facility at which it is produced. In their brief, Petitioners do not identify making any such comment to the Agency, and instead rely mystifyingly on a summary of a July 2025 meeting with EPA – which of course took place well after the Rule was finalized. Industry Brief at 11 (citing a "Summary of July 23, 2025 ACC Meeting").[9] (Petitioners also cite a chart in a comment indicating that byproduct streams *can* be shipped offsite,

---

[9] In addition to being plainly irrelevant to any challenge to the Rule, because the meeting took place well after EPA concluded its rulemaking and therefore the Agency could not have considered it, this cited document does not appear in the nearly 2,000 documents of the Administrative Record Index, Dckt. No. 92 (Case No. 25-1079). Intervenors located the apparent document via a Google search: https://docs.publicnow.com/viewDoc?filename=139931%5CEXT%5C26DA5C095252BB4FA2F1D2D257D0EE0C67BB55C6_4011A3E545265827B1EF01140DB6583C4D5BE107.PDF.

Industry Brief at 11, but no case is made in that comment that companies should be permitted offsite moves and processing of the streams.)

In fact, trade groups like American Chemistry Council and Halogenated Solvents Industry Alliance emphasized in their rulemaking comments to EPA that offsite transportation is costly and risky for workers:

> …the [Proposed Rule] does not consider the need to build truck loading facilities to support offsite disposal by truck, nor does it include the increased personnel, training, and industrial hygiene costs associated with controls implemented for the increased loading activities. Additionally, the transportation of these streams for disposal would increase the time spent by employees involved in the loading process wearing respiratory protection and other PPE.

JA707 (ACC Risk Management Comments, EPA-HQ-OPPT-2020-0642-0320, at 4). *See also* JA601 (HSIA Risk Management Comments, EPA-HQ-OPPT-2020-0642-0296, at 81).

To be sure, various commenters submitted comments generally opposing the byproduct processing restriction. Those comments, however, indicated to EPA that byproduct waste streams were "usually processed at the same facility." JA803 (EPA Response to Comments at 27). After reviewing those comments, EPA modified its proposed restriction to allow companies to process TCE-containing byproduct streams on the site of their creation so long as they abide by the requirements for physical enclosure. EPA stated that it "expects this change will address the commenters' concerns." *See* JA845 (Response to Comments at Line

5853). EPA also gave the companies permission to engage in this activity indefinitely, and did not restrict the TCE concentration level in the Rule. 40 C.F.R. § 751.301(c). Despite the fact that EPA fulfilled Industry's requests (and went beyond by not imposing protections some industry comments had agreed were warranted), Industry now seeks to use EPA's narrowing of its proposed prohibition in response to the comments as leverage to obtain more relief, insisting that the Court should vacate EPA's decision to continue prohibiting off-site processing. But Industry themselves recognized, in a petition to EPA that it has since withdrawn, Industry Brief at 5, that it failed to present this position when EPA was considering the Rule. *See* JA850 (American Chemistry Council Petition for Rulemaking (May 27, 2025) at 2) ("ACC believes that, at the time EPA prepared and finalized the TCE Rule, EPA may not have understood that byproduct TCE is often used in manufacturing processes at a different, downstream site from which it was generated"); *id.* at 10 (offering data generated post-rulemaking).[10] It should also be noted that in that same petition, ACC explained that that industry's failure to

[10] Industry assert now that "EPA was well aware that reuse of byproduct TCE can occur both at the same facility at which it was generated or at other facilities." Industry Brief at 43 (citing JA803 (EPA Response to Comments at 27)). But what EPA actually said was that "multiple industry commenters … explained how TCE is produced as a byproduct in the manufacturing of various other chlorinated solvents, and how the byproduct waste stream is usually processed at the same facility back into hydrochloric acid."

submit comments was due to EPA's lack of fair notice regarding the "site limited" concept in the proposal. *See* JA850 (American Chemistry Council Petition for Rulemaking (May 27, 2025) at 2). Industry, however, have not made such assertions in their brief.

The "dialogue between administrative agencies and the public is a two-way street," and "the agency's opportunity to respond to [] comments [is] meaningless unless the interested party clearly states its position." *Northside Sanitary Landfill, Inc. v. Thomas*, 849 F.2d 1516, 1520 (D.C. Cir. 1988) (internal citations and quotation marks omitted). The Court should not now consider Industry's brand-new arguments and request. *See Southwestern. Pa. Growth Alliance v. Browner*, 121 F.3d 106, 111-12 (3d Cir. 1997) (Alito, J.) (challenge precluded where petitioner did not raise the argument to EPA during the rulemaking process).[11]

### B. Industry's attacks on the validity of EPA's risk findings must be rejected

In the event the Court decides to address the substance of Petitioners' request despite their failure to raise it before the Agency, there is no merit to their

[11] To the extent that Industry argue in reply that the provisions in the Rule were "not fairly noticed" in EPA's proposed rule, an argument Industry made in their now-withdrawn 2025 petition to the Agency, JA853 (ACC Petition at 5), that argument is waived due to Industry's failure to raise it in their opening brief. *United States v. Pelullo*, 399 F.3d 197, 222 (3d Cir. 2005) ("[i]t is well settled that an appellant's failure to identify or argue an issue in his opening brief constitutes waiver of that issue on appeal").

arguments that the Court should overturn EPA's reasonable and supported protections on the use of byproduct TCE.

First, ACC repeatedly characterizes as "low" the TCE concentrations in the byproduct streams that it wants to ship out of facilities and use elsewhere. A primary problem is that "low" in this context is imprecise, non-scientific, and entirely subjective. A "low" concentration of a chemical that is not highly toxic will present a starkly different magnitude of risks than the same "low" concentration of TCE. It is especially concerning for Industry to affix the "low" label to imply harmlessness when the science is clear that TCE exposure may cause serious harm even at levels of parts per billion.

TCE is a genotoxic carcinogen, meaning that the chemical can produce a response at all exposure levels above zero and therefore that there is no level of exposure – or, "threshold" – that does not pose a risk for tumor formation. For such a "non-threshold carcinogen," and particularly one like TCE that is associated with multiple types of cancer, a human's exposure to a concentration of 0.1% or even less of the chemical potentially poses a risk. *See* Environmental Petitioners' Brief, Addendum, Declaration of Paige Varner, Dckt. No. 84-2 (Case No. 25-1082), at 004-5.

Setting aside the indeterminacy of Industry's "low" label and their failure to establish the harmlessness of any such concentration of toxic TCE, Industry

acknowledge that concentrations in byproduct streams range up to 7% (70,000 parts per million), Industry Brief at 9, n.3 and JA620 (ACC TCE Panel Comments, EPA-HQ-OPPT-2020-0642-0310, at 16), and such concentration of TCE may not be considered "low" in any conception of such a label. *See* JA282 (Risk Evaluation at 262) (the "human equivalent concentration" (HEC) for a TCE health harm (.0037 parts per million) is almost 19 million times lower than the 7% concentration).

Nor is Industry's argument supported by their observation that workplace controls exist for the manufacture of perchloroethylene and carbon tetrachloride (two chemicals that create byproduct streams that contain TCE), Industry Brief at 41, because TCE causes toxicity at lower levels than those controls would restrict. For example, the exposure level of concern for toxicity ("human equivalent concentration") from perchloroethylene for non-cancer chronic effects is 200 times higher than TCE. EPA, *Byproducts Assessment for 1,2-Dichlorethane* (April 2026), https://www.regulations.gov/document/EPA-HQ-OPPT-2018-0427-0185, at 60. For all these reasons, Industry's references to "low" concentrations to undermine EPA's conclusion that byproduct streams contribute to TCE's unreasonable risk must be rejected.

Industry are silent about the myriad ways that the byproduct streams pose risk (though, it is important to note, Industry do not challenge EPA's finding that

TCE poses unreasonable risk). For example, someone who both works at a TCE-producing plant and also lives near it can be harmed even if one or more of their TCE exposures are via very "low" TCE byproduct streams. *See* JA814 (EPA Response to Comments at 38) ("even a low exposure to TCE presents unreasonable risk"). But Industry do not acknowledge such multi-exposed people.

Industry also blithely disregard the harm to workers who encounter this chemical that is highly toxic in amounts measured in parts per billion, claiming that "PPE controls essentially eliminate exposure." Industry Brief at 21; EPA, *National Primary Drinking Water Regulations*, https://www.epa.gov/ground-water-and-drinking-water/national-primary-drinking-water-regulations (EPA "maximum contaminant level" for drinking water is 5 parts per billion). In addition to the fact that Petitioners fail to explain what they mean by "essentially eliminate," inherent in this statement is a failure to acknowledge the fact that even after significant exposure reductions, TCE may still pose unreasonable risk to workers and others. For example, as EPA found in its scientific assessment, some processing risks are so high that even reducing them by more than 90% would leave risks above risk benchmarks. JA288 (Risk Evaluation at 389).[12] Thus, EPA requires that any

[12] The chronic non-cancer benchmark for TCE is a margin of exposure of 30. A margin of exposure less than 30 indicates an unreasonable risk; a margin of exposure greater than 30 is a marginal risk. The margin of exposure for workers for processing of TCE is 0.049, which represents an exposure level more than six hundred times greater than the acceptable exposure (30/0.049). Decreasing

processing of byproduct TCE occur in a totally enclosed system so that there would not be emissions "including fugitive emissions, [that] could lead to exposures to workers, the public, or the environment." JA80 (Rule at 102,593).

Industry erroneously invoke a statement by EPA to claim that "EPA agreed that [byproduct TCE processing] does not present unreasonable risk." Industry Brief at 39. In fact, the Agency merely stated that it was *American Chemistry Council* who had in their comments described "controls in place at chlorinated organic facilities to mitigate risk associated with byproduct creation and [processing]." *Id.* (citing Rule at 102,592); (Rule at 102,618) (identifying commenter as American Chemistry Council). The fact that EPA acknowledged an industry claim that risk mitigation measures exist at some facilities does not and cannot equate to a finding of no unreasonable risk. For example, as EPA laid out in detail, where facilities have controls in place to comply with the OSHA permissible exposure limit for TCE, this by itself is utterly insufficient to protect against risk, because that limit – not updated since 1971 – itself is 90,000 times less stringent than necessary to protect workers. JA130-133 (Proposed Rule at 74,719-22). And Congress explicitly provided that "potentially exposed or susceptible subpopulations" can include workers, who must be particularly considered in risk

exposure by more than 90% still leaves a margin of exposure less than 30, posing an unreasonable risk. *Id.*

management. 15 U.S.C. § 2602(12). But the unreasonable risk to workers would go unaddressed under Industry's suggestion that pre-Rule workplace mitigation should suffice.

Industry's disregard in their brief of the multiplicity of ways that TCE harms people, along with their bid to eliminate all TSCA restrictions on TCE byproduct, contrasts with the companies' ready acknowledgments to EPA during rulemaking that limits on byproducts would be necessary. *See* JA621 (ACC TCE Panel Comments, EPA-HQ-OPPT-2020-0642-0310, at 17) (asking for ongoing processing of TCE formed a byproduct "provided owners and operators of such processes can comply with the WCPP requirements as part of the final rule"). *See also* JA683-84 (Vinyl Institute Risk Management Comments, EPA-HQ-OPPT-2020-0642-0318, at 1-2) (seeking "productive reuse of byproduct TCE as a reactant/intermediate, while still protecting against unreasonable risk" through "*de minimis* limits and continued use under the … [existing chemical exposure limit]"); JA602-603 (HSIA Risk Management Comments, EPA-HQ-OPPT-2020-0642-0296, at 82-83) (similar).

But now, post-rulemaking, Industry display no such sensitivity to the risks to their employed workers – or any other potentially exposed group – from byproduct TCE use. But Petitioners' disregard may not negate EPA's findings of unreasonable

risk and the fact that the Agency properly met its obligation to satisfy them through its well-supported restrictions.[13]

### C. Industry's challenge to EPA's restrictions on byproduct TCE processing should be rejected

Industry complain that EPA "effectively" did not identify risk from the processing of streams outside of site-limited systems. The first problem with this argument is that Industry can point to no part of TSCA that permits a party to mount a challenge to a risk management rule on the basis that certain findings were "effectively" not made. Instead, as described above, when EPA evaluates a chemical under Section 6 and finds that it poses unreasonable risk, the Agency must regulate to eliminate that risk. *See* Section II.A, *supra*. Industry do not challenge the unreasonable risk finding for TCE, and they provide no basis to overturn EPA's determination based on the purported "effective" failure to make an unreasonable risk determination for a particular use of this toxic chemical.

At most, Industry's argument amounts to a complaint that EPA extrapolated the risk of byproduct TCE from existing analyses and information provided during the public comment period, including from industry commenters, JA803 (EPA Response to Comments at 27), who as described above acknowledged that the

---

[13] Although Intervenors support the restrictions that EPA did impose on byproduct use, Environmental Petitioners believe the Agency did not go far enough and ask the Court to vacate and remand to EPA its decision allowing TCE byproduct processing in the first instance. Environmental Petitioners' Brief at 63-70.

byproduct streams can contain 7% TCE concentration. Industry Brief at 7. The Petitioners do not provide any evidence that the risks of byproduct TCE at those levels should be ignored under Section 6, particularly in light of the carcinogenic risks of TCE, and the harms of cardiac malformations and immunotoxicity associated with extremely low levels of TCE exposure. *See* JA173 (Proposed Rule at 74,762). Moreover, it is not as if Industry did not have the time and opportunity to provide any support for their positions. As EPA describes, it welcomed and sought information from industry for years:

> [B]eginning in December of 2016, EPA has provided multiple public comment periods and requested, throughout the risk evaluation and rulemaking process, that available exposure data and other information be provided to EPA to assist EPA in conducting the risk evaluation, refining its risk estimates, and developing risk management options.

JA795 (EPA Response to Comments at 19). EPA also reports that it "met with a wide range of stakeholders throughout these processes and actively encouraged information submission relevant to the conditions of use through the docket submission process." JA829 (EPA Response to Comments at 53). Indeed, the docket reveals at least fifty meetings with companies and other groups. *See* EPA rulemaking dockets EPA-HQ-OPPT-2016-0737 and EPA-HQ-OPPT-2020-0642. Just as Industry fail to explain now how the use of TCE-containing byproduct streams does not contribute to the unreasonable risk from the chemical, they failed to provide such information to EPA during the years-long rulemaking.

EPA's attempt to burden EPA with post-hoc demands for analysis must be rejected as inconsistent with TSCA. *See* 15 U.S.C. § 2625(k) (requiring EPA to assess "reasonably *available* information") (emphasis added). What Industry did provide EPA, the Agency considered. *See* JA803 (EPA Response to Comments at 27) (EPA gained a "greater understanding of the circumstances under which TCE may be manufactured as a byproduct, and then processed with the intentionally managed chemicals" … "from multiple industry commenters"). In essence, Industry turn again to their proposed micro-evaluation approach, demanding that EPA's risk evaluation be discredited because EPA should have treated the processing of byproduct TCE not as processing of TCE but as a different condition of use and did not separately estimate the risks from the processing of chlorinated chemical streams containing the byproduct TCE at the concentrations that Industry preferred. Industry Brief at 40.

**D. EPA's allowance of byproduct TCE disposal is consistent with its conditions on byproduct reuse**

Industry also attempt to leverage EPA's allowance of byproduct stream disposal to portray the Agency's restrictions on byproduct reuse as arbitrary and capricious. But the Agency decision was adequately reasoned, including that reuse of byproduct offsite at facilities other than where it was produced poses additional exposures to workers.

Industry themselves acknowledge that even in "closed loop" facilities, "there is potential for exposures in tasks such as loading/unloading, sampling or line opening…". JA598 (HSIA Risk Management Comments, EPA-HQ-OPPT-2020-0642-0296, at 78); Industry Brief at 14-15. Maintenance staff and operational staff are both exposed in a variety of ways. JA411 (HSIA Risk Evaluation Comments, EPA-HQ-OPPT-2019-0500-0094, at 2-1). For example:

> For operational staff, the types of tasks that might involve contact with liquid phase TCE include connecting transfer lines for vessel or container loading and unloading, adding or charging TCE to reactors or mixing vessel charging, collecting samples from process points for laboratory analysis, and assisting maintenance personnel with specific tasks regarding isolation of equipment (e.g., draining vessels)" … some of which tasks are "typically done a few times over a shift"

*Id.*

Industry's attempt to equate these risks associated with TCE byproduct processing with the risks involved in incineration of the toxic stream is an illogical non-starter. The incineration simply does not involve the number of steps and potential for exposure to workers that are described above in connection with byproduct reuse. In sum, this Court must not replace the Agency's judgment with Industry's, as the record supports EPA's decision not to allow unrestricted TCE exposure via byproduct processing, and the Agency therefore acted well within "a zone of reasonableness." *In re Yellow Corp.*, 152 F.4th at 503-04 (citation omitted). As this Court has stated:

> [A]rbitrary and capricious review is not meant to be an exacting standard … [W]e will uphold agency action even if its reasoning is of less than ideal clarity as long as the agency's path may reasonably be discerned … This is especially true in highly technical areas like public health, as we are particularly reluctant to second-guess agency choices involving scientific disputes that are in the agency's province of expertise.

*Logic Tech Dev. v. FDA*, 84 F.4th 537, 549 (3rd Cir. 2023) (internal citations and quotation marks omitted) (rejecting a challenge to FDA's denial of a premarket application for menthol-flavored "electronic nicotine delivery systems" based on the agency's science determination; it was sufficient that the decision was "not without substantial basis in fact and was within [the FDA's] area of competence") (at 555-56) (internal citations and quotation marks omitted).

**E. Industry has alternatives to off-site processing of TCE byproduct**

In addition to the failed arguments described above, Industry rely heavily on the alleged necessity of their freedom to profit from their current processes and resulting chlorinated chemical streams. Even if this were a sufficient rationale to allow Industry to escape regulation under TSCA, and it decidedly is not, *see* Section II.A, *supra*, this point is undermined by Industry's own statements in this rulemaking. For example, petitioner Vinyl Institute explained that *on*-site reuse is the standard way of doing things:

> Instead of discarding the TCE and other chlorinated organics unintentionally produced during [1,2-dichloroethane] manufacturing, these substances are generally utilized on-site … unintended yields of TCE in manufacturing [1,2-dichloroethane] are recovered in light and heavy ends and primarily

> used as feedstocks to make HCl, other chlorinated organics, or destroyed on site and should be considered a low exposure, site-limited impurity.

JA685 (Vinyl Institute Risk Management Comments, EPA-HQ-OPPT-2020-0642-0318, at 3); *see also* JA214-15 (Vinyl Institute Risk Evaluation Comments, EPA-HQ-OPPT-2016-0737-0032, at 2-3). As another example, industry groups admitted that they have alternatives to unrestricted TCE-as-byproduct use, albeit while complaining about the cost. *See* JA618 (ACC TCE Panel Comments, EPA-HQ-OPPT-2020-0642-0310, at 14) (acknowledging ability to "remove TCE as a byproduct in associated streams"). Indeed, it is those *streams*, not the TCE that may be contained in those streams, that is at issue here. By attempting to characterize the unintentionally-produced TCE as the key valuable component, *see* Industry Brief at 6 and 10, Industry misleadingly gloss over this fact.

In their brief, Industry elide the facts that the chemical industry can separate out the TCE, leaving the other components that remain in the stream available for use. JA618 (ACC TCE Panel Comments, EPA-HQ-OPPT-2020-0642-0310, at 14). In rulemaking, the Vinyl Institute also acknowledged that they can make at least one chemical (1,2-dichloroethane, which is used to manufacture vinyl chloride) without producing any TCE as a byproduct. *See* JA685 (Vinyl Institute Risk Management Comments, EPA-HQ-OPPT-2020-0642-0318, at 3). In addition, Industry fail to establish that there are no substitutes for toxic TCE for the products they describe resulting from the byproduct streams. Industry Brief at 6.

In other words, chemical companies can and do deal with TCE if it is created as a byproduct in the manufacture of other chemicals. No scientific or technological barrier exists, only potential costs and the requirement for some companies to change their way of doing things. But neither a regulated party's potential profit reduction nor its aversion to change are reasons permissible under TSCA to overturn a necessary health-protecting restriction of a toxic chemical.

## IV. EPA's Prohibition of Wastewater Containing TCE is Lawful

In challenging EPA's decision to prohibit TCE-containing wastewater disposal, Industry again accuse EPA of failing "effectively" to assess the risks. Industry Brief at 46.[14] Petitioners argue that EPA did not determine specifically enough "whether discharges of wastewater containing trace concentrations of byproduct TCE present unreasonable risk." Industry Brief at 46. Far from a convincing negation of the Agency's risk evaluation, Industry's attack on the wastewater prohibition amounts to a claim that EPA simply should have exonerated their byproduct activities as harmless to workers and allowed unfettered disposal of the produced waste, no matter its concentration of toxic TCE.

[14] Although EPA proposed to prohibit the disposal of TCE-containing wastewater within one year, in the final Rule EPA gave many years' allowance to continue disposing the wastewater to the lead acid battery separator industry (20 years) and the specialty microporous sheet material industry (15 years). JA77-78; 85-85 (Rule at 102,590-91; 102,597-98).

### A. EPA's Prohibition is Supported by Ample Evidence in the Record

To frame as insufficient the Agency's assessment of harms from TCE-containing wastewater, Industry quote EPA in a notably incomplete manner. *See* Industry Brief at 46, citing EPA Response to Comments at 46 (JA822). In fact, EPA stated:

> EPA disagrees with the commenters who argued that EPA should not place limits on the disposal of wastewater containing TCE in this rule. While EPA acknowledges that the 2020 Risk Evaluation for TCE did not directly consider exposures to cleanup workers, it did generally evaluate worker exposures to wastewater and it is the worker exposures to wastewater, including from industrial pre-treatment, industrial treatment, [publicly owned treatment works], cleanup sites, or other places where wastewater containing TCE is treated, that EPA is addressing. Existing guidance for [publicly owned treatment works] from EPA's Office of Water (OW) indicates that [publicly owned treatment works] should screen incoming wastewater for TCE and other volatile toxic chemicals to protect workers from inhalation exposures because these chemicals do escape into the air.

JA822 (EPA Response to Comments at 46). EPA went on to explain that because of the "severity of the hazard from TCE" and because the interim existing chemical exposure limit will not protect workers from unreasonable risk, it must prohibit the wastewater disposal of TCE, as it does for the many other activities that expose workers. *Id.* Indeed, even the "slightest trace" of TCE in wastewater, Industry Brief at 29, contributes to unreasonable risks due to the volatility of TCE from water. JA822 (EPA Response to Comments at 46). EPA has acknowledged that workers

are not fully protected from unreasonable risk so long as they continue to be exposed to TCE. Indeed, as EPA pointed out:

> In particular regarding the feasibility of compliance with the [workplace chemical protection program], commenters associated with wastewater disposal described that even with the maximum available engineering controls, workers would have to rely on [personal protective equipment] of [assigned protection factor] 10,000 to meet the proposed air occupational exposure limits at cleanup sites.

JA69 (Rule at 102,582). EPA's scientific and technical determinations that led it to regulate TCE wastewater, consistent with its obligations under TSCA, was supported by the record, and Industry present no adequate argument based on the record why that determination should be disturbed. *See Fertilizer Institute v. Browner*, 163 F.3d 774, 777 (3d Cir. 1998) ("We have often stated that in assessing the record, the court should not substitute its own judgment for the scientific expertise possessed by the agency").

Instead of explaining why this unreasonable risk determination is incorrect, Industry again ask the Court to accept their view that EPA must be made to re-engage in risk determination. Specifically, Petitioners argue that it was not good enough that the Agency analyzed the risks to humans from "process solvent recycling and worker handling of wastes," and instead should have drilled down further to examine TCE-containing wastewater from byproduct production. Industry's argument is founded on their assertion that TCE appears in those particular streams in "trace" amounts – "trace" being entirely undefined – that are

"lower" than what EPA assessed. *See* Industry Brief at 47. By this argument, Industry replicate the problems inherent in unsupported and unscientific claims about purportedly harmless "low" TCE concentrations. S*ee Section* III.B*, supra.* It is also an attempt to hold EPA to specific scientific determinations that Industry would prefer, rather than making the required demonstration that EPA's decision is "patently unreasonable." *See Sierra Club v. EPA*, 972 F.3d 290, 298 (3d Circ. 2020) ("Even when an agency has engaged in line-drawing determinations, we review primarily to determine whether the result is patently unreasonable or runs counter to the evidence before the agency") (internal citations and quotation marks omitted).

Industry ask the Court to hold EPA to an impossible, and inconsistent-with-TSCA, requirement to engage in untold numbers of granular, facility-specific analyses before the Agency may issue a regulation that protects workers from the toxic chemical. *See* Industry Brief at 47 (calling for EPA to perform analyses, facility-by-facility, of any of their various "engineering, administrative, and personal protection controls"). But such processes are neither called for by TSCA, nor by the rulemaking record, in which it is clear that EPA's decision to protect workers from wastewater containing TCE is amply supported by substantial evidence.

### B. The *de minimis* exemption provides no rationale for overturning EPA's restrictions on TCE-containing wastewater

Industry also complain that, by finalizing a Rule containing a *de minimis* concentration exemption, which Industry themselves asked for during rulemaking and which the Agency granted, the ineligibility of the *exemption* for TCE in wastewater should be deemed unlawful. To start, this argument is based on an illogical, apples-to-oranges comparison. EPA explained why it issued the *de minimis* exemption, which concerns *products*, not wastewater:

> Although the final rule does include a regulatory threshold of 0.1% (formerly referred to as a de minimis level), this provision is applicable only to products. EPA does not consider wastewater a product that is eligible for the regulatory threshold provision … EPA finds that a regulatory threshold provision is necessary to facilitate compliance with the rule and avoid impacts on numerous supply chains, particularly chlorinated organic products. However, these considerations are not applicable to wastewater disposal.

JA823 (EPA Response to Comments at 47). EPA permitted a "regulatory threshold" for products (products are defined by EPA as "the chemical substance … or any object that contains the chemical substance … that is not an article," 40 C.F.R. § 751.5), because of the distinct properties and challenges posed by supply chains that are not applicable to wastewater. For example, in attempting to employ in their argument EPA's statement that the 0.1% threshold is "well below the concentration used for any products that contributed to the unreasonable risk," Industry Brief at

48, citing JA79 (Rule at 102,592), Industry ignore EPA's key distinction between processes, such as the reuse of byproduct TCE, and products:

> By prohibiting TCE concentrations of 0.1% or greater in products, EPA prevents any functional uses of TCE, which generally rely on a higher concentration of the chemical in order to make use of TCE's chemical properties.

*Id.* Although EPA deemed 0.1% the cutoff for functionality, it did not – and could not – deem sub-0.1% concentration of TCE safe. That is because TCE can still be harmful at that level, and even much lower. S*ee Section* III(B)*, supra.* In other words, a concentration of a chemical needed for functionality does not equate to the level of exposure at which people are exposed to unreasonable risk. Thus, Industry's attempt to exploit the product *de minimis* exemption here, and their claims that it was "internally inconsistent" for the Agency not to apply it to wastewater, should be rejected.

In addition, and fundamentally, Industry's attempt to use the exemption to undermine the prohibition on wastewater disposal falls apart because the Rule's *de minimis* threshold is unlawful, as the Environmental Petitioners have argued. Environmental Petitioners' Brief at 70-78. For the reasons stated there, Environmental Petitioners seek vacatur of the *de minimis* exemption. If the Court does not vacate the exemption, however, it should certainly not expand the exemption to embrace unrestricted disposal of TCE wastewater.

### C. Factors such as cost to industry and the existence of Clean Water Act regulation are not lawful bases for EPA to decline to eliminate the unreasonable risk of TCE in wastewater

Industry also invoke cost and feasibility in arguing that EPA should have permitted them unfettered disposal of TCE-contaminated wastewater. *See* Industry Brief at 6 (the wastewater restriction "at a minimum will significantly curtail" their activities). But these would have been impermissible bases for EPA to allow for unreasonably risky exposures of the chemical. *See* Section II.A, *supra*. EPA is required to eliminate that unreasonable risk to the extent necessary, and cost or inconvenience to companies may very well result. 15 U.S.C. § 2605(b)(4)(F)(iii) (amended TSCA expressly prohibits consideration of costs or other non-risk factors in unreasonable risk evaluations). Industry's insistence that EPA should ignore its TSCA obligations must be rejected.

Industry also wave their hand in the direction of the Clean Water Act to imply that no regulation need be imposed on the ostensibly "trace" TCE in wastewater. But EPA considered the Clean Water Act and explained why the bare "existence of a [National Pollutant Discharge Elimination System] permit under the Clean Water Act to discharge TCE does not preclude the need to prohibit discharge of wastewater containing TCE to treatment works to prevent unreasonable risk to workers." JA823 (EPA Response to Comments at 47). Specifically, the Agency pointed out that the permit writers may not have the

requisite knowledge to evaluate the "toxic effects associated within gases, vapors, or fumes" that would allow them to prevent "acute worker health and safety problems," *see* 40 C.F.R. § 403.5(b)(7), and may need to rely on TSCA risk assessments and requirements in implementing the Clean Water Act prohibitions. JA823 (EPA Response to Comments at 47). EPA's decision to regulate under TSCA was thus rational and fully supported.

### D. Industry's request to engage in unrestricted TCE wastewater disposal must be rejected

It is telling that, despite Industry's supposed focus on wastewater containing "trace" amounts of TCE, in the end Petitioners do not limit their vacatur request to such ostensibly low-TCE-containing wastewater. Instead, they seek a sweeping remedy: to be permitted to dispose of any manner of TCE-toxified wastewater with no restrictions under TSCA. *See* Industry Brief at 9 (asking for the Rule's wastewater disposal prohibition to be vacated in its entirety).

In other words, Industry hope to leverage the concessions that EPA made to Industry between the proposed and final rules to secure an all-access pass to dump out TCE with their wastewater streams. But as explained above, such an allowance would run headlong into EPA's findings of unreasonable risk to humans and the Agency's obligations under Section 6 eliminate that risk. Industry may not want to incur the inconvenience and cost of dealing with their contaminated streams in a

different way, but that is no lawful justification for the overturning of the necessary restriction on exposure.

## V. INDUSTRY'S REQUEST FOR VACATUR SHOULD BE DENIED

Industry Petitioners request that this Court vacate the two provisions they challenge because vacatur is the default remedy and "there is no serious possibility that EPA can cure the defects in the Final Rule." Industry Brief at 53. According to Industry, there will be no disruptive consequences from vacatur of the challenged provisions, and "there is no reason to presume that vacating those prohibitions would result in increased exposures to TCE or any harm to the environment." Industry Brief at 53.

Quite to the contrary, vacatur would lift any and all existing TSCA limits on TCE byproduct processing and wastewater disposal, and also would impose no obligation on the Agency to revisit these exposure scenarios and determine whether a limit should be imposed to protect against people's exposure to the toxic substance. *PJM Power Providers Group v. FERC*, 88 F.4th 250, 265 (3d Cir. 2023) ("[v]acating or rescinding invalidly promulgated regulations has the effect of reinstating prior regulations") (citing *Abington Memorial Hosp. v. Heckler*, 750 F.2d 242, 244 (3d Cir. 1984)). Industry certainly have not shown that there will be no harm or increased exposure. Indeed, they point only to a submission that Industry Petitioner American Chemistry Council created after the TCE rulemaking

was completed. *See* Industry Brief at 53-54 (citing ACC IFR Comments, EPA-HQ-OPPT-2020-0642-0772 (Oct. 17, 2025), at 2-3).

Because the consequences of vacatur would certainly be disruptive, including that it would leave people exposed to unreasonable risk from TCE, Industry's request for such a remedy should be rejected. *Center for Biological Diversity v. EPA*, 141 F.4th 153, 182-83 (D.C. Cir. 2025) (remanding without vacatur because "vacatur would be highly disruptive" and because EPA may be able to explain its scientific reasoning). Intervenors ask that Industry's petition be denied in its entirety. If the Court, however, grants relief to Industry on either challenged provision, it should be limited to remand to the Agency for reconsideration.[15]

## CONCLUSION

For all of these reasons, the Petition for Review of Industry Petitioners should be denied.

[15] The Intervenors have standing to defend the Rule against Industry's challenges, as affirmed by the Court through its Order granting them intervention status over the opposition brought by certain industry petitioners who argued that Intervenors lack standing. *See* Court's Order of June 17, 2025, Dckt. No. 64 (Case No. 25-1055). *See also* Environmental Petitioners' Brief at 78-82 and Addendum to Brief, Dckt. No. 84-2 (Case No. 25-1082) at 001-029 (demonstrating standing for Petitioners/Intervenors Center for Environmental Health and Environmental Defense Fund in this case).

Respectfully submitted,

/s/ Samantha Liskow

Samantha Liskow
ENVIRONMENTAL DEFENSE FUND
257 PARK AVE S
NEW YORK, NY 10010
(212) 616-1247
sliskow@edf.org

*Counsel for Intervenor Environmental Defense Fund*

Robert M. Sussman
SUSSMAN & ASSOCIATES
310 Garfield St., N.W.
Washington, D.C. 20008
202-716-0118
bobsussman@comcast.net

*Counsel for Intervenor Center for Environmental Health*

## COMBINED CERTIFICATIONS

1. The foregoing brief complies with the type-volume limitations of Federal Rules of Appellate Procedure 32(g)(1) and 32(a)(7)(B)(i) and the Court's Order of April 13, 2026 (Dckt. No. 88, Case No. 25-1079) because it contains 12,609 words, excluding the parts excluded from length as to briefs under Federal Rule of Appellate Procedure 32(f); and with the typeface and type-style requirements of Federal Rules of Appellate Procedure 32(a)(5) and (a)(6) because the brief has been prepared in a proportionally spaced typeface using Microsoft Word for Microsoft 365 in Times New Roman 14-point font. The text of this brief in electronic form is identical to the paper copies that will be served, in accordance with Third Circuit Local Appellate Rule 31.1(c).

2. In accordance with Third Circuit Local Appellate Rule 28.3(d), counsel for Intervenors are members of the bar of the United States Court of Appeals for the Third Circuit.

3. The electronic version of this Brief is identical to the paper copies of the brief filed with the Court.

4. Pursuant to Third Circuit Local Appellate Rule 31.1(c), a virus detection program was run on the electronic version of the brief using Windows Security and no virus was detected.

## CERTIFICATE OF SERVICE

On September 21, 2026, I electronically filed the foregoing with the Clerk of Court for the United States Court of Appeals for the Third Circuit by using the CM/ECF system.

s/ Samantha Liskow
*Counsel for Intervenor*
*Environmental Defense Fund*